Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Marci KRASS
v.
CONNECTICARE, INC.

No. Civ.3:96CV2565 (AHN).

Jan. 14, 1998.

## RULING ON RENEWED MOTION TO DISMISS

NEVAS, J.

*1 The plaintiff, Marci Krass ("Krass"), brought suit in state court against the defendant, Connecticare, Inc. ("Connecticare"), for breach of contract, misrepresentation, fraud and violation of the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. §§ 42-110a - q ("CUTPA"). Connecticare subsequently removed the action to federal court pursuant to 28 U.S.C. § 1441.

Now pending before the court is Connecticare's Renewed Motion to Dismiss. For the reasons set forth below, the motion [doc. #12] is GRANTED.

### PROCEDURAL BACKGROUND

Rule 12(b) provides that if matters outside of the pleadings are considered on a motion to dismiss "the motion shall be treated as one for summary judgment." Fed.R.Civ.P. 12(b). A district court may not convert a motion "without sufficient notice to an opposing party and an opportunity for that party to respond." Groden v. Random House, Inc., 61 F.3d 1045, 1052 (2d Cir.1995) (citation and internal quotation marks omitted). "The essential inquiry is whether the [opposing party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings." In re G. & A. Books, Inc., 770 F.2d 288, 295 (2d Cir.1985), cert. denied, 475 U.S. 1015 (1986).

On December 27, 1996, Connecticare filed a motion to dismiss pursuant to Rule 12(b)(6) and argued that each of Krass's claims was preempted by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 - 1461 ("ERISA"). On April 2, 1997, the court denied the motion without prejudice to renewal because neither party had "submitted adequate factual proof, e.g., affidavits, regarding whether the insurance policy at issue [was] an ERISA plan." Krass v. Connecticare, Inc., Civ. No. 3:96cv2565(AHN), slip op. at 1 (D.Conn. Apr. 2, 1997). The court directed the parties to include such proof in any future motions. See id., slip op. at 2.

On June 6, 1997, Connecticare filed a renewed motion to dismiss and attached a supporting affidavit. Given the clear language of the court's prior ruling, Krass should have reasonably recognized that this motion might be converted into a motion for summary judgment. See In re G. & A. Books, Inc., 770 F.2d at 295 (recognizing that "[e]ven where only the party moving to dismiss has submitted extrinsic material ... the opposing party may be deemed to have had adequate notice that the motion to dismiss would be converted"). Consequently, this motion shall be treated as one for summary judgment.

### STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. See Rule 56(c), Fed.R.Civ.P.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). After discovery, if the party against whom summary judgment is sought "has failed to make a sufficient showing on an essential element of [[its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

*2 The substantive law governing the case identifies those facts that are material on a motion for summary judgment. See Anderson, 477 U.S. at 258. A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact.' " Miner v. Glens Falls, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir.) (internal quotation marks and citation omitted), cert. denied, 506 U.S.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

965 (1992).

In assessing the record to determine whether a genuine dispute as to a material fact exists, the court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See *Anderson, 477 U.S. at 255.* Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).*

## FACTS

The Law Offices of Barrett L. Krass ("Law Offices") purchased a group health insurance policy from Connecticare, effective November 1, 1994, which provided medical, surgical and hospital benefits for its employees and their dependents. (*See* Aff. of Matthew Manock [hereinafter "Manock Aff."] ¶¶ 3-4.) Law Offices renewed the policy with and paid all premiums for the plan to Connecticare. (*See id.* ¶¶ 3-5.) This renewed policy became effective on February 2, 1996, (*See id.* ¶ 3.) As a dependent child of a Law Offices' employee, Krass received insurance coverage under this policy. (*See id.* ¶ 5.)

In this action, Krass claims that Connecticare failed to pay for medical expenses that she incurred as a result of injuries that she suffered during a skiing accident in Colorado. Specifically, she alleges that she underwent surgery and other medical treatment in Colorado and that Connecticare improperly denied her insurance coverage for her care.

## DISCUSSION

Connecticare argues that Krass's insurance policy constitutes an ERISA plan under 29 U.S.C. § 1002 and that, therefore, her state law claims are subject to ERISA preemption. In opposition, Krass contends that her state causes of action do not relate to the ERISA plan. The court disagrees and finds that each of Krass's causes of action are preempted by ERISA.

### I. *Employee Welfare Benefit Plan*

ERISA "is a comprehensive statute designed to promote the interest of employees and their beneficiaries in employee benefit plans. The statute imposes on benefit plans requirements regarding participation, funding and vesting, and sets uniform standards for reporting, disclosure and fiduciary responsibility." *Burgio and Campofelice, Inc. v. NYS Dep't of Labor, 107 F.3d 1000, 1007 (2d Cir.1997)* (citation omitted). ERISA defines an employee welfare benefit plan as

*3 any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits.

29 U.S.C.A. § 1002(1) (West Supp.1997). An ERISA plan "is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Grimo v. Blue Cross/Blue Shield of Vermont, 34 F.3d 148, 151 (2d Cir.1994)* (citations and internal quotation marks omitted).

Here, each element necessary for the existence of an ERISA plan is demonstrated by the undisputed affidavit of Matthew Manock, an employee of Connecticare. [FN1] First, the benefits under the plan take the form of an insurance policy providing medical, surgical and hospital coverage. (*See* Manock Aff. ¶ 4.) Second, the class of beneficiaries includes all employees of Law Offices and their dependents. (*See id.*) Third, Connecticare's payment of all premiums demonstrates the source of the plan's financing. (*See id.* ¶ 5.) Finally, procedures for obtaining benefits are established by filing claims under the insurance policy. (*See id.* ¶ 4.) *Cf. Grimo, 34 F.3d at 151* (recognizing that "[s]ome essentials of a plan, fund, or program can be adopted, explicitly or implicitly, from [outside] sources ... e.g., an insurance company's procedure for processing claims") (citations and internal quotation marks omitted). Given these factors, the court finds that Law Offices established and maintained an ERISA plan.

FN1. The court notes that Krass does not contest the existence of an ERISA plan.

### II. *ERISA Preemption*

ERISA's preemption provision provides that the statute "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C.A. § 1144(a) (West 1985). In enacting this provision, Congress sought to minimize the possibility of employers incurring undue administrative and financial burdens in an effort to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

comply with conflicting state laws governing employee benefit plans. See Plumbing Indus. Bd. v. E.W. Howell Co., Inc., 126 F.3d 61, 66, 2d Cir.1997); see also New York State Conf. of Blue Cross v. Travelers Ins. Co., 514 U.S. 645, 657 (1995) (recognizing that the "basic thrust of the pre-emption clause ... was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans"). Nonetheless, the court recognizes that the "text [should] not be read to extend to the furthest stretch of its indeterminacy, [or] for all practical purposes preemption would never run its course, for [r]eally, universally, relations stop nowhere." De Buono v. NYSA-ILA Medical and Clinical Serv., 117 S.Ct. 1747, 1751 (1997) (citation and internal quotation marks omitted). Thus, courts analyzing ERISA's preemption clause should be guided by the "objectives of the ERISA statute" and must recognize that Congress did not intend to "supplant state law." See Plumbing Indus. Bd., 126 F.3d at 66-67 (citation omitted).

*4 Generally, state laws are subject to ERISA's preemptive scope under two sets of circumstances: (1) where a state law either acts solely on ERISA plans or is contingent upon the existence of such plans for its operation, (2) where a state law makes no reference to ERISA plans but "has a clear connection with a plan in the sense that it mandate[s] employee benefit structures or their administration or provid[es] alternative enforcement mechanisms." See id. at 67 (citation and internal quotation marks omitted). Beyond these two areas, "the presumption against preemption is considerable." Id.

**II. Krass's State Law Claims**

**A. Breach of Contract**

In the first count of her complaint Krass alleges that Connecticare "breached its contract with [her] by failing to pay for [her] surgery and its related costs." (Compl. ¶ 8.) Courts have consistently found common law breach of contract claims preempted by ERISA. See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 48 (1987) (finding claim for tortious breach of contract preempted by ERISA); Smith v. Dunham-Bush, Inc., 959 F.2d 6, 10 (2d Cir.1992) (holding that ERISA preempted a plaintiff's claim for breach of contract); Cerasoli v. Xomed, Inc., 952 F.Supp. 152, 156 (W.D.N.Y.1997) (finding that ERISA preempted breach of contract claim where plaintiff sought "the recovery of an ERISA plan benefit"); Bailey-Gates v. Aetna Life Ins. Co., 890 F.Supp. 73, 78 (D.Conn.1994) (recognizing that ERISA preempted a breach of contract cause of action).

Here, Krass's breach of contract claim relies upon Law Offices' ERISA plan to show liability. Specifically, liability arises from Connecticare's purported failure to Krass's medical expenses as provided for by this plan. Without the plan, it's apparent Krass could not assert this claim. Because the merits of this claim are contingent upon the rights conferred by the ERISA plan, it fails the first prong of the preemption test and must be dismissed. See Fisher v. Building Serv. 32B-J Health Fund, No. 96 CIV. 5526(LAP), 1997 WL 531315, at *3 (S.D.N.Y. Aug. 27, 1997) (finding ERISA preemption where "existence of" ERISA plan was necessary to demonstrate liability on breach of contract claim); Bailey-Gates, 890 F.Supp. at 77 (recognizing that ERISA preempted common law claims "aris[ing] because of the existence of the benefit plan"); cf. Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139-40 (1990) (holding that ERISA preempted cause of action for wrongful discharge where "the existence of a [ERISA] plan is a critical factor in establishing liability").

**B. Misrepresentation and Fraud**

The second and third counts of Krass's complaint provide, in pertinent part:

> [Krass] relied upon the representation in the contract of the insurance policy issued ... by [Connecticare]. Said representations were that the type of injury and the care that was necessitated would be covered under the insurance policy. [Krass] relied upon the statements in the insurance contract and sought treatment as stated above. [Krass], by relying on such statements, was deceived in one or more of the following ways: a. Undertook with a provider that was not paid by [Connecticare]. b. By incurring costs for said treatment.... The conduct of [Connecticare] was tortious and aforementioned acts were fraudulent.

*5 (Compl. ¶¶ 8-13.)

Like Krass's breach of contract cause of action, the misrepresentation and fraud claims both rely upon Krass's ERISA plan rights to demonstrate liability. When such claims relate directly to a plaintiff's entitlement to benefits, ERISA preemption is appropriate. See Wilcott v. Matlack, Inc., 64 F.3d 1458, 1464 (10th Cir.1995) (finding that ERISA preempted misrepresentation claim where "alleged misrepresentations relate[d] directly to the nature of plaintiff's rights under the plan"); Carlo v. Reed Rolled Thread Die Co., 49 F.3d 790, 794 (1st Cir.1995) (holding that ERISA preempts a plaintiff's

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

common law claim for misrepresentation); *Lee v. E.I. DuPont de Nemours and Co.*, 894 F.2d 755, 757 (5th Cir.1990) (holding that plaintiff's fraud and misrepresentation claims are preempted by ERISA); *Cerasoli*, 952 F.Supp. at 157-58 (recognizing that ERISA preempts a common law misrepresentation claim). Krass's attempt to style these counts as common law causes of action does not remove them from the scope of ERISA preemption. *Cf. id.* at 157 (noting that "[i]t is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit") (citation and internal quotation marks omitted).

Because Krass's misrepresentation and fraud claims are intrinsically related to the underlying employee plan, they are preempted by ERISA.

## C. *CUTPA*

Count Four of Krass's complaint is premised on CUTPA and provides, in pertinent part;

> [Connecticare] failed to pay for said care that [Krass] received as an emergency service ... The failure of [Connecticare] to pay the medical charges incurred by [Krass] has resulted in an ascertainable loss to [Krass]. The failure of [Connecticare] to pay the aforementioned medical charges is an unfair or deceptive act or practice [ ] as defined by [CUTPA].

(Compl. ¶ ¶ 9-10.) Because Krass's CUTPA claim concerns her entitlement to benefits under her ERISA plan it too is subject to preemption.

Generally, ERISA preempts causes of action brought under CUTPA. *See Bailey-Gates*, 890 F.Supp. at 79 (finding that ERISA preempts CUTPA claims); *Degrooth v. General Dynamics Corp.*, 837 F.Supp. 485, 490 (D.Conn.1993) (concluding that ERISA preempted CUTPA claim where relief plaintiff sought depended on "an interpretation of the plan"), *aff'd*, 28 F.3d 103 (2d Cir.), *cert. denied*, 513 U. S. 1043 (1994); *Cote v. Durham Life Ins. Co.*, 754 F.Supp. 18, 22 (D.Conn.1991) (recognizing that ERISA preempts CUTPA claims); *Altieri v. Cigna Dental Health, Inc.*, 753 F.Supp. 61, 64 (D.Conn.1990) (same). Courts have reasoned that such preemption is appropriate because such a CUTPA claim is generally based upon "the circumstances [surrounding a plaintiff's] medical treatment under" an ERISA plan. *Bailey-Gates*, 890 F.Supp. at 79; *accord Altieri*, 753 F.Supp. at 64.

*6 Here, Krass's claim directly relates to her ERISA plan benefits and ultimately to Connecticare's administration of this plan. Thus, the ERISA plan is essential to a demonstration of liability under CUTPA in this case. Based on this fact the CUTPA claim fails the first prong of ERISA preemption analysis and must be dismissed. [FN2]

> FN2. Courts have also found that ERISA preempts CUTPA claims because CUTPA "provide[s] an alternate remedy to ERISA's exclusive civil enforcement scheme and thus conflict[s] with the will of Congress." *Stone v. Blue Cross & Blue Shield of Connecticut*, Civ. No. N-88-147 (AHN), 1988 WL 146645, at *6 (D.Conn. Jan. 6, 1989). Based on this finding, it appears that CUTPA does not satisfy either prong of ERISA preemption analysis. *See Plumbing Indus. Bd.*, 126 F.3d at 67 (finding that a state law is preempted by ERISA where it provides an "alternative enforcement mechanism"). The court, however, need not reach this issue here.

## CONCLUSION

Based on the foregoing analysis, the defendant's Renewed Motion to Dismiss [[doc. #12] is GRANTED. The Clerk of Court is directed to close this case.

1998 WL 26409, 1998 WL 26409 (D.Conn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

United States District Court,
D. Connecticut.

Eugene PANECCASIO, Plaintiff
v.
UNISOURCE WORLDWIDE, INC., et al.,
Defendants.

No. CIVA3:01CV2065(CFD).

March 28, 2003.

*RULING ON MOTIONS TO DISMISS*

DRONEY, J.

*1 The plaintiff, Eugene Paneccasio, brings this action against the defendants, Unisource Worldwide, Inc., Georgia-Pacific Corporation, Alco Standard Corporation, IKON Office Solutions, Inc., the Board of Directors of IKON Office Solutions, Inc., (individually and as fiduciaries), and W.J. Hope Jr., (individually and as administrator and fiduciary of the 1991 IKON Office Solutions Inc. Deferred Compensation Plan), alleging violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § § 621 et seq., the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § § 1001 et seq., and state statutory and common law. The plaintiff seeks compensatory, liquidated and punitive damages, and attorney's fees and costs. Pending are motions to dismiss by defendants Unisource Worldwide, Inc. and Georgia-Pacific Corporation [Doc. # 11] and defendants IKON Office Solutions, Inc., Alco Standard Corporation, the Board of Directors of IKON Office Solutions, Inc., and W.J. Hope Jr. [Doc. # 15].

I. Facts [FN1]

> FN1. The facts are taken from the plaintiff's complaint and any documents incorporated by reference, and are accepted as true for purposes of the motion to dismiss. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991).

The plaintiff, Eugene Paneccasio ("Paneccasio"), was employed by defendant Unisource Worldwide, Inc. ("Unisource") as Vice-President of Sales and National Accounts in Unisource's offices in Hartford, Connecticut. Unisource is a subsidiary of defendant IKON Office Solutions, Inc. ("IKON Office Solutions"), formerly known as Alco Standard Corporation ("Alco Standard"), and was acquired by defendant Georgia-Pacific Corporation ("Georgia-Pacific") in July 1999.

On March 31, 1994, the plaintiff retired from his employment at Unisource, based upon representations made by Unisource orally and in a written agreement regarding the "Unisource Early Retirement Package." [FN2] Unisource represented that Paneccasio would receive, *inter alia,* certain benefits under the "1991 ALCO Standard Corporation Deferred Compensation Plan," later known as the "1991 IKON Office Solutions Deferred Compensation Plan" (hereinafter "the IKON Plan") and that his benefits under the plan would be sixty-five percent vested at the time of his early retirement. The benefits included a monthly benefit payment for ten years upon reaching sixty-five years of age, and a life insurance policy.

> FN2. Paneccasio was fifty-seven years old at the time.

On December 31, 2000, the Board of Directors of IKON terminated the IKON Plan. On January 2, 2001, the IKON Plan sent Paneccasio a termination benefit of $75,419.22 and ended his participation in the plan.

On November 5, 2001, Paneccasio filed the instant complaint. [FN3] Count One alleges age discrimination in violation of the ADEA by defendants Unisource, Georgia Pacific, IKON Office Solutions, and Alco Standard in connection with the termination of the IKON Plan. Counts Two through Seven raise Connecticut state law claims and only concern the termination of the IKON Plan. Counts Two through Six are directed against Unisource and Georgia Pacific and allege breach of contract (Count Two), breach of the implied duty of good faith and fair dealing (Count Three), violations of the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § § 42-110 et seq. ("CUTPA") (Count Four), reckless misrepresentation (Count Five), and negligent misrepresentation (Count Six). Count Seven alleges tortious interference with a contractual relationship and financial expectancy against IKON Office Solutions and Alco Standard. Finally, Count Eight alleges ERISA violations against all of the defendants.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

FN3. On August 9, 2001, Paneccasio received a right to sue letter from the EEOC. The administrative proceedings are discussed *infra*.

*2 Defendants Unisource and Georgia-Pacific have filed a motion to dismiss [Doc. # 11] on the following grounds: (1) Paneccasio fails to state a claim for breach of contract; (2) Paneccasio's state law claims are preempted by ERISA; (3) Paneccasio fails to state a claim under ERISA for breach of fiduciary and non-fiduciary duties; (4) Paneccasio's ADEA claim fails because he did not file a timely charge with the Equal Employment Opportunity Commission ("EEOC"); (5) Paneccasio's ADEA claim against Georgia-Pacific fails because the company was not his employer; and (6) Paneccasio's breach of good faith and fair dealing claim is barred as a matter of public policy. IKON Office Solutions, Alco Standard, the Board of Directors of IKON Office Solutions, and W.J. Hope Jr. ("the IKON defendants") have moved to dismiss Counts One, Seven and Eight on the bases that: (1) Paneccasio's ADEA claim against IKON Office Solutions and Alco Standard in Count One fails because they were not his employer; (2) Paneccasio's state law claim against IKON Office Solutions and Alco Standard in Count Seven is preempted by ERISA; and (3) Paneccasio's claim under ERISA against all of the IKON defendants in Count Eight fails to state a claim for breach of fiduciary and non-fiduciary duties.

II. Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984); *Easton v. Sundram*, 947 F.2d 1011, 1014-15 (2d Cir.1991), *cert. denied*, 504 U.S. 911 (1992). Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with his allegations, it is clear that no relief can be granted. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims." *United States v. Yale-New Haven Hosp.*, 727 F.Supp. 784, 786 (D.Conn.1990) (citing *Scheuer*, 416 U.S. at 232). Thus, a motion to dismiss under 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994) (citations and internal quotations omitted), *cert. denied*, 513 U.S. 816 (1994). In its review of a 12(b)(6) motion to dismiss, a court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transport Local 504*, 992 F.2d 12, 15 (2d Cir.1993).

III. Discussion

A. ADEA Discrimination Claim (Count One)

*3 As to Paneccasio's age discrimination claim, Unisource, Georgia-Pacific, IKON Office Solutions, and Alco Standard claim that Paneccasio failed to file a timely charge with the Equal Employment Opportunity Commission ("EEOC"). Georgia-Pacific, IKON Office Solutions, and Alco Standard also claim that they were not Paneccasio's "employer" for purposes of the ADEA. Each argument will be addressed below.

1. Timeliness

The ADEA provides that, before an aggrieved person may initiate a private action, he or she must file with the EEOC a charge alleging unlawful age discrimination within 180 days of the allegedly unlawful employment practice. *See* 29 U.S.C. § 626(d)(1). However, when alleged discrimination occurs in a state or locality that has its own anti-discrimination laws and an enforcement agency, the time period for filing claims with the EEOC is extended to 300 days of the occurrence of the allegedly unlawful employment practice. 29 U.S.C. § § 633(b), 626(d)(2); *Ford v. Bernard Fineson Dev. Ctr.*, 81 F.3d 304, 307 (2d Cir.1996); *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325-28 (2d Cir.1999) ("Section 626(d)(2) allows such claimants 300 days to file an ADEA charge with the EEOC, whether or not the charge is initially filed with the deferral-state agency."); *Reinhard v. Fairfield Maxwell, Ltd.*, 707 F.2d 697, 700 (2d Cir.1983) (holding that deferral-state claimant has 300 days to file ADEA charge with the EEOC, regardless of when charge filed with state agency). Accordingly, the 300 day limit applies to Paneccasio's ADEA claim.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Paneccasio filed a charge of age discrimination with the EEOC in Boston, Massachusetts on July 18, 2001. Three hundred days prior to that date is September 22, 2000. The defendants argue that the adverse employment action occurred on March 31, 1994, the date Paneccasio alleges that Unisource induced him to take early retirement. Paneccasio contends that the period from March 31, 1994 until December 31, 2000, the date that the IKON plan was terminated, should be tolled and the defendants should be estopped from invoking an earlier date, in light of their "fraudulent concealment" of his cause of action during that period. Pl.'s Mem. Supp. Obj'n. Mtn. to Dismiss at 9-12.

"The essence of the [equitable tolling] doctrine 'is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action."' *Dillman v. Combustion Eng'g, Inc.*, 784 F.2d 57, 60 (2d Cir.1986) (quoting *Cerbone v. International Ladies' Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir.1985)). The doctrine of equitable tolling "will be applied, for example, when an employer's misleading conduct is responsible for the employee's unawareness of his cause of action." *Id.* "[E]quitable tolling will defer the start of the EEOC filing period from the time of the discriminatory action to the time the employee should have discovered the action's discriminatory nature." *Id.* Paneccasio's allegation that the defendants fraudulently concealed the facts that formed the basis of his age discrimination claim, which must be accepted as true for purposes of the motion to dismiss, states an adequate ground for equitable tolling. Accordingly, the Court declines to find that Paneccasio's ADEA claim is time-barred at this time. [FN4]

> FN4. This is without prejudice to the defendants filing a motion for summary judgment on this issue.

2. "Employer" Under the ADEA

*4 Georgia-Pacific, IKON Office Solutions, and Alco Standard also argue that they were not Paneccasio's employer for purposes of his ADEA claim. These defendants argue that Paneccasio's complaint does not allege any facts from which it could be inferred that they were his employer.

In the employment context, liability may attach to an affiliated corporation if the plaintiff can demonstrate that there are "sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer." *Herman v. Blockbuster Entertainment Group*, 18 F.Supp.2d 304, 308 (S.D.N.Y.1998) (Lowe, J.) (internal quotation marks omitted), *aff'd* 182 F.3d 899 (2d Cir.1999), *cert. denied*, 528 U.S. 1020 (1999); *Gagliardi v. Universal Outdoor Holdings, Inc.*, 137 F.Supp.2d 374, 378 (S.D.N.Y.2001).

The Second Circuit has established a four-part test indicating what a plaintiff must demonstrate in order to establish that corporations are related in such a manner: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir.1995) (quoting *Garcia v. Elf Atochem North America*, 28 F.3d 446, 450 (5th Cir.1994)). A court should focus its inquiry on the "'second factor: centralized control of labor relations."' *Id.* (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983).

In paragraph 6 of Paneccasio's complaint, he alleges that Georgia-Pacific merged with Unisource in July 1999 and "did adopt and ratify each and every act of discrimination and unlawful conduct committed by" Unisource and, since July 1999, acted "in concert with" Unisource in the discriminatory conduct committed by Unisource, Alco Standard, and IKON Office Solutions. Compl. ¶ 6. In paragraph 8, Paneccasio alleges that Alco Standard changed its name to IKON Office Solutions and "did adopt and ratify every action and contract" of Alco Standard with respect to the IKON Plan. Compl. ¶ 8. In paragraphs 14, 15, and 16, Paneccasio alleges that Unisource terminated him on the basis of his age by making certain representations to him in its early retirement package. In paragraph 17, Paneccasio alleges that Unisource, Georgia-Pacific, Alco Standard, and IKON Office Solutions deprived him of the benefits promised him in the early retirement package. In paragraph 21, he alleges that Alco Standard, its successor IKON Office Solutions, and Georgia-Pacific are interrelated entities. In his opposition to the motions to dismiss, Paneccasio argues that he can establish, through discovery, the interrelation of operations, common management, common ownership or financial control and centralized control of labor unions of Unisource, Georgia-Pacific, Alco Standard, and IKON Office

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Solutions. Paneccasio also argues that Alco Standard's control of eighty percent of the stock of Unisource creates a basis for attributing Unisource's employment actions to Alco Standard.

*5 In light of these allegations, the Court declines to dismiss at this time Paneccasio's ADEA claim against Georgia-Pacific, Alco Standard, and IKON Office Solutions on the basis that they were not his employer. [FN5]

> FN5. This ruling is also without prejudice to the defendants moving for summary judgment on this issue.

B. ERISA Preemption of State Law Claims (Counts Two through Seven)

The defendants argue that Paneccasio's state law claims for breach of contract, breach of the covenant of good faith and fair dealing, CUTPA violations, reckless misrepresentation, negligent misrepresentation, and tortious interference concerning the termination of the IKON Plan are preempted by ERISA because they concern the alleged denial of benefits provided under an ERISA plan to a participant or beneficiary. They further argue that allowing Paneccasio to go forward with those state law claims would provide him with an alternative enforcement mechanism specifically preempted by ERISA.

According to ERISA's preemption clause, ERISA supersedes "any and all State laws insofar as they relate to any employee benefit plan." 29 U.S.C. § 1144(a). In *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987), the Supreme Court stated: "the express preemption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern." ' *Id.* at 45-46 (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981)). Courts once interpreted this preemption clause by focusing on the question of whether a particular state law related to ERISA. *See, e.g., Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 (1983). However, this approach "proved to be a verbal coat of too many colors," and the Supreme Court more recently indicated that a more focused analysis should apply. *Plumbing Industry Board, Plumbing Local Union No. 1. V. E.W. Howell Co.*, 126 F.3d 61, 66 (2d Cir.1997) (describing the change in approach). Analysis of the preemption clause should begin with the "starting presumption that Congress does not intent to supplant state law." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995). To overcome this presumption, a party must convince the court that there is something in the practical operation of the challenged state law to indicate that it is the type of law that Congress specifically aimed to have ERISA supersede. *See De Buono v. NYSA-ILA Med. And Clinical Servs. Fund*, 117 S.Ct. 1747, 1751-52 (1997).

> The Supreme Court has identified several ways in which the anti-preemption presumption can be overcome. First, preemption will apply where a state law clearly refers to ERISA plans in the sense that the measure acts immediately and exclusively upon ERISA plans or where the existence of ERISA plans is essential to the law's operation. Second, a state law is preempted even though it does not refer to ERISA or ERISA plans if it has a clear connection with a plan in the sense that it mandates employee benefit structures or their administration or provides alternate enforcement mechanisms.

*6 *Plumbing Industry*, 126 F.3d at 67 (citations and quotations omitted). In *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142 (2d Cir.1989), the Second Circuit held that:

> laws that have been ruled preempted are those that provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee. Those that have not been preempted are laws of general application--often traditional exercises of state power or regulatory authority--whose effect on ERISA plans is incidental.

*Id.* at 146. Accordingly, "[w]hat triggers ERISA preemption is not just any indirect effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit." *Id.* at 146-147.

The parties do not appear to dispute that the IKON Plan is an employee welfare benefit plan to which ERISA applies. *See* 29 U.S .C. § 1002(1) (defining "employee welfare benefit plan"). As mentioned, Paneccasio's complaint sets forth causes of action for breach of contract, breach of the covenant of good faith and fair dealing, CUTPA violations, reckless misrepresentation, negligent misrepresentation, and tortious interference with contract. The alleged conduct underlying each of these causes of action

concerns the termination of the IKON Plan and Paneccasio's resulting failure to receive a deferred monthly retirement benefit payment and lump sum death benefit. More specifically, in Count Two, Paneccasio alleges that Unisource and Georgia-Pacific breached their agreement that memorialized Unisource's "Early Retirement Package." Paneccasio alleges that such agreement promised that he would become 65 percent vested in the IKON Plan if he retired from his employment and would receive a deferred monthly retirement benefit and lump sum death benefit and that terminating the IKON Plan before he received those benefits breached the agreement. In Count Three, Paneccasio alleges that Unisource and Georgia-Pacific breach the implied covenant of good faith and fair dealing through this same conduct, and in Count Four, Paneccasio alleges that it was an unfair or deceptive act in violation of CUTPA. In Counts Five and Six, Paneccasio alleges that he was induced to retire based on Unisource and Georgia-Pacific's reckless and negligent misrepresentations regarding the deferred compensation arrangement. Finally, in Count Seven, Paneccasio alleges that IKON Office Solutions and Alco Standard tortiously interfered with the contractual relationship between Unisource and Paneccasio embodied in the retirement package agreement and tortiously interfered with the financial expectancy of Paneccasio to receive certain benefits under that agreement.

These causes of action are precisely the type that Congress sought to preempt through ERISA. In *Smith v. Dunham-Bush, Inc., 959 F.2d 6 (2d Cir.1992)*, the plaintiff set forth causes of action for breach of contract and negligent misrepresentation, claiming that his employer, Dunham-Bush, had made an oral promise to pay certain pension-related benefits in order to induce him to relocate to Connecticut. According to Smith's complaint, when he "expressed concerns about the inferiority of the United States affiliate's pension plan, Elliot assured him that Dunham-Bush would provide him with a benefits package comparable to what he would have received upon his retirement in the United Kingdom." *Id.* at 7. In upholding the district court's finding that the state law claims were preempted, the Second Circuit found that Smith "makes explicit reference to the pension plan in his complaint .... the oral representation underlying this suit deals expressly and exclusively with the appellant's benefits." *Id.* at 10. Additionally, "the calculation of the promised supplemental benefits" would implicate the ERISA plan. *Id.* As Smith's claims represented "an attempt to supplement the plan's express provisions and secure an additional benefit," the Second Circuit found they were preempted by ERISA. *Id.*

*7 District courts have found breach of contract and negligent misrepresentation claims preempted by ERISA in similar contexts. In *Hamburger v. Southern New England Telephone Co., 1998 WL 241214 (D.Conn. May 6, 1998)*, the plaintiff elected to participate in an "Early Out Offer" based on his employer's representation as to the benefits he would receive. Subsequently, Hamburger was informed that the sum he was to receive was significantly less than what had been earlier represented. Dismissing the plaintiff's state law claim of negligent misrepresentation, the district court held that the claim "necessarily relies on the existence of an ERISA plan.... [I]t only arises *because of* the existence of an ERISA Plan." *Hamburger, 1998 WL 241214 at *3.* As the court explained:
> In order to succeed on this negligent misrepresentation claim, Hamburger would have to show that (1) an ERISA plan existed; (2) Hamburger was entitled to the payment of a certain amount of funds under this plan; and (3) the defendants negligently misrepresented the amount that Hamburger would be entitled to receive. Thus, because the negligent misrepresentation claim is intrinsically related to the underlying employee [benefit] plan, it is preempted by ERISA.

*Id.* at *3 (internal quotation marks omitted). Accordingly, the court held, Hamburger's negligent misrepresentation claim is "intrinsically related to the underlying employee benefit plan [and] is preempted by ERISA." *Id.* (internal quotation marks and citation omitted).

Similarly, in *Bedger v. Allied Signal Inc., No. 97-6786, 1998 WL 54411, *4 (E.D.Pa. Jan. 23, 1998)*, the plaintiff claimed her employer breached its severance agreement when it denied her certain pension benefits under that agreement. She argued that this state law claim did not relate to an employee benefits plan because she was not contesting any element of the plan directly, but rather the defendant's alleged breach of the severance agreement. *See Bedger, 1998 WL 54411 at *4.* The court held that the breach of severance agreement claim related to the benefits plan because "[i]f the benefits plan did not exist, the Plaintiff would have no breach of contract claim. This claim only exists because it incorporates the terms of the ERISA plan." *Id.* Accordingly, the court held that the breach of contract claim was preempted by ERISA. Several other courts have found that breach of contract and negligent misrepresentation claims arising out of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

early retirement agreements in similar circumstances are preempted by ERISA. *See, e .g., Zito v. SBC Pension Benefit Plan*, No. 3:02CV277(JBA), 2002 WL 31060363, at *3 (D.Conn. July 18, 2002); *Carlo v. Reed Rolled Thread Die Co.*, 49 F.3d 790, 793-95 (1st Cir.1995); *Vartanian v. Monsanto Co.*, 14 F.3d 697, 700 (1st Cir.1994).

As in *Smith, Hamburger*, and *Bedger*, Paneccasio sets forth breach of contract and misrepresentation claims in connection with his employer's promises regarding benefits he was to receive in exchange for certain employment consequences. With regard to each of these causes of action, Paneccasio makes "explicit reference to the pension plan in his complaint," and each of these causes of action concern his receipt of benefits under the plan. *Smith*, 959 F.2d at 11. As noted above, in Count Two, Paneccasio's breach of contract claim, Paneccasio alleges that terminating the IKON Plan before he received the deferred monthly retirement benefit and lump sum death benefit breached the early retirement agreement. In Counts Five and Six, the misrepresentation claims, Paneccasio alleges that he was induced to retire based on Unisource and Georgia-Pacific's misrepresentations regarding the deferred compensation arrangement. As in *Smith*, these representations deal "expressly and exclusively" with the benefits under the ERISA plan. *Id.* at 10.

*8 Furthermore, the calculation of the defendants' promised benefits will implicate the ERISA plan. *See id.* at 12. The Court will be required to refer to the IKON Plan in order to determine whether Paneccasio received the benefits which were promised to him. Finally, as in *Bedger*, though Paneccasio argues that his state law claims do not relate to an employee benefits plan because he is not contesting any element of the plan directly, but rather the defendants' alleged breach of the early retirement agreement, the foregoing analysis indicates that the state law claims do relate to an ERISA Plan. *See Bedger*, 1998 WL 54411 at *4. Accordingly, Paneccasio's breach of contract, reckless misrepresentation, and negligent misrepresentation claims are pre-empted by ERISA. *See id.; Hamburger*, 1998 WL 241214 at *3; *Bedger*, 1998 WL 54411 at *4; *see also Pilot Life*, 481 U.S. at 47 (holding that employee's common law causes of action of breach of contract, and fraud in the inducement were preempted by ERISA). Paneccasio's other causes of action-breach of the duty of good faith and fair dealing, CUTPA violations, and tortious interference-are likewise preempted, as they also make explicit reference to the IKON plan, concern his receipt of benefits under the plan, and require reference to the plan to calculate the promised benefits. *See Smith*, 959 F.2d at 11-12; *DeGrooth v. General Dynamics Corp.*, 837 F.Supp. 485 (D.Conn.1993) (CUTPA claim preempted); *Murphy v. Metropolitan Life Ins. Co.*, 152 F.Supp.2d 755, 757 (E.D.Pa.2001) ("[P]laintiff's statutory law bad faith and consumer protection claims 'relate to' an employee benefit plan and are expressly preempted"). Therefore, Counts Two through Seven of Paneccasio's complaint are preempted by ERISA. [FN6]

> FN6. Accordingly, the Court need not reach Unisource and Georgia-Pacific's alternative arguments.

C. ERISA Claim (Count Eight)

Each of the defendants argues that Paneccasio's complaint fails to state a claim under ERISA. Georgia-Pacific and Unisource argue that (1) they were not responsible for administering the IKON Plan at the time the plan was terminated, nor were they Paneccasio's employer at that time; (2) the act of terminating a plan is a settlor function, rather than a fiduciary action; and (3) the IKON Plan is a "top hat" plan and is thus excluded from ERISA's statutory fiduciary requirements. The IKON defendants join in the latter two arguments.

As to these issues, the Court concludes that the allegations of the complaint are sufficient to withstand a motion to dismiss. Accordingly, the Court declines to dismiss Paneccasio's ERISA claim. [FN7]

> FN7. This ruling is also without prejudice to the defendants filing a motion for summary judgment.

IV. Conclusion

For the preceding reasons, the motion to dismiss by defendants Unisource Worldwide, Inc. and Georgia-Pacific Corporation [Doc. # 11] is GRANTED IN PART, DENIED IN PART, and the motion to dismiss by defendants IKON Office Solutions, Alco Standard, the Board of Directors of IKON Office Solutions, and W.J. Hope Jr. [Doc. # 15] is GRANTED IN PART, DENIED IN PART. Only

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy
30 Employee Benefits Cas. 1476
**(Cite as: 2003 WL 1714085 (D.Conn.))**

Page 7

Count One, Paneccasio's ADEA claim, and Count Eight, Paneccasio's ERISA claim, remain in the case.

2003 WL 1714085 (D.Conn.), 30 Employee Benefits Cas. 1476

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Case 3:03-cv-00596-JBA    Document 28-2    Filed 11/07/2003    Page 13 of 18

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

LODA AGENCY, INC. and Frank Loda, Plaintiffs
v.
NATIONWIDE INSURANCE CO., Defendant

No. 3:001750(EBB).

Oct. 10, 2000.

RULING ON THE MOTION TO DISMISS

BURNS, Senior District J.

INTRODUCTION

*1 Defendant Nationwide Insurance Co., ("NIC" or "Defendant") has moved to dismiss seven counts of the ten-count Complaint filed by Loda Agency, Inc. and Frank Loda (collectively "Loda" or "Plaintiffs"). Specifically, Defendant challenges the First Count, to the extent that it relies on events beyond the applicable statute of limitations; the Second Count, because a principal cannot be liable with tortiously interfering with the business expectancies of its agent; the Third and Ninth Counts because a Connecticut Unfair Practices Act ("CUTPA") claim does not arise from the relationship between a principal and its agent; the Fourth and Eighth Counts because (a) an insurance agent cannot allege a Connecticut Unfair Insurance Practices ("CUIPA") claim against its principal and (b) CUIPA does not provide for a private cause of action; and the Tenth Count because the terms of Plaintiffs' contract, incorporated by reference into the Complaint, permit the very acts complained of by Plaintiffs.

STATEMENT OF FACTS

The Court sets forth only those facts deemed necessary to an understanding of, and decision rendered on, this Motion. The facts are culled from the Complaint, the parties' moving papers and documents incorporated by reference into the Complaint.

Loda was an independent contractor of NIC. He alleges that from 1985 through 1987, he acted as the exclusive NIC agent in order to write NIC's commercial insurance for an account of a certain K. Klarides Supermarkets, Inc. ("KSI"). Frank Loda, as agent for NIC, received commissions on this account.

In 1987, NIC determined not to renew its policy with KSI. However, in 1991, NIC agreed to insure KSI, albeit through a different one of its independent contractor insurance agents. Loda asserts that his Agreement with NIC prohibited this conduct.

NIC settled Loda's original complaint in 1997 by agreeing to assign to him in the future a portion of the insurance policy renewal business from a third NIC insurance agency which was then closing. Loda now contends that the renewal commissions he received from this new business were less than the commissions he would have received from the KSI account.

Loda also asserts that NIC breached oral and written [FN1] agreements by (a) misrepresenting that its commercial insurance coverage was unavailable for KSI; (b) allowing or facilitating the diversion of the KSI's insurance agreements with NIC during 1991 and subsequent years; (c) not returning the entire KSI accounts and commissions earned thereby to Loda; (d) failing to provide Loda with proper compensation for his lost KSI commissions after the 1993 agreement; and (e) misrepresenting to Loda the value of the renewal commissions generated by the insurance policies for the third, now closed, NIC agency. These facts essentially form the basis for his interference with contractual relations, CUTPA and CUIPA counts.

> FN1. He does not distinguish between the two in his Complaint.

Loda next alleges that, in the Spring of 1999, NIC announced that it intended to pay a one-time loyalty bonus to its career agents. Calculation of the bonus was based on insurance premiums generated by each independent contractor during the first six months of 1998 or 1999. Loda contends that, even though he generated the requisite amount of commissions during this time frame, NIC never paid him the bonus.

*2 Loda retired on July 1, 1999. Loda's Complaint alleges that NIC did nothing to advise NIC policyholders for whom Loda had previously provided services of his retirement. NIC continued to provide these same customers with Loda's name, address and telephone number. Resultingly, Loda asserts that he had to expend his own monies on

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

notifying his former clients of his retirement; respond to inquiries regarding coverage before his notice was received by them; and was required to allow NIC to continue to use his office. He claims that NIC was unjustly enriched by this conduct.

## LEGAL ANALYSIS
### I. *The Standard of Review*

*Federal Rule of Civil Procedure 12(b)(6)*

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. Spalding,* 467 U.S. 69, 73, (1984). "The function of a motion to dismiss is merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984) quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980).

Pursuant to a Rule 12(b)(6) analysis, the Court takes all well-pleaded allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). *See also Conley v. Gibson,* 355 U.S. 41, 45-46, (1957)(Federal Rules reject approach that pleading is a game of skill in which one misstep by counsel may be decisive of case). The proper test is whether the complaint, viewed in this manner, states *any* valid ground for relief. *Conley,* 355 U.S. at 45-46.

Although Loda does not attach his Agent's Agreement to the Complaint, the Court may consider this document in Ruling on the Motion to Dismiss, without converting it into a summary judgment motion. *See* F.R.Civ.P. 10(c). When a plaintiff fails to introduce a pertinent document to his Complaint, the defendant may introduce the exhibit as part of his motion attacking the pleading. *Wright & Miller, 5 Federal Practice & Procedure: Civil* at § 1327. *Accord, Bryan v. Acorn Hotel, Inc.,* 931 F.Supp. 394, 395,(E.D.Pa.), aff'd. 162 F.3d 1150 (1996). Here, the Agent's Agreement, attached to Defendant's moving papers and incorporated by reference in Plaintiffs' Complaint, will be considered in the Ruling on this Motion.

### II *The Standard As Applied* [FN2]

FN2. The parties have not dealt with the Counts of the Complaint seriatim. Accordingly, the Court will also address each argument as it is presented and responded to.

The CUIPA Counts: Four and Eight

In the Fourth and Eighth Counts, Plaintiffs assert that NIC violated CUIPA by its conduct in the relationship with Frank Loda as its independent contractor insurance agent.

Section 38a-815 of CUIPA prohibits any person engaging in a trade practice that is an "unfair method of competition or an unfair or deceptive act or practice in the business of insurance." Unfair practices in the business of insurance are defined at Section 38a-816. A careful reading of this lengthy statute reveals no unfair practice in the business of insurance among Loda and NIC. The allegations of the Complaint simply do not meet the standards of this statute.

*3 Further, Plaintiffs' claims do not meet the three-prong test of the seminal case defining "business of insurance", *Group Health & Life Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211-230 (1979). The three criteria to be employed in determining whether a particular practice involves the relationship between the insurer and its policyholders are:
1. Whether the practice has the effect of transferring or spreading a policyholders' risk;
2. Whether the practice is an integral part of the policy relationship between the insurer and the insured; and
3. Whether the practice is limited to entities within the insurance industry.

Each inquiry must be answered in favor of NIC. First, none of Plaintiffs' allegations concern the spreading, or have the effect of spreading, policyholders' risks. In the end, it is NIC which determines for whom it will write policies. There are no allegations of this behavior by NIC in the Complaint.

Secondly, the practice must be between the insured and the insurer. Again, the claimed misconduct found in the Complaint has nothing to do with the policyholder-insurance company relationship but concerns NIC's relationship with one of its insurance sales agents.

Third, the practice at issue is not limited to entities within the insurance industry. Issues of failure to pay commissions, bonuses or other compensation exist in

a multitude of industries.

What truly is an issue under the CUIPA counts are garden-variety breach of contract allegations. Counts Four and Eight are, accordingly, hereby DISMISSED. [FN3]

> FN3. The disposition on the Fourth and Eight Counts means that no determination of whether a private cause of action lies under CUIPA is required.

The CUTPA Counts: Three and Nine

The central prohibition of CUTPA is contained in Section 42-110b(a), which provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in any trade or commerce." In determining whether a given action is "unfair", the Connecticut Supreme Court has adopted the so-called "cigarette rule" developed by the Federal Trade Commission Act. According to the cigarette rule, this Court must consider:
> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other business].
> *Boulevard Associates v. Sovereign Hotel, Inc.*, 72 F.3d 1029, 1038 (2d Cir.1995), quoting *Atlantic Richfield v. Canaan Oil Co.*, 202 Conn. 234, 239 (1987)(alterations in original). Although Plaintiffs assert that NIC's actions violate this statute, what has been incorporated in these counts is the alleged breaches of contract only. The Court agrees with Defendant and the vast majority of courts in Connecticut that a simple breach of contract is not sufficient

*4 to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth in what respect the defendant's activities are either immoral, unethical, unscrupulous, or offensive to public policy.
> *Chaspek Mfg. Corp. v. Tandet*, 1995 WL 447948 at *12 (Conn.Super Ct. June 16, 1995). See also *Lester v. Resorts Camplands International, Inc.*, 27 Conn.App., 59, 62 (1992)(more than contract violation necessary to claim for punitive damages; requires calculated, deceitful, and unfair conduct associated with a breach of contract to sustain CUTPA damages); *Emless Equipment Leasing Corp. v. Waterbury Transmissions, Inc.*, 41 Conn.Supp. 575, 580 (1991)( " 'simple breach of contract, even if intentional, does not amount to a violation of the Act; a [claimant] must show substantial aggravating circumstances attending the breach to recover under the Act' ")(alteration in original); *A. Secondino & Son, Inc. v. L.D. Land Co.*, 1994 WL 728775 at *2- 3 ( Conn.Super. Ct., December 29,1994)(recognizing that this rule is the majority rule in Connecticut).

Inasmuch as Loda has simply incorporated by reference the alleged breaches of contract found in Counts One and Five and fails to set forth exactly [FN4] how such conduct violates the cigarette rule, the Third and Ninth Counts are hereby DISMISSED.

> FN4. The CUTPA counts merely call the alleged breaches of contract "immoral, oppressive and unscrupulous" without ever explaining how they can be so characterized.

The Second Count: Tortious Interference with a Contract.

In the Second Count, Loda asserts that NIC interfered with the contractual relationship between Loda and KSI. However, the direct parties to the insurance contract at issue are KSI and NIC and not Loda and KSI.

Connecticut courts have long recognized a cause of action for tortious interference with contract rights or other business relations. See, e.g., *Blake v. Levy*,191 Conn. 257, (1983). "However, it is well-settled that the tort of interference with contractual relation only lies when a third party adversely affects the contractual relationship between the two parties." *Paint Products Co. v. Minwax Co.*, 448 F.Supp. 656, 658 (D.Conn.1998, citing *Rand W Hat Shop v. Scully*, 98 1, 14 (1992). Hence, "[i]n Connecticut, a party to a contract cannot be held liable for tortious interference with that contract." *Urashka v. Griffin Hospital*, 841 F.Supp. 468, 475 (D.Conn.1994). Accord, *Powell v.. Feroleto Steel Co.*, 659 F.Supp. 303, 307 (D.Conn.1996)(Cabranes, J.)(as a matter of law, party to a contract cannot interfere with that contract).

The parties to the contract of insurance in the present case are NIC and KSI. Loda was the independent contractor who brought the parties together but it still

remains clear exactly who the contract of insurance was between. Loda was merely a third-party beneficiary of the contract between NIC and KSI, in that he received commissions for his work. At no time, did a contract directly exist between Loda and KSI. Accordingly, NIC cannot be held liable for tortiously interfering with its own contract.

*5 The Plaintiffs have not brought to this Court's attention any authority that states otherwise nor has the Court in its own research found any. Accordingly, the Second Count is hereby DISMISSED.

Count One: The Statutes of Limitation

In Count One, two separate agreements are at issue. The first is "contractual agreements and policies" between NIC and its agents which "protected a broker such as Plaintiff LODA from attempts by other Nationwide brokers or representatives to interfere with the underwriting, writing, or renewal of policyholders ...". Plaintiffs assert that these agreements are written agreements and policies. [FN5] The second alleged agreement at issue is one in which NIC, in 1997, agreed that, in order to compensate the Plaintiffs for lost annual commissions from the KSI commercial account, NIC would assign to the Plaintiffs a portion of the renewal business of an NIC insurance agency which was closing. This is claimed to be a misrepresentation by NIC.

> FN5. The Court has carefully reviewed the Corporate Agency Agreement between Loda and NIC and finds no such language therein. If there was a second policy which supports this contention, it was Plaintiff' burden to produce such a document.

In their moving papers, Plaintiffs concede that the actions complained of in large part in Count One occurred outside the limitations period, from 1987 to 1991. Thus, all of these allegations are barred by the six-year statute of limitations. *See* Conn.Gen.Stat. § 52-581 (three year limitations for oral contract; § 52-576 (six year limitations for written contract).

This Complaint was filed in April, 2000. Thus, any actions alleged to have been done by NIC prior to April, 1994, are barred by the statute of limitations. Those include the refusal of NIC to renew KSI's commercial insurance from 1987 through 1991; allowing and/or facilitating the diversion of KSI's's commercial insurance accounts during 1991 and subsequent years [FN6]; and doing nothing to return the KSI commercial insurance accounts between 1991 and 1997. [FN7]

> FN6. Any actions taken between 1991 and March, 1994 are barred by the six-year statute of limitations, in that this Agreement would have had to be in writing. *See,* Corporate Agency Agreement. Thus, the only viable claim, if it exists, is from March, 1994 to the present.

> FN7. Again, under the Corporate Agency Agreement, NIC had no obligations to return the KSI accounts to Loda.

The second claim is that NIC misrepresented the value of the renewal commissions from the insurance policies of a third, closing insurance agency. Further, it is contended that NIC failed to provide Loda with the compensation for the lost KSI commercial insurance commissions after 1997, as allegedly required by a settlement agreement of July, 1997.

Hence, any written agreements or contract drafted and executed before April, 1994 are barred by the statute of limitations. Any oral representations prior to April, 1997 are also barred by the statute of limitations for oral contracts.

Count One is hereby DISMISSED WITHOUT PREJUDICE. On or before October 31, 2000, Plaintiffs shall amend their Count One, asserting exactly when these circumstances occurred and attaching thereto any documents in support thereof. Any written agreements will not be considered unless they are dated after 1994.

Count Ten: Unjust Enrichment.

Plaintiff Frank Loda alleges that NIC was unjustly enriched after his retirement from NIC, in that NIC continued to use his office, send out bills with his name, address and telephone number on it, and send him mail for processing. He further claims that he gave ample notice of his retirement, yet NIC did nothing to advise NIC customers of this fact. As a result of the NIC's alleged inaction, Plaintiff Frank Loda asserts that he was forced to expend his own time and funds to prepare NIC notices to be sent out to customers and respond to many customer inquiries regarding NIC insurance quotations, renewals or policy issues, some of which he needed to respond to

from his home.

*6 In the Corporate Agency Agreement, Loda agreed:
> 1) ... If this agreement is canceled, your name will be removed as soon as possible, but you acknowledge that occasional error may cause it to continue to be printed. (Corporate Agency Agreement at ¶ 14.)
> 2) ... The agent hereby gives the Companies permission to use his name on those billings and for use of his name for a reasonable period of time following the cancellation. (Corporate Agreement at ¶ 16).

Plaintiff Frank Loda unfortunately has not specified when he was incurring these expenses, which would be critical to a decision as to the reasonableness of Defendant's action or inaction. The Motion is Denied as to the Tenth Count.

## CONCLUSION

For each of the foregoing reasons the Motion to Dismiss [Doc. No. 15] is hereby GRANTED IN PART AND DENIED IN PART. Counts Four, Eight, Three, Nine, and Two are hereby dismissed. The First Count and Tenth Counts shall be amended, if legally possible, within the dictates of this opinion, on or before October 31, 2000.

SO ORDERED

2000 WL 1849865 (D.Conn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works