Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

QUALITIVE REASONING SYSTEMS, INC.,
v.
COMPUTER SCIENCES CORP.

No. 3:98CV554 AWT.

March 31, 2000.

RULING ON MOTION FOR PRELIMINARY
INJUNCTION AND APPLICATION FOR
PREJUDGMENT
REMEDY

THOMPSON.

*1 This case arises out of a business relationship between plaintiff Qualitative Reasoning Systems, Inc. ("QRSI") and defendant Computer Sciences Corp. ("CSC"), which was terminated by CSC in February 1998. QRSI has filed a 15-count complaint against CSC, which includes claims for fraudulent misrepresentation (Fourth Count), negligent misrepresentation (Fifth Count) and breach of contract (Sixth Count). CSC has asserted counterclaims against QRSI for breach of contract and unjust enrichment. QRSI moves for a preliminary injunction based on its claims for fraudulent misrepresentation, negligent misrepresentation and breach of contract. QRSI has applied for a prejudgment remedy based on its counterclaims.

For the reasons set forth below, QRSI's motion for a preliminary injunction is being denied, and CSC's application for a prejudgment remedy is being granted.

I. FACTUAL BACKGROUND

In July 1995, QRSI, a start-up company founded by John and Mimi Barron, acquired rights to exploit qualitative reasoning technology and software from United Technology Corporation ("UTC") and Sikorsky Aircraft Corporation ("Sikorsky"). QRSI's license from UTC and Sikorsky provided that UTC could terminate the license if QRSI failed to develop a commercial product employing the technology within two years.

Manufacturers and users of complex systems and equipment spend substantial amounts maintaining and repairing such systems and equipment. The use of computers to diagnose failures in complex systems and equipment is part of a growing area of computer-based technology called "artificial intelligence." Traditional artificial intelligence programs employ "fault trees" or "rule-based logic" to diagnose failures and are only 50% to 70% accurate in diagnosing failures in complex systems. During the late 1980s and early 1990s, UTC developed a series of modeling and reasoning algorithms it called "qualitative reasoning technology," and implemented those algorithms in a software package it called "qualitative reasoning systems," i.e., the QRS software. UTC's qualitative reasoning technology algorithms were a significant improvement over the fault tree and rule-based approaches to failure diagnosis. Qualitative reasoning technology can diagnose system failures with accuracy approaching 100%. It also permits diagnosis of multiple, unanticipated, simultaneous failures that cannot be diagnosed using any other known method. Moreover, it allows manufacturers to analyze potential failures at the design stage and to design a product that will fail less often and be significantly easier and less costly to maintain.

Prior to 1996, CSC had developed with the National Aeronautics and Space Administration ("NASA") an advanced software development tool for building expert systems that monitor and control NASA spacecraft. It was called the Generic Spacecraft Analyst Assistant ("GenSAA"). GenSAA enabled users to build expert systems without writing program code. Rather, the user would build an expert system by clicking buttons with a mouse, selecting items from pull-down menus and performing other operations with a graphical user interface. GenSAA proved to be valuable in building highly graphical real time expert systems for systems monitoring, commanding and fault detection and isolation. It is used for assisting spacecraft analysts in control centers and provides several levels of automation.

*2 In January of 1996, John Dodd was CSC's director of quality and productivity enhancement. He was looking for ways in which CSC could exploit new technology better. Dodd came across an article that mentioned UTC's work with qualitative reasoning technology. He contacted someone at UTC, expressing an interest in integrating the qualitative reasoning technology with GenSAA. The individual from UTC arranged for Dodd to talk with a representative of QRSI and, eventually, John Barron and Dodd spoke. After several telephone

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

calls, Dodd and Barron met in February 1996.

Dodd and Barron discussed the utility of developing a product that incorporated both qualitative reasoning systems and GenSAA, with GenSAA being used to replace the user interface in the QRS software.

There was an exchange of correspondence in February 1996 in which Barron spelled out how he would like to proceed to the next steps with CSC and in which Dodd informed Barron that Dodd had been instructed by his superiors within CSC to develop a business proposal. On March 6, 1996, QRSI and CSC entered into a confidentiality agreement, and Barron delivered the qualitative reasoning technology, including the QRT source codes, to CSC. In May 1996, Dodd reported to his superiors at CSC that QRSI was about to issue to CSC a "time and materials to not exceed" contract to have CSC support QRSI in creating a commercially viable qualitative reasoning tool. He pointed to the need to write a memorandum of understanding that would address several points, including whether CSC would work only on the basis of a time and materials contract, or whether there would be a strategic investment by CSC.

On June 7, 1996, Dodd forwarded to Barron a copy of a letter CSC had received from Dennis Marchant, who was patent counsel at NASA. The letter from Marchant was dated May 31, 1996. It referred to CSC as a co-developer of the GenSAA software and pointed out that GenSAA was subject to the new technology clause contained in CSC's contract with NASA. Marchant stated that both CSC and NASA had "the right to make, use or sell GenSAA without consulting each other." He stated further that "CSC is free to use the GenSAA software in any manner that they see fit." (Pl.'s Ex. 5.) On July 10, 1996, QRSI sent to CSC a price quote for the services CSC contemplated rendering to QRSI. Attached to that July 10, 1996 letter containing a price quote was an additional copy of the letter from Marchant, which was referred to by CSC as "giving CSC the right to sell GenSAA." (Pl.'s Ex. 8.) The July 10 letter estimated that CSC's charges to QRSI would be a total of $785,000 plus estimated travel expenses of $15,000 and consultant expenses of $50,000. That letter contemplated that if CSC's approach was acceptable, the parties would enter into a memorandum of understanding.

As discussions between QRSI and CSC evolved, the product to be developed was referred to as "genQR," which was short for "Generic Qualitative Reasoning." The July 10, 1996 letter reflected the parties' expectations that a first commercial release, genQR Release 1, would be ready by June 1, 1997 and that a second commercial release, genQR Release 2, would be ready by October 1, 1997. Commencing in October 1996 and continuing through the first quarter of 1997, QRSI submitted a series of purchase orders to CSC in connection with the product development effort CSC was undertaking on behalf of QRSI. The parties had not, however, entered into a memorandum of understanding as contemplated by CSC's July 10, 1996 letter. In December 1996, Barron had indicated, in an internal memorandum, that QRSI's position would be to resist "CSC's effort to quantify and limit terms of engagement until [QRSI] believes the key parameters of the QRS opportunity have been maximized." (Def.'s Ex. 12.)

*3 On March 4, 1997, Mimi Barron wrote to CSC:
We need to quickly finalize the terms of the business relationship between CSC and QRSI regarding the licensing of GenSAA, whether or not NASA is included in the arrangement at this time. I recommend we amend the Letter Agreement executed on February 15, 1996, and amended on April 3, 1996, by CSC and QRSI, to reflect:
1. the product development schedules, costs, and commitments;
2. the GenSAA commercialization and marketing agreement.
If this is satisfactory to you, I will ask our corporate legal counsel to draft the Agreement.
(Def.'s Ex. 18.)

By April 1997, Guy Miller had replaced Dennis Marchant as the NASA patent counsel with responsibility for CSC's rights with respect to GenSAA. Miller informed a representative of QRSI that CSC did not have the right to sub-license GenSAA to QRSI. This revealed the presence of a major problem, as the parties had contemplated that CSC would grant to QRSI marketing rights to GenSAA and would do so by means of giving a sub-license for GenSAA to QRSI. It appears that up to this point both QRSI and CSC had proceeded on the assumption, which each had felt comfortable with based on the letter from Marchant, that CSC had the right to sub-license GenSAA to QRSI.

On April 11, 1997, Mimi Barron forwarded to CSC a copy of a message from Guy Miller to QRSI, which gave Miller's analysis of CSC's rights. She informed CSC that she believed that CSC needed to obtain from NASA the right to sub-license to QRSI the marketing rights to GenSAA. In addition, on April 18, 1997, Mimi Barron wrote to Dodd. She stated, among other things, that it was likely that Marchant's

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

letter of May 31, 1996 had led CSC to assume the rights included the right to sub-license the qualitative reasoning technology to QRSI.

CSC undertook to obtain from NASA the right to sub-license to QRSI marketing rights to GenSAA; it was to file an application with NASA by July 1997. CSC also informed QRSI that it had confirmed with Miller, the NASA patent counsel, that QRSI could request a non-exclusive revocable license for GenSAA directly from NASA with no involvement from CSC that would provide QRSI with the same rights as CSC currently held.

By June 30, 1997, CSC had arranged for a short-term solution that could be utilized while the parties worked on a long-term approach. This temporary solution involved CSC and QRSI entering into a software marketing agreement, which CSC would have signed as the owner and QRSI would have signed as the remarketer. CSC would have been the seller of QRSI's product, but this arrangement would have been transparent to the end user. This software marketing agreement was forwarded by CSC to QRSI on June 30, 1997, but it was never executed.

Meanwhile, during June 1997, QRSI stopped making payments to CSC. It had paid a total of $158,856.63 to CSC at that point. In addition, on June 30, 1997, QRSI issued an additional purchase order to CSC in the amount of $319,000. Around this time, QRSI was short of funds and its investors were declining to provide additional funding because QRSI did not have the marketing rights to GenSAA.

*4 In August 1997, George Meyerson, the president of CSC's Systems Sciences Division, which had responsibility for the QRSI project, attended a meeting with representatives of QRSI. There was a demonstration of what CSC had produced to date on genQR Release 1, and QRSI indicated its displeasure with CSC's performance.

On October 16, 1997, CSC wrote to QRSI confirming that CSC had applied to NASA for a non-exclusive license and that, once the license was granted to CSC by NASA, CSC would sub-license the technology exclusively to QRSI. CSC also stated that if CSC were unable to obtain the necessary license after having used its best efforts for a period of at least six months, then QRSI and CSC would "negotiate in good faith to establish a mutually acceptable alternative arrangement." (Pl.'s Ex. 17.) This was the application CSC had undertaken to file by July. The reason for the delay is an issue that is hotly contested by the parties.

A few days later on October 22, 1997, the first release of genQR was demonstrated at a meeting with Sikorsky. Barron believed the demonstration was very well received by Sikorsky, even though work still needed to be done to make the product "commercially supportable/maintainable." (Def.'s Ex. 21.) Up to at least this point, QRSI had no reason to believe that CSC had not relied in good faith on the letter from Marchant in concluding it had the necessary rights with respect to GenSAA. On October 26, 1997, John Barron wrote: "To the best of our knowledge they honestly thought they did ." (Def.'s Ex. 10.)

On October 31, 1997, representatives of QRSI and CSC met to try and resolve the differences between the two companies. At the meeting, CSC agreed to defer receipt of payment for its services rendered to CSC until sub-licensing rights were obtained from NASA. The parties left the meeting with the understanding that a memorandum of understanding would be prepared.

Approximately six weeks later, negotiations over the memorandum of understanding had been completed, and that document was executed on December 22, 1997. Notably, the memorandum of understanding provided that QRSI and CSC would enter into "good faith negotiations to complete, execute and deliver within 30 days a definitive agreement," which would be subject to approval and would contain mutually acceptable terms and conditions. (Pl.'s Ex. 20.) It also provided that the transaction "shall only be consummated by the Definitive Agreement." (*Id.*) The memorandum of understanding provided further that upon receipt of the marketing rights from NASA, QRSI would pay CSC the full amount invoiced by CSC for its work on the genQR Release 1 without dispute of the invoice charges. Moreover, the memorandum of understanding provided that a marketing investigation plan would be undertaken by a CSC organization to determine the market feasibility and profit potential of the genQR product; it contemplated that this would be approximately a 90- to 120-day effort. Finally, the memorandum of understanding contained a provision stating that the memorandum of understanding contained the entire agreement between QRSI and CSC with respect to their transaction.

*5 On November 14, 1997, QRSI forwarded to CSC a purchase order in the amount of $40,800, and on December 31, 1997, CSC sent to QRSI a status report on the project.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

On January 20, 1998, there was another meeting between representatives of QRSI and CSC. The attendees at this meeting included John and Mimi Barron and Meyerson. Mimi Barron made a presentation on behalf of QRSI. She proposed that the parties sign a legally binding agreement no later than January 30, 1998. The terms of QRSI's proposed agreement would include a provision that CSC would absorb all future product development costs for genQR in exchange for royalties if the product was delivered on time. CSC would also agree to a value-added reseller marketing agreement for genQR and pay QRSI $2,000,000 for software product licenses and/or marketing rights. This was not the first time QRSI had proposed compensating CSC by means other than direct payment for services rendered. QRSI had also made such a proposal in March 1996, but CSC had never agreed to any such arrangement.

There were various contacts between representatives of QRSI and CSC as to the status of the parties' negotiations after the January 20 meeting. One such contact was an e-mail message QRSI sent to CSC on January 26, 1998 stating, among other things, that the memorandum of understanding "is inoperative since no Definitive Agreement was provided within 30 days of the execution of the MOU, as stated in the MOU." (Def.'s Ex. 13.)

Then, on February 25, 1998, Meyerson called and then sent a letter to John Barron stating that CSC had concluded that the relationship between QRSI and CSC should be terminated. Among other things, CSC stated that it would not absorb any development costs or purchase any pre-paid product licenses. It also informed QRSI that upon the payment of all invoices rendered to date but unpaid and invoices then to be rendered, CSC would deliver to QRSI, or to its designee, all source code and documentation for genQR Release 1.

QRSI had received from CSC the object code, but had never received the source code, for genQR Release 1. Thus it could not make any needed changes, and thus, that object code was of little value to QRSI. Also, while QRSI applied to NASA in May 1998 for marketing rights to GenSAA, it has not received those rights.

Exclusive of John and Mimi Barron, QRSI has no employees. It owns some furniture, fixtures and computers. It has no cash in the bank.

John Barron concedes that there exists no written agreement where CSC undertook the risk of doing work without getting paid. As of the date the relationship between QRSI and CSC ended, QRSI had failed to pay in excess of $650,000 of the amounts that had been billed to it by CSC; once final invoices were rendered, the total amount unpaid was $704,122.

QSRI seeks an order requiring CSC to turn over to it the genQR Release 1 source code and related documentation. QRSI is not able to post security but has proposed an arrangement whereby it will hold in escrow amounts of revenue generated by using that source code until there is a full trial on the merits.

II. MOTION FOR A PRELIMINARY INJUNCTION

A. Legal Standard for Injunctive Relief

*6 A party seeking a preliminary injunction must demonstrate that it is likely to suffer irreparable injury *and* show *either* "(1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990) (citations omitted); *Tucker Anthony Realty Corp. v. Schiesinerer*, 888 F.2d 969, 972 (2d Cir.1989) (citations omitted).

The showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Mamiya Co. v. Masel Supply Co.* 719 F.2d 42, 45 (2d Cir.1983) (internal quotations and citations omitted). Irreparable harm must be shown by the moving party to be imminent, not remote or speculative. *See Tucker Anthony Realty Corp.,* 888 F.2d at 975. It must also be one incapable of being fully remedied by monetary damages. *See id.*

Also, where the grant of injunctive relief would change the position of the parties as it existed prior thereto, it is commonly referred to as a mandatory injunction, and more stringent standards apply.

The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. *See Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985). A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act. *See id.* As noted above, this distinction is important because we have held that a mandatory injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

extreme or very serious damage will result from a denial of preliminary relief. *Id* . (internal quotations and citations omitted); *See also* SEC v. Unifund SAL, 910 F.2d 1028, 1039 (2d Cir.1990) (injunction going beyond preservation of status quo requires "a more substantial showing of likelihood of success"); *Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 441 (2d Cir.1977). The "clear" or "substantial" showing requirement--the variation in language does not reflect a variation in meaning--thus alters the traditional formula by requiring that the movant demonstrate a *greater likelihood* of success. *See Unifund SAL,* 910 F.2d at 1039 [ (emphasis added) ].

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 34 (2d Cir.1995). As the court observed in *Tom Doherty Associates,* a heightened standard of proof is justified where an injunction will provide the movant with "all the relief that is sought," and the effect of the order, once complied with, cannot be undone. *Id.* at 34-35.

Finally, Rule 65(c) of the *Federal Rules of Civil Procedure* provides that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

B. Discussion

*7 QRSI seeks a mandatory injunction because it seeks a court order that would alter the status quo by commanding a positive act. It is clear here that CSC was to be paid for delivering products to QRSI. Taking just the amounts that were billed as of January 20, 1998, when the parties had their last meeting to attempt to resolve their differences, QRSI owed CSC in excess of $650,000 for services rendered. CSC has been and continues to be willing to turn over the genQR Release 1 source code and related documentation if QRSI pays the unpaid invoices, or in the context of this motion, posts adequate security. QRSI wants CSC to turn over the product without being paid and without receiving adequate security. QRSI proposes that if it is financially successful with the product, then amounts would be escrowed by it for CSC's benefit. This source code may or may not turn out to be worthless in the hands of either CSC or QRSI. However, at this point, CSC has control over it, and CSC is being asked to relinquish that control without being paid the more than $650,000 the parties appeared to have previously assumed CSC would be paid for doing so.

QRSI delivered the QRT source codes to CSC, but QRSI has never possessed the source code or the technical documentation it seeks in this case, which is the genQR source code and related documentation. Given the fact that QRSI has not paid for this product, granting its motion for injunctive relief would, for all practical purposes, provide it with substantially all the relief it seeks in this case. In addition, given the fact that it wants to proceed to use the product in the stream of commerce, the effect of an order requiring CSC to turn over the product to it could not be undone.

Accordingly, the higher standard of a clear or substantial likelihood of success on the merits is applicable in this case. That is a standard QRSI cannot meet with respect to either of its misrepresentation claims or its breach of contract claim. Nor can it show that "extreme or very serious damage will result from denial of preliminary relief." *Tom Doherty Associates, Inc.,* at 34. For that reason, notwithstanding the fact that irreparable harm is the single most important prerequisite for issuance of a preliminary injunction, the court does not reach the issue of irreparable harm.

To succeed on a claim of fraudulent misrepresentation under Connecticut law, the plaintiff must demonstrate that "(1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." *Chanoff v. United States Surgical Corp.,* 857 F.Sup. 1011, 1017 (D.Conn.1994), *aff'd,* 33 F.2d 50 (2d Cir.1994). The plaintiff must also show "injury that is the direct and proximate result of the alleged misconduct." *Id.*

Under Connecticut law, a claim for negligent misrepresentation can be made where the following situation exists:
  *8 one who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
*Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 575 (1995) (internal quotations and citations omitted).

QRSI claims fraudulent and/or negligent misrepresentations were made in three areas: First, as

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

to CSC's ability to provide QRSI with the right to use the GenSAA technology; second, as to timely development of the genQR product; and third, as to CSC becoming a value-added reseller of QRSI's commercial product.

The court cannot conclude that QRSI has shown a clear or substantial likelihood of success on the merits as to its claim of fraudulent misrepresentation concerning CSC's ability to provide QRSI with the right to use the GenSAA technology. There is substantial evidence that runs counter to a finding that CSC knew its statements to be untrue; this evidence includes statements by representatives of QRSI--both John and Mimi Barron. While CSC's statements in this regard were clearly untrue and it is possible that QRSI will prevail on its claim for negligent misrepresentation, the court cannot conclude that QRSI has shown a clear or substantial likelihood of success on the merits as to the requirement, under its claim for negligent misrepresentation, that it demonstrate that CSC's alleged misconduct was the direct and proximate cause of the harm to QRSI. The finder of fact will have to weigh substantial evidence from both parties as to the events that occurred between April 1997 and February 1998, and it appears on the present record that a finder of fact could very well find for either side here on questions such as whether and to what extent QRSI's reliance was justifiable, and whether CSC failed to exercise reasonable care or competence in obtaining or communicating information.

As to the claim that CSC made false promises as to timely product development, the court also concludes that QRSI has not shown a clear or substantial likelihood of success on the merits. There is substantial evidence to be weighed here as to each of the elements of the claim for fraudulent misrepresentation, and also as to the claim for negligent misrepresentation, with respect to the questions noted above. This is especially so given the fact that the largest part of the purchase orders, in terms of dollars, was placed after the parties became aware of the problem with the marketing rights to GenSAA.

Finally, with respect to the claim that CSC stated that it would become a value-added reseller of QRSI's commercial products, QRSI relies on the July 10, 1996 letter from CSC and conversations that allegedly occurred between representatives of the parties. However, the July 10, 1996 letter from CSC clearly contemplates that the parties would enter into a memorandum of understanding, which did not occur until the memorandum of understanding was executed on December 22, 1997. That memorandum of understanding did not contain any such commitment by CSC and, moreover, provided that the transaction would be consummated only by a definitive agreement. No such agreement was ever reached. In light of the foregoing, the court concludes that QRSI has not shown a clear or substantial likelihood of success on the merits as to this claim either.

*9 As to its breach of contract claim, QRSI relies on the proprietary information agreement entered into the by the parties on March 6, 1996. It focuses on a provision in that agreement that provides that upon the termination of the business relationship between QRSI and CSC, CSC will promptly return to QRSI, without retaining any copies, "all notes, programs, analyses or other tangible expressions of work product derived from such Proprietary Information." (Pl.'s Ex. 6.) QRSI argues that by its plain terms this language entitles QRSI to possession of the source code and documentation for genQR Release 1. However, the most that can be said with respect to this language is that the provision is ambiguous and that this is one possible, although certainly not obvious, interpretation. The various statements by QRSI which reflected its understanding that there was no legally binding agreement between QRSI and CSC are more likely to be associated with the primary object of their business dealings, i.e., the genQR product, than is a general provision from a proprietary information agreement. Therefore, the court cannot conclude that QRSI has shown a clear or substantial likelihood of success on the merits on its breach of contract claim.

Nor has QRSI shown that extreme or very serious damage will result if it is not granted preliminary injunctive relief. If QRSI's motion for injunctive relief is denied, a small start-up business might fail. However, there is no authority for the proposition that such a circumstance meets the standard of "extreme or very serious damage." In addition, while the public interest is certainly not served by having what appears to be valuable technology remain only partially developed, such an absence of progress does not constitute what appears to be the requirement that one make an affirmative showing of extreme or very serious damage before a mandatory injunction issues.

III. APPLICATION FOR A PREJUDGMENT REMEDY

A. Legal Standard for a Prejudgment Remedy

CSC has moved for a prejudgment remedy pursuant

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

to Connecticut General Statutes § 52-278d(a), which provides, in pertinent part:
> The hearing shall be limited to a determination of (1) whether or not there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff, (2) whether payment of any judgment that may be rendered against the defendant is adequately secured by insurance, (3) whether the property sought to be subjected to the prejudgment remedy is exempt from execution, and (4) if the court finds that the application for the prejudgment remedy should be granted, whether the plaintiff should be required to post a bond to secure the defendant against damages that may result from the prejudgment remedy or whether the defendant should be allowed to substitute a bond for the prejudgment remedy.

*10 Pursuant to Connecticut General Statutes § 52-278d(a), the standard for issuing a prejudgment remedy is "whether or not there is probable cause to sustain the validity of the plaintiff's claim." *Three S. Dev. Co. v. Santore*, 193 Conn. 174, 175 (1984) (internal quotations and citations omitted). The statute authorizes issuance of a prejudgment remedy to secure a counterclaim upon the same basis. *See* Conn.Gen.Stat. § 52-278i. "The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." *Three S. Dev. Co.*, at 175 (internal quotations and citations omitted). "Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false." *Id.*

"The hearing in probable cause for the issuance of a prejudgment remedy is not contemplated to be a full scale trial on the merits of the plaintiff's claim. The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim." *Id.*

B. Discussion

CSC has met the standard for issuance of a prejudgment remedy to secure its counterclaim. Although there are many disputed areas in this case, it is undisputed that CSC agreed to perform work for QRSI and has only been partially paid for that work. CSC has provided evidence that it had a "time and materials" contract and has also provided evidence as to the process by which time was billed to that contract in response to purchase orders from QRSI. The amounts of the invoices and the payments are set forth in Defendant's Exhibit 8, which reflects an outstanding amount due of $704,122. Given the potential value of the genQR technology if QRSI is able to fully develop it, there is probable cause to believe that CSC could obtain a judgment in this amount even after consideration of QRSI's defenses.

QRSI is presently without current assets to pay the amount of CSC's counterclaim, and there is no evidence that this amount is adequately secured by insurance. The court notes that QRSI is carrying its software development as an asset on its balance sheet, valued at $903,678, and there is no evidence that this property is exempt from execution. Finally, the issue of whether CSC should be required to post a bond to secure QRSI against damages that may result from the prejudgment remedy has not been addressed, and it does not appear that QRSI has the ability to substitute a bond for the prejudgment remedy.

IV. CONCLUSION

For the foregoing reasons, QRSI's Motion for a Preliminary Injunction (doc. # 77) is hereby DENIED, and CSC's Application for a Prejudgment remedy (doc. # 80) is hereby GRANTED.

It is so ordered.

2000 WL 852127, 2000 WL 852127 (D.Conn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Richard UNDERKOFLER, M.D. Plaintiff
v.
COMMUNITY HEALTH CARE PLAN, INC.
Defendant

No. 3:87-CV-534 (EBB).

June 17, 1999.

*RULING ON RENEWED MOTION FOR SUMMARY JUDGMENT*

BURNS, Senior J.

*1 The defendant, Community Health Care Plan, Inc. ("CHCP"), brings this renewed motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The defendant moves for summary judgment on the one remaining count of breach of contract. For the reasons set forth below, the defendant's Motion for Summary Judgment (Doc. No. 414) is GRANTED.

Familiarity is presumed with this Court's twenty-nine page Ruling on Cross Motions for Summary Judgment, filed April 21, 1998 (Doc. No. 386) ["Prior Ruling"], in which the defendant's Motion for Summary Judgment was granted in part and denied in part, and the plaintiff's Motion for Summary Judgment was denied in its entirety.

I. Background

The plaintiff physician, Richard Underkofler, originally filed a motion for summary judgment on June 30, 1997. At that time, the two remaining counts were for breach of contract and discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The defendant filed its own motion for summary judgment on October 15, 1997.

This Court denied the plaintiff's motion in its entirety. The defendant's motion was granted with respect to the Title VII count, but denied as to the breach of contract count.

In deciding the breach of contract issue, this Court found that "paragraph 11 [of the employment contract] promises the plaintiff that if his professional performance should prove unsatisfactory, the Medical Director and the plaintiff's peers will decide *with him* what course of action is within the best interest of the plaintiff and CHCP." (Emphasis in original) *Prior Ruling* at 15. "It is not clear from [the language of paragraph 11] [FN1] that CHCP retained the prerogative to terminate the plaintiff's employment at will after determining that his performance was not satisfactory. Paragraph 11 could be read as a promise by CHCP to Dr. Underkofler that, at the very least, it would meet with him to explore options that might be mutually agreeable." *Id.* at 15-16. This Court concluded that an ambiguity existed as to what the parties intended to occur if the plaintiff's performance should prove unsatisfactory. *Id.* at 17.

 FN1. Paragraph 11 of the employment contract reads as follows:
 Your performance will be reviewed annually or as necessary by the Medical Director and/or CHCP's Professional Review Committee. In the unlikely instance of unsatisfactory professional performance, the Committee, the Medical Director and your peers will determine with you what course of action is in your best interest and in the best interest of CHCP.

The defendant now moves again for summary judgment on the breach of contract claim. In support of its motion, the defendant raises two arguments. First, that the defendant met its contractual obligations to the plaintiff, and second, that the plaintiff's inability to regain appointment to the Yale-New Haven Hospital's medical staff deprives him of any entitlement to relief. Because this Court agrees with the second argument and finds it dispositive, the defendant's first argument will not be addressed.

The following facts were found undisputed in this Court's prior ruling and remain undisputed. [FN2] First, pursuant to paragraph one [FN3] of the employment contract, the plaintiff was required to obtain medical staff privileges at Yale-New Haven Hospital in order to fulfill the duties proscribed therein. *Prior Ruling* at 3. Thus, the plaintiff could not perform his contractual obligations to CHCP without these privileges.

 FN2. Although the plaintiff attempts to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

argue that these facts are in dispute, he has failed, despite his repeated efforts and voluminous submissions to this Court, to produce admissible evidence to the contrary.

FN3. Paragraph one of the employment contract states:
You will ... perform other patient-related functions appropriate to your specialty in CHCP affiliated hospitals, ambulatory facilities and birthing centers.

*2 Second, on April 10, 1985, the plaintiff met with Dr. Ronald Rozett, CHCP's Medical Director, Dr. Warren Weiswasser, the Medical Director of the clinical department of CHCP's facility at Longwharf, and Dr. Roslyn Chosak (OB/GYN department chief). Rozett informed the plaintiff that his employment contract would not be renewed. *Id.* at 9. The defendant had determined that the plaintiff's professional performance was unsatisfactory. There were a number of reasons the defendant elected not to renew the plaintiff's contract. *Id.* at 20.

Third, the plaintiff would not have achieved reappointment to the medical staff at Yale-New Haven Hospital. *Id.* at 21. The unrefuted evidence shows that the following two statements were made to the plaintiff at a June 5, 1985 meeting with the Hospital's Chief of Staff. Dr. Frederick Naftolin, Chairman of the Department of Obstetrics and Gynecology at Yale University School of Medicine, stated: "I would in conscience not be able to risk having you reappointed by me ... I don't want you to feel like you're somehow caught in some Catch 22 and if you were to now go and try to renegotiate with CHCP, somehow we would come around. We won't." Pl's Resp. to Def's Req. for Admis. at 10. Dr. John Fenn, Yale-New Haven Hospital's Chief of Staff stated: "I don't see the possibility of your continuing on the staff here almost under any circumstances." *Id.* at 11. Without reappointment, the plaintiff has no privileges at the hospital.

II. Legal Analysis

A. The Standard of Review

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant must set forth specific facts showing a genuine issue for trial, however, "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon,* 93 F.3d 47, 51 (2d Cir.1996).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In doing so, the court is mandated to resolve "all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). Hence, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992).

B. Discussion

*3 In light of the undisputed facts previously mentioned, the defendant contends that the plaintiff is not entitled to relief. The defendant makes two claims in support of this contention. First, because the plaintiff would not be reappointed to Yale-New Haven Hospital, he would lose his privileges there and would then be unable to fulfill his contractual obligations to CHCP. Therefore, once CHCP determined that the plaintiff's professional performance was unsatisfactory, any input he may have had would not have prevented his termination due to the fact that his medical privileges were not going to be renewed. Second, these facts also provided CHCP with a legal basis to terminate the plaintiff's contract, impracticability of performance and frustration of purpose.

On November 1, 1983, the temporary medical staff

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

privileges provisionally granted to the plaintiff at the beginning of his employment expired. *Prior Ruling* at 4. At his deposition, the plaintiff gave the following answer when questioned about his inability to work for CHCP without maintaining medical staff privileges at Yale-New Haven Hospital. "The idea of being a physician for CHCP if you can't work at the hospital is ludicrous." [FN4] Pl's Dep. Aug. 23, 1994 p. 134.

> FN4. The following exchange took place at the plaintiff's deposition on August 23, 1994:
> Q: Did you consider at that point, when you received Dr. Fenn's letter [dated November 3, 1983, informing the plaintiff of the expiration of his temporary medical staff privileges], that your employment at CHCP might be terminated if you couldn't get those privileges reinstated?
> A: I certainly did. The idea of being a physician for CHCP if you can't work at the hospital is ludicrous.
> Q: So I mean, this was very serious news to you?
> A: Very.
> Q: And could well have meant, if you couldn't reverse what had happened, the end of your employment at CHCP?
> A: True.
> Q: Did you meet with anybody at CHCP to decide what to do about this?
> A: As I recall, Dr. Rozett came down. I believe I met with he and Dr. Chosak. I don't remember if Dr. Weiswasser was involved at that point. I don't remember if Dr. Rozett came down or we went up there, I don't remember if it was his office or our office, but the general feeling was that we would have to make sure that the medical board gave me the privileges; otherwise, I wouldn't be able to stay, obviously.
> (Pl's Dep. August 23, 1994 at 133-34).

The defendant argues that, as a result of this Court's prior ruling, the breach of contract claim is now reduced to the proposition that the plaintiff should have been able to provide some input to Rozett as to an alternative to termination prior to Rozett's decision not to renew the plaintiff's contract. The defendant contends, however, that even if the defendant failed to provide the plaintiff with such an opportunity, any such input would not have changed the fact that his privileges were not going to be renewed, resulting in his inability to perform under the contract making termination inevitable.

In Connecticut, the elements of a breach of contract action are: (1) the existence of a contract or agreement; (2) a breach of the contract or agreement; and (3) damages resulting from the breach. *Chem-Tek, Inc. v. General Motors Corp.,* 816 F.Supp. 123 (D.Conn.1993); *O'Hara v. Connecticut,* 218 Conn. 628, 637, 590 A.2d 948 (1991). The plaintiff has the burden to prove each element by a preponderance of the evidence.

There is no dispute over the existence of a contract in this case. The Court will assume, for purposes of resolving this motion for summary judgment only, that the defendant failed to provide the plaintiff with any input prior to deciding not to renew his contract. In light of this assumed breach of contract, the only element for the Court to address is that of damages.

In a breach of contract action, the damages award is designed to place the injured party in the same position as he would have been in had the contract been performed. *O'Hara v. Connecticut,* 218 Conn. at 642; *West Haven Sound Development Corp. v. West Haven,* 201 Conn. 305, 319 (1986); 3 Restatement (Second), Contracts, §§ 344(a), 347(a) and (b), and comments contained therein. "The most fundamental precepts of contract law are that a successful plaintiff must show that a breach has occurred, and that as a result, he is not in the same position he would have been had the contract not been breached. The function of a court is to award damages which will fulfill the plaintiff's expectations in the bargain and place him in a position which is as good as possible, and which approximates the position he would have been in absent a breach." *Jolie v. Frito-Lay, Inc.,* No. H-86-1418, slip op. at 7 (D.Conn. Feb. 9, 1988).

*4 In this case, even if the defendant had provided the plaintiff with some input prior to its determination not to renew his contract, the fact remains that the plaintiff's medical staff privileges at Yale-New Haven Hospital would not have been renewed. Because the contract required the plaintiff to maintain privileges at Yale-New Haven Hospital, he could not satisfy his contractual obligations to CHCP without these privileges. Furthermore, the plaintiff has failed to offer any evidence indicating what input he was prevented from providing which would have altered the defendant's decision.

This Court concludes that the plaintiff has failed to produce any evidence showing that he has suffered damages due to the defendant's breach, and,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

therefore, no genuine issue of material fact exists. The plaintiff is in precisely the same position he would have been in had the defendant allowed him to offer input as apparently provided in the contract. There is no evidence indicating that the action of the defendant placed the plaintiff in a position different than he would have been in had the action not taken place.

"Even though the failure of the defendants to do the work might be considered a technical breach of the contract, the plaintiff has suffered no actual damage, and no injustice was done to him when he was denied recovery on this aspect of the case." *Waicunas v. Macari,* 151 Conn. 134, 139, 193 A.2d 709 (1963). Although the defendant's action could be termed a technical breach, the plaintiff was not harmed by it. Again, the plaintiff's inability to renew his privileges at Yale-New Haven Hospital prevented him from fulfilling the contractual obligations of his employment contract. As the plaintiff himself acknowledged, it would be "ludicrous" to think of being a physician at CHCP without having privileges at Yale-New Haven Hospital.

The defendant also contends that the plaintiff's inability to renew his privileges provided a legal basis to terminate the plaintiff's contract. Specifically, the defendant relies on the doctrines of impracticability of performance and frustration of purpose.

"The impracticability doctrine represents an exception to the accepted maxim of *pacta sunt servanda,* in recognition of the fact that certain conditions cannot be met because of unforseen occurrences. *Cf. Aetna Casualty & Surety Co. v. Murphy,* 206 Conn. 409, 413, 538 A.2d 219 (1988). A party claiming that a supervening event or contingency has prevented, and thus excused, a promised performance must demonstrate that: (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes. 2 Restatement (Second), Contracts § 261; E. Farnsworth, Contracts (1982) § 9.6, p. 678." *O'Hara, 218 Conn. at 637* (quoting *Dills v. Enfield,* 210 Conn. 705, 717, 557 A.2d 517 (1989)).

*5 "A party claiming that a supervening event or contingency has frustrated, and thus excused, a promised performance must demonstrate that: (1) the event substantially frustrated his principal purpose; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the frustration resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes. 2 Restatement (Second), Contracts § 265; E. Farnsworth, Contracts (1982) § 9.7, p. 691." *Id.* at 638 n. 7.

The defendant argues that each element of the two doctrines are satisfied in this case. The Court agrees that the undisputed facts support this contention.

The plaintiff's inability to retain his medical staff privileges at Yale-New Haven Hospital made performance impracticable and substantially frustrated the defendant's principal purpose in this case; i.e., employing an obstetrician/gynecologist to treat CHCP patients. The nonoccurrence of the event was a basic assumption on which the contract was made. In this case, the event was the plaintiff's inability to maintain privileges at the hospital. This inability is in no way the fault of the defendant. Finally, the defendant has not assumed a greater responsibility than the law imposes. The plaintiff could no longer perform and meet his obligations under the contract.

Therefore, the Court concludes that a supervening event occurred that made performance under the contract impracticable and frustrated its purpose. In light of this, a legal basis exists to justify the defendant's decision not to renew the plaintiff's employment contract. Restatement (Second), Contracts §§ 261, 265.

Conclusion

For all of the foregoing reasons, the defendant's Motion for Summary Judgment (Doc. No. 414) is granted, and judgment shall enter on the defendant's behalf.

1999 WL 464530, 1999 WL 464530 (D.Conn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

NUCLEAR MANAGEMENT CORPORATION,
Plaintiff,
v.
COMBUSTION ENGINEERING, INC., and
Octagon, Inc., Defendants.

No. 3:94CV00403(WWE).

Jan. 22, 1997.

*Ruling on Defendant Octagon, Inc.'s Motion for Summary Judgment*

EGINTON, Senior District Judge.

*1 Defendant Octagon, Inc. has moved for summary judgment (Document # 85) as to all counts of the Second Amended Complaint which assert claims against Octagon (Counts Four, Five, and Six). Finding no genuine issue of material fact as to any of these counts, this Court will GRANT Defendant's Motion for Summary Judgment.

*Facts*

This action arises out of the failed attempts of plaintiff Nuclear Management Corporation ("Nuclear Management") to purchase the stock of ABB Power Systems Energy Services, Inc. ("ABB"), a wholly owned subsidiary of Defendant Combustion Engineering, Inc. ("Combustion"). Plaintiff not only seeks to impose liability on Combustion as the seller, but it also seeks to hold liable defendant Octagon, Inc. ("Octagon"), the company that was ultimately successful in purchasing the shares of ABB. A brief factual history of the relevant aspects of the ABB transaction follows.

Sometime in 1993, Combustion began seeking a buyer for ABB. Both Nuclear Management and Octagon were interested prospective purchasers.

In December of 1993, Octagon first began discussions with Combustion concerning the acquisition of ABB. Octagon was aware that Combustion was talking to other interested purchasers about the acquisition of ABB. On February 10, 1994, Octagon outlined possible purchase terms to Combustion. Rather than pursuing a deal with Octagon, however, on February 23, 1994, Combustion entered into a contract with Nuclear Management for the sale of all shares of ABB.

The Purchase Agreement required Nuclear Management to obtain approximately $2 million in cash by the time of closing. The Purchase Agreement also contained an exclusive dealing clause, which provided:
> From the date of this Agreement until the Closing Date, the Seller shall not take any action to encourage, initiate or engage in discussions or negotiations with, or provide information to, anyone other than the Buyer concerning any purchase of the Shares or any merger, sale of substantial assets or similar transaction involving the Company.

The Closing Date was set for February 28, 1994, or at such other time as agreed to by Nuclear Management and Combustion, but not later than March 2, 1994.

Shortly after Combustion contracted with Nuclear Management, Combustion advised Octagon that it had entered into an agreement with Nuclear Management, but encouraged Octagon to continue further negotiations to enable a fall-back sale if the Nuclear Management deal did not close for any reason. On February 28, 1994, Combustion sent a facsimile to Octagon stating that it would keep Octagon "informed" of the progress of the transaction." On March 3, 1994, Octagon communicated to Combustion its continued interest in acquiring ABB if the deal with the other party did not close. The letter from Octagon's President stated as follows:
> Attached you will find recent correspondence from Mr. Eric Lint of your organization pertaining to the subject. [This was the letter advising Octagon that a contract had been signed by Combustion with another party].
> *2 Octagon, Inc. stands ready, willing, and able to close this transaction with *immediately available cash*. We will not, however, represent that this readiness posture will continue for more than a few more days. Our company would hope that you would recognize the benefits of an existing, established infrastructure coupled with skilled managers able to make this acquisition and perform services without delay associated with "raising the money" or risk associated with this start-up.
> Our commitment to providing both CE and ABB with the best services and with the best acquisition transaction at a price premium well above book remains unshaken, despite our surprise at learning

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

that a term sheet had been executed with another offeror at the same time we were being told that the "competition" was ongoing.
Please call me today to discuss this subject, or I will conclude that our efforts and our cash resources are better expended in other ventures.
(Original emphasis).

The following day, Octagon received a call from Combustion indicating that it was having difficulty closing with the other party and wanted to know if Octagon was still interested. Octagon responded that it was. Combustion indicated that it would give the other party until Monday (March 7th) to close, but that if the deal did not close by then, Combustion would give Octagon another call to see if they could get together.

Nuclear Management and Combustion did not close during the week of February 28th as their Purchase Agreement required, nor did they close prior to March 7th.

Nuclear Management and Combustion dispute the reasons why the deal did not close: Nuclear Management blames Combustion; Combustion blames Nuclear Management. For purposes of this motion, this Court will accept as true the contentions of Nuclear Management that it stood ready, willing and able to close the deal, and that Combustion breached its agreement by refusing to close according to the agreed-upon terms.

On March 7th, Combustion informed Octagon that it would like to discuss the possible sale of ABB to Octagon, and Octagon responded by sending Combustion a term sheet for the purchase of ABB. Octagon states that at no time between February 10th, when it communicated its initial proposal, and March 7th did it discuss terms of the acquisition of ABB by Octagon different from those outlined in its initial proposal.

On March 11th, Combustion and Octagon executed a Stock Purchase Agreement in which Octagon agreed to buy the ABB stock and to close on March 15th. The terms were essentially the same as those outlined in Octagon's February 10th proposal. As part of the contract between Combustion and Octagon, Combustion warranted that it owned the ABB stock free of any and all claims and that it had "full legal right, power and authority to sell, transfer and convey" the shares to Octagon. On March 15th, the transaction between Combustion and Octagon closed and Octagon acquired the ABB stock.

*3 It is undisputed that as of March 15th, Octagon had no actual knowledge of the exclusive dealings clause in the Nuclear Management Purchase Agreement. It is also undisputed that, as of March 15th, Octagon had no actual knowledge that Nuclear Management claimed a right to acquire the ABB stock. The President of Octagon states in his sworn affidavit that it was his understanding that Nuclear Management's deal with Combustion had not closed because Nuclear Management, which he describes as a "start-up company," had been unable to raise the money it needed to close.

Discussion

Summary judgment may be entered only when the court determines from the entire record that there is no genuine issue of material fact to be tried and the moving party is entitled to summary judgment as a matter of law. Rule 56(c), Fed. R. Civ. P. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987). The burden of establishing that no genuine factual dispute exists rests with the party moving for summary judgment. In determining the existence of a genuine issue of material fact, this Court must view the evidence in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Therefore, not only must there be no genuine issue of material fact, but there also must be no controversy regarding the inferences to drawn from the facts. *Donahue*, 834 F.2d at 57, citing *Schwabenbauer v. Board of Education*, 667 F.2d 305, 313 (2d Cir. 1981); accord *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 253-55.

I. Tortious Interference with Contractual Relations -- Count Four

The Connecticut courts have long recognized a cause of action for tortious interference with contract rights or other business relations. *Robert S. Weiss and Associates, Inc. v. Wiederlight*, 208 Conn. 525, 546 A.2d 216 (1988). The courts have held, however, that "not every act that disturbs a contract or business expectancy is actionable." *Id.* at 536 (citations and internal quotations omitted). A plaintiff claiming tortious interference must prove "that the defendant's conduct was in fact tortious." *Id.* "This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation... or that the defendant acted maliciously." *Id.* The Connecticut Supreme Court has emphasized repeatedly that a claim is established

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

only when the interference resulting in injury to another "is wrongful by some measure beyond the fact of the interference itself." *Blake v. Levy*, 191 Conn. 257, 262, 464 A.2d 52 (1983); *Kakadelis v. DeFabritis*, 191 Conn. 276, 279-80, 464 A.2d 57 (1983). *See Old Quarry Ass'n v. Hickey*, 659 F. Supp. 1064, 1072 (D. Conn. 1986). In *Robert S. Weiss and Associates*, the Connecticut Supreme Court held that the plaintiff's complaint failed to plead allegations essential to an action for tortious interference with contractual relations where plaintiff pled that defendant "encouraged" the covenantor to sell commercial insurance in the restricted area "when [defendant] knew or should have known of the covenant's terms." 208 Conn. at 536-37. The Court held that such allegations did "not fairly imply that [defendant] acted with 'fraud, misrepresentation, intimidation or molestation' or that it acted with malice." 208 Conn. at 536 (citations omitted).

*4 In this case while plaintiff has *alleged* that Octagon "intended to maliciously interfere" with plaintiff's contract with Combustion to purchase the ABB stock, there is not a shred of evidence in the record to support the allegation of malicious interference.

Relying heavily on Octagon's March 3rd letter, quoted in full above, Nuclear Management argues that a "reasonable inference" of "Octagon's intimidation and disparagement tactics" can be drawn from this letter. Citing Octagon's indication of its "surprise" over the Nuclear Management contract, Nuclear Management asserts that this was a "thinly veiled threat of a misrepresentation claim" intended by Octagon to intimidate Combustion into breaching the contract with Nuclear Management. Moreover, it claims that the letter's positive references to Octagon in contrast to the reference to the "delay associated with 'raising the money' or risk associated with start-up," (which it claims referred to the Nuclear Management deal), were intended to disparage Nuclear Management and maliciously induce a breach of contract by Combustion. This Court disagrees.

While this Court must view the inferences to be drawn from the facts in the light most favorable to plaintiff as the party opposing the motion for summary judgment, a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Zabelle v. Coratolo*, 816 F. Supp. 115, 119 (D. Conn. 1993) *citing Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), *cert. Denied*, 480 U.S. 932 (1987). Moreover, any inference to be drawn must be a reasonable one.

No *reasonable* inference can be drawn from the facts that Octagon acted maliciously in indicating its continued interest in purchasing ABB if the contract with the other party fell through. There was nothing wrong with Octagon's indicating its continued interest in purchasing ABB, or reciting its ability to do so with "immediately available cash" if the deal with another party did not close for an independent reason. Further, the fact that Octagon's March 3d letter places quotation marks around "raising the money" seems to indicate that this was the reason given by Combustion as to why it was having difficulty closing the deal with Nuclear Management -- that is, that Nuclear Management was having difficulty "raising the money."

In fact, Nuclear Management admits in its brief that its deal with Combustion was not consummated on March 4th for three reasons. It states: First, Combustion had not provided Nuclear Management with an explanation of the revised cash projections for ABB given to Nuclear Management on March 2nd. The second problem concerned difficulties Nuclear Management was having in securing workers' compensation coverage for ABB employees. The third problem related to verification of ABB's accounts receivables and Nuclear Management's intended use of a factoring company to finance part of the purchase price. None of these factors are attributed to Octagon. Accordingly, it is difficult to understand how Nuclear Management now holds Octagon accountable for inducing a breach of contract given these other factors, which it admits were the reasons the transaction was not consummated. There simply is no evidence in the record to show that Octagon induced Combustion to breach its contract with Nuclear Management. *Cf. Boulevard Associates v. Sovereign Hotels, Inc.*, 852 F. Supp. 127, 133 (D. Conn. 1994).

*5 Moreover, this was not a situation where Octagon sought to outbid Nuclear Management. There is no evidence that Octagon changed the terms that it had offered Combustion at the outset, which Combustion presumably found to be less favorable than those offered by Nuclear Management. *See, e.g., Old Quarry Ass'n, supra*.

Accordingly, this Court finds that there is no genuine issue of material fact as to plaintiff's claim of tortious interference with contractual relations and, therefore, holds that defendant Octagon is entitled to summary judgment as a matter of law on Count Four of plaintiff's Second Amended Complaint.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*II. Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110b -- Count Five*

Plaintiff has also alleged that this same conduct by Octagon constituted an "unfair and deceptive trade practice" in violation of Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.* CUTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or business." Conn. Gen. Stat. § 42-110b. [FN1]

> FN1. While this Court and the Connecticut Supreme Court have previously held that CUTPA does not apply to cases involving the purchase or sale of securities, *see, e.g., Seeman v. Arthur Andersen & Co.,* 896 F. Supp. 250 (D. Conn. 1995); *Russell v. Dean Witter Reynolds, Inc.,* 200 Conn. 172, 510 A.2d 972 (1986), those cases involved more traditional securities fraud claims. Whether those holdings would extend to CUTPA claims of this nature, which are more akin to tortious interference claims albeit involving securities, is an issue that this Court need not decide in light of its finding no genuine issue of material fact as to a deceptive or unfair trade practice.

The Connecticut Supreme Court has held that the essential difference between a tortious interference claim and a claim under CUTPA is the standard by which the alleged acts are measured. While liability in tort is imposed only where the defendant maliciously or deliberately interfered with the plaintiff's contract or business expectancies, "CUTPA liability is premised on a finding that the defendant engaged in unfair competition and unfair or deceptive trade practices." *Sportmen's Boating Corp. v. Hensley,* 192 Conn. 747, 754, 474 A.2d 780 (1984); *see also Web Press Services Corp. v. New London Motors, Inc.,* 203 Conn. 342, 363, 525 A.2d 57 (1987). Conduct that is actionable under CUTPA may not rise to a level sufficient to invoke liability for tortious interference. *Sportsmen's Boating Corp.,* 192 Conn. at 757. CUTPA is remedial legislation which is to be liberally construed to effectuate its public policy goals. *Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 656 A.2d 1009 (1995). Thus, this Court must consider plaintiff's tort and CUTPA claims separately.

In determining whether the practice in question is "unfair or deceptive" within the meaning of CUTPA, Connecticut courts have considered (1) whether the practice is at least within the penumbra of some common law, statute or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; or (3) whether it causes substantial injury to consumers, competitors, or other businessmen. *Old Quarry Ass'n,* 659 F. Supp. at 1073 (citations omitted); *Sportsmen's Boating Corp.,* 192 Conn. at 756 (citations omitted).

All three criteria do not need to be satisfied. A CUTPA violation can be established by showing either an actual deceptive practice or one amounting to a violation of public policy. An act is considered deceptive if it has the tendency or capacity to deceive. *Brandewiede v. Emery Worldwide,* 890 F. Supp. 79, 82 (D. Conn. 1994) (citations omitted), *aff'd* 66 F.3d 308 (2d Cir. 1995).

*6 After careful consideration of the affidavits and deposition excerpts submitted by both parties, this Court finds no genuine issue of material fact as to whether the actions of defendant Octagon constituted an unfair or deceptive trade practice. There is no evidence that Octagon's conduct offended traditional concepts of fairness; nor that its conduct was immoral, unethical, oppressive, or unscrupulous; nor that the breach of the Nuclear Management-Combustion Purchase Agreement was caused by the actions of Octagon. For these reasons, this Court finds that there is no genuine issue of material fact that Octagon engaged in actions that constitute an "unfair or deceptive practice" within the meaning of Conn. Gen. Stat. § 42-110b, and accordingly grants defendant Octagon's motion for summary judgment as to Count Five of plaintiff's Second Amended Complaint.

*III. Uniform Commercial Code, Conn. Gen. Stat. § 42a-8-315 -- Count Six*

Plaintiff Nuclear Management next asserts that by virtue of the Purchase Agreement with Combustion, it had an equitable interest in the shares of ABB and that Octagon, as a subsequent purchaser, acquired these shares subject to this prior equitable interest. Accordingly, Nuclear Management claims that it is entitled to relief under Article 8 of the Uniform Commercial Code, Conn. Gen. Stat. § 42a-8-315.

In defense of this claim, Octagon asserts that it was a "bona fide purchaser" as that term is defined by Article 8 of the Uniform Commercial Code in that it acquired the stock without notice of Nuclear Management's claim against Combustion. *See* Conn.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Gen. Stat. § 42a-8-302(3). Because a bona fide purchaser "acquires his interest in the securities free of any adverse claim," Conn. Gen. Stat. § 42a-8-302(3), if Octagon is a bona fide purchaser, then it is the lawful owner of the stock under the "shelter rule" of Article 8. The burden is on Octagon to establish this affirmative defense.

A "bona fide purchaser" is defined as "a purchaser for value in good faith and without notice of any adverse claim ...." Conn. Gen. Stat. § 42a-8-302(1). A person has "notice" of a fact when "(a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists." Conn. Gen. Stat. § 42a-1-210(25).

Nuclear Management does not contend that Octagon had actual knowledge of its claim to the stock; instead it argues that there is at least a genuine issue of material fact as to whether Octagon had reason to know of its claim from all the facts and circumstances known to it prior to its acquiring the stock on March 15th. See First United Financial Corp. v. Specialty Oil Co., 5 F.3d 944, 948 (5th Cir. 1993)(holding that the relevant inquiry is whether the facts surrounding the purchase so suspicious as to give the buyer reason to know of an adverse claim). Citing First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407 (7th Cir. 1988), Nuclear Management asserts that Octagon is charged with notice of adverse claims which were discoverable through adherence to reasonable commercial standards of business conduct, which Octagon did not follow in this case.

*7 Octagon counters that the undisputed facts establish that there were no suspicious circumstances that gave it reason to know of any claim by Nuclear Management to the stock. It believed that the Combustion-Nuclear Management deal fell through for the same reason that many stock deals do not close -- because the buyer could not come up with the necessary funds at closing. Furthermore, Octagon asserts that it reasonably relied on the representation of Combustion in its Purchase Agreement that it owned the ABB stock free and clear of any and all claims. Finally, it argues that there were no suspicious circumstances present that would require it to look further than it did -- that is, in requiring a representation from Combustion as to its free and clear title.

It is undisputed that Octagon did not have actual knowledge of Nuclear Management's claim. Upon close review of the record in this case, this Court finds no genuine issue of material fact as to the issue of constructive notice. There simply were no facts known to Octagon that should have raised a reasonable suspicion as to any equitable claim of Nuclear Management to the stock.

Accordingly, this Court finds that Octagon was a bona fide purchaser of the stock, which defeats any claim of Nuclear Management under Conn. Gen. Stat. § 42a-8-315.

*Conclusion*

For the reasons set forth above, this Court grants defendant Octagon, Inc.'s Motion for Summary Judgment and the Clerk is directed to enter judgment in favor of Octagon, Inc. and against plaintiff Nuclear Management Corp. on all counts of plaintiff's Second Amended Complaint.

SO ORDERED.

1997 WL 43099, 1997 WL 43099 (D.Conn.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works