*EXHIBIT A*

Case 3:03-cv-00596-JBA   Document 36-2   Filed 12/15/2003   Page 1 of 19

2003 WL 22351018      Page 1
--- F.Supp.2d ---
(Cite as: 2003 WL 22351018 (D.Conn.))

United States District Court,
D. Connecticut.

BISH, et al.
v.
AQUARION SERVICES CO., et al.

No. 3:03CV1118 (JBA).

Oct. 14, 2003.

Retired employees of city's waste water treatment facilities and unions brought suit against private operator of facilities, which took over for predecessor, and predecessor, seeking reinstatement of retirement medical insurance coverage. On motions to dismiss for lack of subject matter jurisdiction and/or failure to state claim, the District Court, Arterton, J., held that: (1) plaintiffs sufficiently pled, under notice pleading standards, their claims under Labor Management Relations Act (LMRA) and Employee Retirement Income Security Act (ERISA); (2) allegations that operator assumed predecessor's obligations under collective bargaining agreement (CBA) to provide employees with retirement medical insurance coverage when it took over administration of facilities, if proven, could form basis, under ERISA and LMRA, for holding operator liable for providing such coverage; (3) issue of whether operator was required, under LMRA, to continue retirement medical benefits after it took over facilities could not be resolved at motion to dismiss stage because of factual disputes as to whether operator assumed predecessor's responsibilities under CBA to provide such coverage; (4) claims for retirement medical benefits under ERISA against operator would be construed as claims against operator's ERISA plan administrator and trustees, and not dismissed for failure to name proper parties; (5) plaintiff's state law equitable estoppel claim against predecessor was preempted by § 301 of the LMRA; and (6) it would be futile to require employees to exhaust administrative remedies before bringing ERISA action against predecessor.

Motions granted in part, and denied in part.

[1] Pensions ☞ 105.1

296k105.1

Allegations that operator of city's waste water treatment facilities assumed predecessor's obligations under collective bargaining agreement (CBA) to provide retired employees of facilities with retirement medical insurance coverage when it took over administration of facilities, and that operator's refusal to provide coverage violated LMRA and ERISA, were sufficient, under notice pleading requirements, to give operator fair notice of claims against it and grounds upon which they rested. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185; Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

[2] Pensions ☞ 102

296k102

Allegations that private operator of city's waste water treatment facilities assumed predecessor's obligations under collective bargaining agreement (CBA) to provide retired employees of facilities with retirement medical insurance coverage when it took over administration of facilities, if proven, could form basis, under ERISA and LMRA, for holding operator liable for providing such coverage. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185; Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

[3] Federal Civil Procedure ☞ 1772

170Ak1772

On motion to dismiss for failure to state claim stage of proceedings, plaintiffs, in accordance with notice pleading requirements, need not establish that they will likely prevail in their claim, but merely that they are entitled to present evidence in support of their claim. Fed.Rules Civ.Proc.Rules 8(a), 12(b)(6), 28 U.S.C.A.

[4] Federal Civil Procedure ☞ 1773

170Ak1773

Given notice pleading standard, district court may dismiss complaint for failure to state claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with allegations. Fed.Rules Civ.Proc.Rules 8(a), 12(b)(6), 28 U.S.C.A.

[5] Labor Relations ☞ 262

232Ak262

Under the LMRA, although subsequent business entity generally is not bound by collective bargaining

agreement (CBA) of its predecessor, it may impliedly or expressly assume CBA's obligations, and thereby agree to be bound; evaluating such claims is by necessity fact-intensive endeavor. Labor Management Relations Act, 1947, § 1 et seq., 29 U.S.C.A. § 141 et seq.

[6] Federal Civil Procedure ⚖=1831
170Ak1831

Issue of whether new operator of city's waste water treatment facilities was required, under LMRA, to continue retirement medical benefits of retired employees of facilities when it took over facilities from predecessor could not be resolved at motion to dismiss stage because of factual disputes as to whether operator assumed predecessor's responsibilities under collective bargaining agreement (CBA) to provide such coverage. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

[7] Pensions ⚖=105.1
296k105.1

Claims for retirement medical benefits, under ERISA, against new operator of city's waste water treatment facilities by retired employees of facilities would be treated as claims against operator's plan administrator or trustees, and not dismissed for failure to name proper parties, in light of employee's allegations that operator assumed obligations to contribute to retirement plan when it took over from predecessor, and operator's denial of such obligation. Employee Retirement Income Security Act of 1974, § 502(a)(1)(B), 29 U.S.C.A. § 1132(a)(1)(B).

[8] Estoppel ⚖=52(8)
156k52(8)

State law equitable estoppel claim by retired employees of city's waste water treatment facilities against former operator of facilities, seeking reinstatement of their retirement medical insurance coverage, was preempted by § 301 of the LMRA; claim, as well as operator's defense to claim, i.e., that its obligation to provide such coverage under collective bargaining agreement (CBA) became null and void when its contract with city terminated, required interpretation of CBA. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

[8] States ⚖=18.51
360k18.51

State law equitable estoppel claim by retired employees of city's waste water treatment facilities against former operator of facilities, seeking reinstatement of their retirement medical insurance coverage, was preempted by § 301 of the LMRA; claim, as well as operator's defense to claim, i.e., that its obligation to provide such coverage under collective bargaining agreement (CBA) became null and void when its contract with city terminated, required interpretation of CBA. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

[9] Labor Relations ⚖=758.1
232Ak758.1

[9] Labor Relations ⚖=773.1
232Ak773.1

If resolution of state-law claim depends upon meaning of collective-bargaining agreement (CBA), application of state law, which might lead to inconsistent results since there could be as many state-law principles as there are States, is preempted by § 301 of the LMRA, and federal labor-law principles must be employed to resolve dispute. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

[9] States ⚖=18.46
360k18.46

If resolution of state-law claim depends upon meaning of collective-bargaining agreement (CBA), application of state law, which might lead to inconsistent results since there could be as many state-law principles as there are States, is preempted by § 301 of the LMRA, and federal labor-law principles must be employed to resolve dispute. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

[10] Labor Relations ⚖=758.1
232Ak758.1

[10] Labor Relations ⚖=773.1
232Ak773.1

Section 301 of the LMRA preempts state law only if application of state law requires interpretation of collective-bargaining agreement (CBA). Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

[10] States ⚖=18.46

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

360k18.46

Section 301 of the LMRA preempts state law only if application of state law requires interpretation of collective-bargaining agreement (CBA). Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

[11] Pensions ☞140
296k140

Although ERISA itself does not include exhaustion requirement, there is firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

[12] Pensions ☞140
296k140

It would be futile to require retired employees of city's waste water treatment facilities to exhaust administrative remedies and pursue administrative claim process before bringing action, under ERISA, for reinstatement of their retirement medical insurance coverage, against former operator of facilities because operator's administrative procedure was aimed at resolving disputes about particular benefits for which coverage was in dispute under respective health care benefit programs, and that was not relief sought by employees. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

[13] Pensions ☞140
296k140

Requirement that plaintiffs exhaust administrative remedies before bringing ERISA actions serves important purposes, including to (1) uphold Congress' desire that ERISA trustees be responsible for their actions, not federal courts, (2) provide sufficiently clear record of administrative action if litigation should ensue, and (3) assure that any judicial review of fiduciary action, or inaction, is made under arbitrary and capricious standard, not de novo. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

[14] Pensions ☞140
296k140

If pursuit of administrative remedies would be futile, then purposes of exhaustion requirement are not served, and the failure to exhaust may be excused in ERISA actions, but to overcome exhaustion rule, plaintiffs must make a clear and positive showing that administrative procedure would be futile. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

[15] Pensions ☞140
296k140

Exhaustion of administrative remedies rule, in the context of ERISA, requires only those administrative appeals provided for in the relevant plan or policy. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

J. William Gagne, Jr., J. William Gagne & Assoc., Wethersfield, CT, John R. Williams, Williams & Pattis, New Haven, CT, for Plaintiffs.

Daniel Schwartz, Jennifer L. Sachs, Patricia M. Canavan, Day, Berry & Howard, Christian A. Grenier , Conrad S. Kee, Jeffrey M. Vona, Jackson Lewis, Stamford, CT, John Richard Mitola, Office of the City Attorney, Bridgeport, CT, for Defendants.

Ruling on Defendants Aquarion's and U.S. Filter's Motions to Dismiss [Docs. ## 29, 31]

ARTERTON, District Judge.

*1 Plaintiffs commenced this suit to reinstate their retirement medical insurance coverage that was terminated after the transfer of administration of the Bridgeport Water Pollution Control Authority's waste water treatment facilities, where they had been formerly employed. Defendants Aquarion Services Company, Aquarion Company, and Aquarion Water Company (collectively "Aquarion") moved to dismiss all counts of Plaintiffs' Amended Complaints that were directed at Aquarion. Defendant U.S. Filter Operating Services, Inc. ("US Filter") moved under Fed. R. Civ. P. 12(b)(1) and (6) to dismiss Counts Five, Eleven, Twelve and Fifteen of Plaintiffs' Amended Complaint. For the reasons discussed below, Aquarion's motion is denied. US Filter's motion is granted as to Count Five and denied as to Counts Eleven, Twelve and Fifteen.

I. Background [FN1]

Plaintiffs Alexander Bish and Richard Faustine, and Intervening Plaintiff Donald Mohyde, are retired employees of the Bridgeport Water Pollution Control

Authority ("WPCA"). Plaintiff Local 1303 of Council 4, American Federation of State, County and Municipal Employees, AFL-CIO ("Local 1303") is the union representing Bish, Faustine and other WPCA employees. Intervening Plaintiff International Brotherhood of Teamsters Local 145 ("Local 145") is the union representing Mohyde and certain other employees of the WPCA. Plaintiffs claim entitlement to retirement medical benefits, which they were refused after Aquarion replaced U.S. Filter as the private entity operating the WPCA's waste water treatment facilities.

On April 28, 1997, Defendant City of Bridgeport ("Bridgeport") entered into a contract with a private company, Professional Services Groups, Inc. ("PSG"), to operate the WPCA's waste water treatment site. Prior to the privatization of management of the water treatment facilities, Bridgeport Mayor Joseph P. Ganin stated in a letter to WPCA employees that all city waste water treatment employees would be offered jobs by PSG, would be provided with an equal or better wage and benefit package, and would, as employees of PSG, be allowed to participate in the state-managed retirement fund with no disruption in pension plans.

Upon formally entering into the privatization contract on April 28, 1997, PSG accepted the terms of Mayor Ganin's letter to WPCA employees, recognized the unions, and entered into collective bargaining agreements with Local 1303 ("Local 1303 CBA"), and with Local 145 ("Local 145 CBA"). Both collective bargaining agreements were to remain in effect for five years from the date of execution and were thereafter to be automatically renewed absent notice from one of the parties.

US Filter subsequently purchased PSG and agreed to adopt the CBA. When plaintiffs Bish and Faustine retired, they were covered by the Local 1303 CBA and were provided with retiree medical benefits by U.S. Filter pursuant to Section 29-3 of the CBA, which states:
> For those employees who have completed fifteen (15) years of service and are fifty-five (55) years of age, or have completed twenty-five (25) years of service regardless of their age, and who will retire during the term of this agreement or an employee over the age of sixty-five (65) but not eligible for Medicare and who will retire during the term of this [a]greement, PSG shall provide and pay for the Insurance coverages as described in Section 29-1(a), (b), (c), and (d) for each retiree and his enrolled dependents.
> *2 A) PSG may offer a point-of-service plan option that enables employees to receive improved benefits and administration through a network of participating providers.
> B) There shall be a retiree contribution equal to five (5%) percent of the cost of the difference between the employee and the dependent(s) premium.

Mohyde, who was covered by the Local 145 CBA, also retired during the CBA's term and received the same retirement benefits from U.S. Filter, his pursuant to Section 17.03 of the Local 145 CBA.

Subsequently, Aquarion submitted proposals to the City to operate the Bridgeport waste water treatment facility. In September 2002, John Bonomo, the Vice President of Aquarion, wrote a letter to Andrew S. Abate, General Manager of the WPCA, stating: "[W]ith specific reference to the 1996 letter, and as indicated in our prior submittals: ... There will be no disruption in pension plans. As required by the RFP, and as indicated in our previous responses, Aquarion will provide retirement benefits which will mirror those of the MERF plan." On April 18, 2003, Aquarion entered into an agreement to operate the waste water site.

After U.S. Filter's contract to operate the waste water treatment facilities terminated, Faustine, Bish, and Mohyde received the following letter from U.S. Filter:
> The Bridgeport, CT project site was acquired by Aquarion Water Company (Aquarion) effective April 18, 2003.
> In accordance with this acquisition, Aquarion has assumed full responsibility for the collective bargaining agreements that cover the employees at the Bridgeport site effective April 19, 2003. Therefore, US Filter Operating Systems was relieved of its obligations under the collective bargaining agreements for the provision of retiree medical insurance coverage effective that same date, i.e. April 19, 2003.
> However, as a courtesy during this transition, USFilter will continue your retiree medical benefits through June 30, 2003. If you have any questions regarding your future retiree medical insurance coverage, please contact Lucy Teixeira, who is with Aquarion's Human Resources Department, as (203) 337-5986.

The letter was copied to Lucy Teixeira of Aquarion.

On May 15, 2003, Faustine, Bish and Mohyde received a letter from Aquarion:

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

On May 7, 2003, you were inadvertently provided with a letter from [U.S. Filter] stating that [Aquarion] has purchased a project site located in Bridgeport. The purpose of this letter is to provide you with accurate facts about this business transaction.

Aquarion Services Company entered into an agreement with the City of Bridgeport to operate their [sic] wastewater operation effective April 18, 2003. As part of the agreement, Aquarion Services hired the employees who were formerly employed by U.S. Filter and are in the process of negotiating the union contracts with the various represented groups. Aquarion Services did not acquire a site nor assume collective bargaining unit agreements. No transaction has transpired between U.S. Filter and Aquarion Services to shift the responsibility of retiree medical insurance from U.S. Filter to Aquarion.

*3 When a stock acquisition ensues between two companies, the acquirer takes on the liabilities of the purchased companies. Aquarion did not purchase U.S. Filter, and therefore U.S. Filter maintains all its liabilities associated with the implied or express promise to provide you with retiree medical insurance coverage and your pension benefit.

The letter closes with a suggestion to contact U.S. Filter with further questions.

On May 27, 2003, U.S. Filter wrote to Aquarion:
I am writing regarding the retiree medical benefits of three former employees at the Bridgeport CT site: Richard Faustine, Don Mohyde and Alexander Bish.
In accordance with its acquisition of the Bridgeport CT project site on April 19, 2003, Aquarion assumed full responsibility for the collective bargaining agreements that cover the employees at the Bridgeport site. Therefore, [U.S. Filter] was relieved of its obligations under the collective bargaining agreements for the provision of retiree medical coverage that same date, i.e., April 19, 2003.

* * *

Again, U.S. Filter has no retiree medical obligation by virtue of the termination of its collective bargaining agreements with the Bridgeport employees, coincident with the termination of its contract with the City of Bridgeport to operate the site.
Please be advised that [U.S. Filter] will honor its commitment to provide retiree medical insurance coverage for Messrs. Faustine, Mohyde and Bish through June 30, 2003. Further, due to the nature of this being retiree coverage, [U.S. Filter] does not have a continuation of coverage obligation under COBRA.

Finally, on May 29, 2003, Faustine and Mohyde received another letter from U.S. Filter, which again stated that Aquarion had assumed full responsibility for the collective bargaining agreement but that U.S. Filter would, as a courtesy, continue coverage through June 30, 2003.

Plaintiffs then brought suit in Superior Court for the Judicial District of Fairfield, and a temporary restraining order was issued prohibiting the defendants from canceling the plaintiffs' benefits. US Filter removed the case to this Court, and on August 1, 2003, this Court entered an order extending the TRO, requiring U.S. Filter to continue to provide the retiree health benefits to plaintiffs Bish and Faustine until further court order.

Plaintiffs' Amended Complaint alleges violations of the Labor Management Relations Act ("LMRA") and the Employment Retirement Income Security Act ("ERISA"), along with supplemental state common law claims. Counts One through Four, Six, and Seven of Plaintiffs' Amended Complaint allege breach of the collective bargaining agreement by U.S. Filter and Aquarium, and are brought under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Count Five raises an equitable estoppel claim against U.S. Filter, pursuant to the Court's supplemental jurisdiction in 28 U.S.C. § 1367. Count Eight through Ten make claims against Bridgeport for breach of contract and misrepresentation, and are brought under 28 U.S.C. § 1367. Counts Eleven through Sixteen allege, under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), that U.S. Filter and Aquarion failed to provide benefits to plan participants. [FN2]

*4 Aquarion has moved under Fed.R.Civ.P. 12(b)(6) to dismiss all claims against it, while U.S. Filter has moved under Fed.R.Civ.P. 12(b)(6) to dismiss Count Five as preempted by federal law, and under Fed.R.Civ.P. 12(b)(1) to dismiss Counts Eleven, Twelve and Fifteen for failure to exhaust administrative remedies.

II. Standard

When deciding a 12(b)(6) motion to dismiss, the Court must accept all well-pleaded allegations as true

2003 WL 22351018 Page 6
(Cite as: 2003 WL 22351018, *4 (D.Conn.))

and draw all reasonable inferences in favor of the pleader. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513-14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

A motion to dismiss under Rule 12(b)(1) is proper to contest the basis for the Court's subject matter jurisdiction. "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). The plaintiff has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *See id.* (citing *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996)).

III. Discussion

A. Aquarion's Motion to Dismiss

Aquarion contends that it is not liable under either ERISA or the LMRA for any alleged breach of the collective bargaining agreement, because Aquarion (1) was never a party to the CBA, (2) never employed plaintiffs, (3) has no relationship with U.S. Filter (as it "merely replaced U.S. Filter as the private entity providing waste water treatment services to the City of Bridgeport"), and (4) did not assume the obligations under "US Filter's CBA to U.S. Filter's retirees." *See* Def.'s Mem. L. Supp. Mot. Dismiss [Doc. # 30] at 2. Aquarion argues that plaintiffs' claim that Aquarion in fact assumed the obligations of the collective bargaining agreement between U.S. Filter and the unions is "conclusory," "unsupported by any other factual assertions," and thus "insufficient to defeat Aquarion's motion to dismiss." *Id.* at 6. Aquarion also argues that section 301 of the LMRA only applies to violations by a signatory to a contract, and only to disputes between an employer and employees. Finally, Aquarion argues that ERISA does not apply because it was not the administrator or trustee of the retirement plan at issue.

Aquarion's motion is misguided, for it misstates the standard of review for motions to dismiss and disregards the well-settled framework for determining the liability of subsequent employers under the LMRA and ERISA. In short, plaintiffs' allegations that Aquarion assumed the obligations of U.S. Filter's collective bargaining agreement are sufficiently pled, and if proven, may form the basis of Aquarion's liability under the LMRA and ERISA.

1. Sufficiency of Plaintiffs' Pleadings

*5 [1][2][3][4] Federal Rule of Civil Procedure 8(a)(2) provides "that a complaint must include 'only a short and plain statement of the claim showing that the pleader is entitled to relief.' Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.* (citations omitted). It bears repeating, therefore, that at this stage of the proceedings, plaintiffs need not establish that they will likely prevail in their claim, but merely that they are entitled to present evidence in support of their claim. Given the notice pleading standard, "a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz,* 534 U.S. at 513-14, 122 S.Ct. 992 (citations and internal quotation marks omitted).

Here, plaintiffs have alleged that Aquarian assumed the obligations in the collective bargaining agreement, and have supported this allegation with several letters from the various defendants attached to their complaint. [FN3] They acknowledge the existence of other letters from Aquarion denying its assumption of any such obligation, and recognize that their discovery will need to explore "testimony from a number of people to ascertain the intent of the various parties as they negotiated this transition." Pl. Mem. Opp. Mot. Dis. [Doc. # 37] at 12.

Notwithstanding these factual assertions, Aquarion argues alternatively that plaintiffs have failed to

allege "any facts or events which, if believed, would support their legal assertion that Aquarion assumed the obligations of U.S. Filter with respect to U.S. Filter's retirees," Def. Aquarion's Rep. Supp. Mot. Dis. [Doc. # 39] at 1, and that plaintiffs' allegations are "conclusory," Def. Aquarion's Mem. L. Supp. Mot. Dis. [Doc. # 30] at 6. Aquarion misstates the standard.

First, whether Aquarion assumed obligations under the collective bargaining agreement requires the resolution of several underlying factual disputes about the circumstances surrounding the transfer of management of certain operations at the WPCA from U.S. Filter to Aquarion. Therefore, the relevant question under a 12(b)(6) motion is not whether Aquarion in fact assumed the obligations under the collective bargaining agreement, for all ambiguities in the documents attached to the complaint should be resolved in plaintiffs' favor at this stage. *See International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995). Instead, the relevant inquiry is whether Aquarion can be held liable under the LMRA or ERISA if plaintiffs prove the facts they are alleging. As discussed *infra,* the Court finds that Aquarion may be held liable under such facts.

*6 Second, the assertion that plaintiffs' allegations are conclusory is both factually dubious, given plaintiffs' highly specific assertions, and irrelevant as a matter of law, as all that is required under Fed.R.Civ.P. 8 is a "short and plain statement" that gives the defendant fair notice of the claim. The cases that Aquarion cites to support its argument for a more stringent pleading standard have no bearing on plaintiffs' claims. *See* Def. Aquarion's Mem. L. Supp. Mot. Dis. [Doc. # 30] at 6-7 (citing, e.g. *De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65 (2d Cir.1996) ; *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996)). *De Jesus* involved allegations of fraud, which, under Fed.R.Civ.P. 9, must be pled with greater particularity. *Leeds,* a 1996 civil rights case arising under § 1983, likewise was decided on the basis of a higher pleading standard. [FN4] In contrast, claims under Fed.R.Civ.P. 8, as are plaintiffs', need only satisfy a minimal notice standard. Here, Aquarion clearly is on notice of the claims against it; it has, in fact, devoted much of its briefing to arguing against plaintiffs' factual claim that it assumed U.S. Filter's obligations under the collective bargaining agreement. Viewed in this context, plaintiffs' complaint allegations plainly are sufficient to survive a motion to dismiss.

2. Framework under the LMRA for finding a subsequent business entity bound by an existing collective bargaining agreement

[5] It is well settled under the LMRA that although a subsequent business entity generally is not bound by the collective bargaining agreement of its predecessor, it may impliedly or expressly assume the collective bargaining agreement's obligations, and thereby agree to be bound. Because plaintiffs have alleged that Aquarion assumed the obligation in a preexisting collective bargaining agreement to provide retiree medical benefits to petitioners, they have adequately stated a claim for relief under the LMRA.

In a trio of cases, the Supreme Court established the framework for determining whether a subsequent company is bound by the collective bargaining agreement between a labor union and the predecessor employer. In *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Supreme Court's first occasion to address the issue, the Court held that a successor had a duty to arbitrate under the terms of a predecessor employer's collective bargaining agreement, where there was a substantial continuity of identity in the business enterprise. *See id.* at 551, 84 S.Ct. 909. Wiley had acquired by merger the publishing firm Interscience Publishers, Inc., and thereafter refused to recognize the collective bargaining agreement between the employee's union and Interscience. As the Court noted, "Wiley, though recognizing for purposes of its own pension plan the Interscience service of the former Interscience employees, asserted that the merger terminated the bargaining agreement for all purposes." *Id.* at 545-46, 84 S.Ct. 909. The Supreme Court held that "the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement." [FN5] *Id.* at 548, 84 S.Ct. 909.

*7 *National Labor Relations Board v. Burns International Security Services,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), presented the next occasion for the Court to address whether a subsequent employer could be bound by the terms of a predecessor's collective bargaining agreement. Burns had replaced the Wackenhunt Corp. as the

contractor providing plant protection services to a Lockheed Aircraft Service Co. factory, and refused to honor the collective bargaining agreement that Wackenhut had signed with the security guard's union. The Supreme Court held that Burns was not "bound to observe the substantive terms of the collective-bargaining contract the union had negotiated with Wackenhut and to which Burns had in no way agreed." *Id.* at 281-82, 92 S.Ct. 1571. [FN6] The Court distinguished *Wiley,* emphasizing, among other matters, that "[n]othing in its actions ... indicated that Burns was assuming the obligations of the [collective bargaining] contract." *Id.* at 287, 92 S.Ct. 1571. [FN7]

Because *Wiley* and *Burns* sent somewhat mixed signals, the Supreme Court again addressed the issue in *Howard Johnson Co., Inc. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), reconciling its earlier holdings. Drawing from *Wiley* and *Burns,* the Court observed that " 'the substantial continuity of identity in the business enterprise,' " *Howard Johnson,* 417 U.S. at 259, 94 S.Ct. 2236 (quoting *Wiley,* 376 U.S. at 551, 84 S.Ct. 909), or "an express or implied assumption of the agreement," *id.* at 264, 94 S.Ct. 2236, were factors that could obligate a subsequent employer to follow the terms of the predecessor's collective bargaining agreement. The Court emphasized that its framework for determining the obligations of a subsequent employer to a predecessor's employees involved a fact-intensive inquiry:

> Particularly in light of the difficulty of the successorship question, the myriad of factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate .... [T]he real question in each of these 'successorship' cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former employer or their representative? The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of 'successor' which is applicable in every legal context....

*Howard Johnson,* 417 U.S. at 256, 264 n. 9, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).

The clear import of these cases is that a subsequent employer, while generally not bound by the substantive provisions in a collective bargaining agreement signed by its predecessor, may under certain circumstances assume and thereby be bound by the obligations of the predecessor's collective bargaining agreement. Evaluating such claims is by necessity a fact-intensive endeavor. Indeed, as is clear from the Second Circuit's cases applying the Supreme Court framework, the ultimate resolution of LMRA successorship claims depends on the peculiar, highly developed factual record in each case. For example, in *Stotter Division of Graduate Plastics Co. v. District 65,* 991 F.2d 997 (2d Cir.1993), the Court found a "substantial continuity of identity" between the predecessor and subsequent employer when:

> *8 [T]he same plant is being operated, the Stotter name is being used, the same products are being made with the same equipment and methods of production, all the Stotter employees were retained by GPC, and employee benefits are calculated based on service time with both Stotter and GPC.... Additionally, the collective bargaining agreement between the Union and GPC expressly adopted the provisions of the Contract with only immaterial exceptions. Finally, because the delinquent contributions arose prior to the transfer of the business, this is not a case where the Union is "assert [ing] ... bargaining rights independent of the [Contract]."

*Id.* at 1001-02. As a result of these factual findings, the Court concluded that the subsequent employer had a duty to follow the arbitration clause in the collective bargaining agreement and arbitrate the Union's claims. *Id.* at 1002. In *Local 32B-32J Service Employees International Union, AFL-CIO v. NLRB,* 982 F.2d 845 (2d Cir.1993), however, the Second Circuit stated that although the subsequent employer was found to have assumed the obligation to arbitrate under the collective bargaining agreement, its agreement to arbitrate did not mean that it "assumed the Agreement in full and is necessarily a successor with respect to legal obligations other than the obligation to arbitrate." *Id.* at 849-50 (upholding the NLRB's requirement that there be "clear and convincing evidence of consent, either actual or constructive, before [it] will find an assumption of the contract occurred."). In contrast, in *National Labor Relations Board v. Babad,* 785 F.2d 46, 49-50 (2d Cir.1986), the Second Circuit found that a subsequent building owner assumed its predecessor's labor contract when the collective bargaining agreement between the predecessor and the union provided that if the predecessor sold the building, it would require

the purchaser to agree in writing to adopt the agreement; when the sale contract between the predecessor and subsequent business provided that the collective bargaining agreement was a permitted encumbrance; and when the collective bargaining agreement was specifically assigned to the successor.

Aquarion fails to address this precedent. Instead, Aquarion argues that plaintiffs' LMRA claims must be dismissed because Aquarion was not a signatory to U.S. Filter's collective bargaining agreement with the unions and never employed plaintiffs, selectively citing to fact-specific conclusions and inapposite authorities. For example, in *District 2 Marine Engineers Beneficial Association-Associated Maritime Officers v. Grand Bassa Tankers, Inc.*, 663 F.2d 392 (2d Cir.1981), the Second Circuit held that a management contract between the owner of an oil tanker and the operator-employer was not within the scope of section 301 of the LMRA, because the owner was not an employer and did not sign the collective bargaining agreement with the employee's union. Thus, the management contract, not the collective bargaining agreement, was the purported basis for LMRA jurisdiction. Moreover, unlike plaintiffs' claim against Aquarion, there was no claim in *District 2* that Grand Bassa succeeded a predecessor as an employer, or assumed the obligations of the collective bargaining agreement. Likewise, in *McPeek v. Beatrice Co.*, 936 F.Supp. 618, 622 (N.D.Iowa 1996), there was no claim of assumption of the collective bargaining agreement.

*9 [6] As plaintiffs correctly observe, the "issue is not whether [plaintiffs] were employed by Aquarion; the issue is whether Aquarion assumed responsibility for providing them the benefits that they earned when they were employed by Aquarion's predecessor." Pls.' Mem. L. Opp. Mot. Dis. [Doc. # 37] at 13. Because there is a factual dispute about whether Aquarion assumed the terms of the collective bargaining agreement, and a resolution of this dispute in plaintiffs' favor would entitle them to relief from Aquarion, Aquarion's motion to dismiss the LMRA claims is denied.

3. ERISA

[7] Aquarion also seeks dismissal of plaintiffs' ERISA claims against them because Aquarion was never plaintiffs' employer nor an administrator of the ERISA plan that had been provided to plaintiffs by U.S. Filter. Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), provides plan beneficiaries with a cause of action to enforce their rights under the terms of the plan. Aquarion contends that the Second Circuit permits "only the plan and the administrators and trustees of the plan" to be held liable under Section 502(a)(1)(B), and requires dismissal of any claim brought against a party other than the administrator named in the plan. *See* Def. Aquarion's Mem. L. Supp. Mot. Dis. [Doc. # 30] at 9 (quoting *Crocco v. Xerox Corp.*, 137 F.3d 105, 107 (2d Cir.1998); *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195 (2d Cir.1989)).

Aquarion's reliance on *Crocco* and *Leonelli* is misplaced. In *Crocco*, 137 F.3d at 107, the Second Circuit found that when a named plan administrator was also a party defendant, an employer who was not specifically designated as a plan administrator in the retirement plan could not be held jointly liable for ERISA violations. The Second Circuit clarified that "the question before us is not whether a suit by Crocco against other Xerox employees may be treated as a suit against the Plan Administrator, but whether Crocco's cause of action against Xerox may be maintained *in addition to* her suit naming the Plan administrator as defendant." *Id.* at 107 n. 3 (emphasis in original). *Leonelli* more closely supports Aquarion's argument, but also is ultimately distinguishable. In *Leonelli*, the Second Circuit noted that the district court properly denied on grounds of futility plaintiff's motion to amend his complaint to recast his common law claims as ERISA claims, because, *inter alia*, "the proposed amended cause of action ... would be barred by plaintiff's failure to name the Pension Administrative Committee as a defendant. In a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." *Id.* at 1199. Unlike *Leonelli*, however, the case at hand involves the issue of a subsequent business entity's liability if it assumes the obligation to contribute to a benefit plan. Because Aquarion argues that it did not assume this obligation, Aquarion disclaims any involvement in the administration of plaintiffs' benefit plan. Thus, Aquarion does not claim that it provided plaintiffs with information about who its Plan Administrator is, how to contact the Plan Administrator, or how to pursue administrative remedies. [FN8] Under such circumstances, the failure to name a plan administrator is not fatal, and this Court will treat plaintiffs' ERISA claims against Aquarion as claims against Aquarion's plan administrator or trustees.

*10 While this Court has not identified any cases that

2003 WL 22351018                                                                                              Page 10
(Cite as: 2003 WL 22351018, *10 (D.Conn.))

directly support plaintiffs' argument that a subsequent business may be liable in an ERISA civil enforcement action under 1132(a)(1)(b) under the circumstances of this case, it is clear that in related contexts, ERISA recognizes successor liability. For example, the First Circuit has concluded that in suits for breach of fiduciary duty under section 409(b) of ERISA, 29 U.S.C. § 1109(b), which states that "[n]o fiduciary shall become liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary," that "[n]othing in section 409(b) precludes a later fiduciary from assuming by contract the ERISA obligations of a former fiduciary." *Watson v. Deaconess Waltham Hospital*, 298 F.3d 102, 110 (1st Cir.2002). In *Audit Services, Inc. v. Rolfson*, 641 F.2d 757, 763 (9th Cir.1981), the Ninth Circuit found that because a subsequent employer assumed the obligation in a collective bargaining agreement to contribute to a multi-employer benefit plan, it was liable under both the LMRA and ERISA. Likewise, in *Central States, Southeast and Southwest Areas Pension Fund v. PYA/Monarch of Texas, Inc.*, 851 F.2d 780, 782-83 (5th Cir.1988), the Fifth Circuit recognized the possibility of legal recovery under ERISA if the subsequent employer assumed the obligation to contribute to a benefit plan, though under the facts of the case, the court found that the obligation had not been assumed.

Because plaintiffs have stated facts in their complaint, which, if proven, may establish Aquarion's liability as a successor under ERISA, Aquarion's motion to dismiss the ERISA counts is denied.

B. US Filter's Motion to Dismiss

US Filter has moved to dismiss Count Five of plaintiffs' amended complaint as preempted by federal law, and Counts Eleven, Twelve, and Fifteen of plaintiffs' Amended Complaint for failure to exhaust administrative remedies.

1. Preemption of Equitable Estoppel Claim

[8] Count Five raises a state common law equitable estoppel claim against U.S. Filter, alleging that "Plaintiff retirees Bish and Faustine have already chosen to retire in reliance upon U.S. Filter's compliance with the terms of the collective bargaining agreement, and have incorporated into their decisions to retire at a particular time their expectations of continued no cost retiree medical insurance for life with the exception of the 5% contribution." Pl. Am. Compl. [Doc. # 22] at ¶ 24. US Filter argues that this claim is preempted by the LMRA, because it is based on a dispute over the terms of the collective bargaining agreement.

[9] Section 301(a) of the LMRA, 29 U.S.C. § 185(a), provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act ... may be brought in any district court of the United States having jurisdiction over the parties ...." The Supreme Court has concluded that section 301 not only confers jurisdiction on the federal courts but also "authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements." *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Thus, "if the resolution of a state-law claim depends upon the meaning of a collective- bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is preempted and federal labor-law principles-- necessarily uniform throughout the Nation--must be employed to resolve the dispute." *Lingle v. Norge Division of Magic Chef, Inc.*, 486 U.S. 399, 405-06, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988); *see also United Steelworkers of America, AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 368, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990) ("Any state- law cause of action for violation of collective-bargaining agreements is entirely displaced by federal law under § 301.") (citing *Avco Corp. v. Aero Lodge No. 735, Intern. Ass'n of Machinists*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968)); *Franchise Tax Board of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 23-24, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). ("[T]he preemptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.' Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301.") (citation omitted).

*11 [10] Nonetheless, the doctrine of preemption applies "only if such application requires the interpretation of a collective-bargaining agreement." *Lingle*, 486 U.S. at 413, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). *See also Wall v. Construction & General Laborers' Union*, 224 F.3d 168, 178 (2d Cir.2000) ("Section 301 of the LMRA preempts claims that are

'inextricably intertwined with consideration of the terms of [a] labor contract.' ") (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)); *Vera v. Saks & Co.*, 335 F.3d 109, 114 (2d Cir.2003) ("Not every suit concerning employment or tangentially involving a CBA ... is preempted by section 301."). Plaintiffs thus argue that interpretation of the CBA is not required to adjudicate their equitable estoppel claim, and so Count Five is not preempted by the LMRA. Plaintiffs argue first that "U.S. Filter claims that it is no longer obligated to comply with the collective bargaining agreement. Assuming this is so, it would appear to be irrelevant to U.S. Filter whether its actions comport with the agreement or not." Pl.'s Mem. L. Opp. Mot. Dis. [Doc. # 38] at 6-7. Second, plaintiffs contend that "it is not the terms of the agreement that form the basis of the plaintiffs' claim, but U.S. Filter's longstanding practice of administering retiree medical insurance coverage in a particular way, regardless of the terms of the collective bargaining agreement." *Id.* at 7.

Plaintiffs' first argument is unpersuasive. As plaintiffs acknowledge, U.S. Filter's defense to plaintiff's claim that it is obliged by the CBA to provide plaintiffs with retirement medical benefits for life is that "its obligations under the collective bargaining agreement became null and void on the effective date that its contract with the City terminated." Pls.' Mem. L. Opp. U.S. Filter's Mot. Dis. [Doc. # 38] at 7. A resolution of this dispute will require an interpretation of the CBA's provisions, including whether the benefits for those retired during the CBA's term had vested before the termination of the CBA. These sorts of issues are precisely the kind that must be dealt with under the federal common law pursuant to section 301 of the LMRA.

Plaintiff's second argument is also unavailing. Plaintiff's equitable estoppel claim in Count Five is expressly based on the CBA, alleging, for example that "US Filter has maintained a practice in accordance with the collective bargaining agreement," and that plaintiffs chose "to retire in reliance upon U.S. Filter's compliance with the terms of the collective bargaining agreement." Pls.' Amended Complaint, Count Five [Doc. # 22] at ¶ 23. Moreover, U.S. Filter's "longstanding practice" of providing retiree medical benefits is claimed to be a direct result of its duty under the terms of the collective bargaining agreement, not any unilateral beneficence. Because plaintiffs' common law estoppel claim requires interpretation of the CBA, it is preempted by the LMRA. Accordingly, U.S. Filter's motion to dismiss Count Five of Plaintiffs' complaint is granted. [FN9]

2. Exhaustion of Administrative Remedies

*12 [11][12] Defendants also claim that Plaintiffs' ERISA claims should be dismissed because plaintiffs failed to exhaust their administrative remedies under U.S. Filter's Employee Welfare Benefit Plan. ERISA requires every employee benefit plan to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). Therefore, although ERISA itself does not include an exhaustion requirement, there is a "firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases." *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588, 594 (2d Cir.1993) (quoting *Alfarone v. Bernie Wolff Construction*, 788 F.2d 76, 79 (2d Cir.1986)).

The U.S. Filter Employee Welfare Benefit Plan has a "Claims and Appeal Procedure," which provides for administrative review of the denial of a claim. Paragraph 7(a)(4) states:

*Review of Denial of Claim.* A claimant may request a review by a committee appointed by the Company for such purpose (the "Group Health Benefit Review Committee") of a decision denying a claim in writing within 180 days following receipt of the denial. All such reviews shall be decided in writing by the Group Health Benefit Review Committee within the time periods specified below...

US Filter Employee Welfare Benefit Plan [Doc. # 33, Ex. A] at ¶ 7(a)($).

The Summary Plan Description further instructs claimants that "[i]n no event may you bring a legal action in court with respect to a dispute over your benefits under the Plan or any Benefit Program unless and until you have complied with the mandatory claim and appeals procedure under the applicable Benefit program." US Filter Employee Welfare Benefit Plan, Summary Plan Description [Doc. # 33, Ex. B]. Based on these provisions, U.S. Filter argues that plaintiffs were on notice that they were required to exhaust their administrative remedies, and failed to do so.

[13][14] The exhaustion requirement serves important purposes, including to "(1) uphold Congress' desire that ERISA trustees be responsible

for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not de novo." *Davenport v. Harry N. Abrams, Inc.,* 249 F.3d 130, 133 (2d Cir.2001) (citations and internal quotation marks omitted). If the pursuit of administrative remedies would be futile, however, then the purposes of the exhaustion requirement are not served, and the failure to exhaust may be excused. To overcome the exhaustion rule, plaintiffs must "make a clear and positive showing" that the administrative procedure would be futile. *Kennedy,* 989 F.2d at 594.

Plaintiffs acknowledge that they did not pursue administrative remedies, and agree that a failure to exhaust administrative remedies ordinarily bars an ERISA claim. They argue, however, that exhaustion would be futile in this case, for four reasons. First, they contend that the plaintiffs are not eligible for benefits under the Employee Welfare Benefit Plan on which U.S. Filter relies, so the administrative procedure set out in that Plan is not applicable. Second, they argue that even if they were participants in the U.S. Filter Employee Welfare Benefit Plan, pursuing administrative remedies would have been futile because the Plan does not require U.S. Filter to make contributions to the plaintiffs' insurance coverage, which is the relief that plaintiffs seek from this suit. Third, plaintiffs argue that exhaustion would have been futile because the Plan's administrative appeal procedure is meant for disputes about payment for particular medical services, not for disputes about payment of premiums. Finally, plaintiffs assert that exhaustion is not necessary because pursuing the administrative process would have resulted in irreparable harm, since their claim would not have been resolved prior to the termination of their medical insurance coverage.

*13 [15] While plaintiffs first two arguments lack merit, [FN10] the Court agrees that it would be futile for plaintiffs to pursue the administrative claim process, because the administrative procedure was aimed at resolving disputes about particular benefits for which coverage is in dispute under their respective health care benefit programs, and that is not the relief plaintiffs seek. "Exhaustion in the context of ERISA requires only those administrative appeals provided for in the relevant plan or policy." *Kennedy,* 989 F.2d at 594. Here, U.S. Filter's Summary Plan Description defines a claim as "[a]ny request for benefits under a health care Benefit Program made in accordance with the Benefit Program's claims filing procedures, including any request for a service that must be pre-approved." See [Doc. # 33, Ex. B]. A claim is thus defined as request for benefits under a health care Benefit Program, not a request for payment of insurance premiums so that an individual would remain eligible to participate in the benefit program. Plaintiffs do not seek coverage for any particular medical service, and do not seek a determination of whether, under the terms of the plan itself, they are eligible participants. *Compare Davenport,* 249 F.3d at 132 (finding exhaustion required where claimant asserted eligibility to participate as an independent contractor under the terms of the benefit plan). Instead, plaintiffs's claim requires a determination first of which predecessor or subsequent employer, if any, must contribute to their benefit plan. In this regard, U.S. Filter expressly instructed plaintiffs that Aquarion had assumed the obligations of the collective bargaining agreement and thus U.S. Filter "was relieved of its obligations under the collective bargaining agreements for the provision of retiree medical insurance coverage". See Letter from Dianna Adams, U.S. Filter Benefits Specialist, May 7, 2003 [Doc. # 22, Ex. 3]. The letter instructed plaintiff to contact Lucy Teixeira at Aquarion's Human Resources Department, if they had any questions regarding their future retiree medical insurance coverage. *See id.* In essence, then, U.S. Filter represented to plaintiffs that it had no authority over their benefit plan. Plaintiffs' eligibility to participate in the plan was not based on the language of the plan, but on a corporate decision by U.S. Filter to hand over to Aquarion the operation of Bridgeport's waste water treatment facilities, and a dispute between Aquarion and U.S. Filter about the obligations Aquarion assumed by this transfer. As to this foundational dispute, there is nothing in the plan for an administer to interpret, and no established administrative procedure for resolving such a claim. As a result, plaintiffs' pursuit of the administrative appeal process would have been futile. The Court will thus excuse the exhaustion requirement.

III. Conclusion

For the foregoing reasons, Aquarion's motion to dismiss [Doc. # 29] is DENIED. US Filter's motion to dismiss [Doc. # 31] is GRANTED as to Count Five of Plaintiffs' Amended Complaint, but DENIED as to Counts Eleven, Twelve, and Fifteen.

*14 IT IS SO ORDERED.

FN1. The following facts are based on plaintiffs' amended complaint, and, where noted, intervening plaintiffs' amended complaints. For the purposes of the motions to dismiss, these facts are accepted as true. See *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

FN2. Intervening plaintiff Mohyde asserts the same LMRA, ERISA, and common law claims, as well as an additional claim of judicial estoppel against defendant Bridgeport, and a claim of breach of fair representation against "Third Party Defendant Teamsters."

FN3. In one letter, for example, written by Aquarion prior to entering into an agreement to operate the waste water site, Aquarion represented to the WPCA that "there will be no disruption in pension plans." In other letters, U.S. Filter, the company that Aquarion succeeded, declared that Aquarion assumed the obligations of the collective bargaining agreement U.S. Filter signed with the unions. Aquarion has also written to the plaintiffs, however, asserting that it did not assume the obligations of the CBA.

FN4. Six years after the Second Circuit decided *Leeds*, the Supreme Court clarified, in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), that civil rights actions, at least in the Title VII context, need only satisfy the notice pleading standard in Fed.R.Civ.P. 8.

FN5. The Supreme Court has since made clear that "[s]o long as there are other indicia of 'substantial continuity,' the way in which a successor obtains the predecessor's assets is generally not determinative of the 'substantial continuity' question." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 44 n. 10, 107 S.Ct. 2225, 96 L.Ed.2d 22(1987); *see also Howard Johnson Co. v. Detroit Local Joint Executive Bd., Hotel & Restaurant Employees*, 417 U.S. 249, 257, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974) ("ordinarily there is no basis for distinguishing among mergers, consolidations, or purchases of assets in the analysis of successorship problems").

FN6. *See also Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987) (reaffirming its holding in *Burns* that a successor employer is ordinarily not bound by the substantive provisions of a predecessor's collective-bargaining agreement, though it has an obligation to bargain with the union). Here, no claim is raised of a refusal to bargain with the union, and Aquarion has pointed out that it negotiated and entered into a collective bargaining agreement with employees' representatives. *See* Def. Aquarion's Mem. L. Supp. Mot. Dis. [Doc. # 30] at 4.

FN7. The Court also noted that, unlike *Wiley*, "[h]ere there was no merger or sale of assets, and there were no dealings whatsoever between Wackenhut and Burns. On the contrary, they were competitors for the same work, each bidding for the service contract at Lockheed. Burns purchased nothing from Wackenhut and became liable for none of its financial obligations." *Burns*, 406 U.S. at 286, 92 S.Ct. 1571.

FN8. *See, e.g.* 29 U.S.C. § 1133 (requiring every employee benefit plan to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied," and to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.")

FN9. The Court notes that while estoppel cannot be brought as an independent cause of action, in the opinion of at least one Circuit Court, the "federal common law of contract applicable under the LMRA includes the doctrine of promissory estoppel." *Anderson v. AT&T Corporation*, 147 F.3d 467, 477 (6th Cir.1998). Further, the Second Circuit allows an estoppel theory for recovery in ERISA suits under 29 U.S.C. § 1132(a)(1)(B) in "extraordinary circumstances." *See Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir.1993); *Schonholz v. Long Island Jewish Medical Center*, 87 F.3d 72, 78-79 (2d Cir.1996).

FN10. As a preliminary matter, ERISA requires all benefit plans to have an administrative appeal procedure. *See* 29 U.S.C. § 1133(2). Thus, to the extent that plaintiffs argue categorically that they are not required to pursue an administrative appeal under any benefit plan, their argument must fail. Moreover, plaintiffs' contention that the U.S. Filter Employee Welfare Benefit Plan does not apply to them as retirees is unpersuasive. Though plaintiffs assert that the Plan provides that only active employees may be plan participants, the plain language of the plan suggests otherwise. For example, Paragraph 2(a) of the Plan states that the terms of the relevant benefit program, not the Employee Welfare Benefit Plan itself, determined who was eligible to participate. *See* [Doc. # 33, Ex. A] at ¶ 2(a) ("An individual shall become eligible to participate in one or more Benefit Programs or to receive benefits under one or more Benefit Programs *only to the extent provided in the Operative Documents applicable to such Benefit Programs.*") (emphasis added). The Summary Plan Description goes on to limit the definition of employee to those actively on the payroll, but notes that the definition applies only "[t]o the extent that a Benefit program requires that an individual be an

employee for purposes of Benefit Program participation." *See* [Doc. # 33, Ex. B]. Thus, as U.S. Filter concludes, "if a benefit program does not limit eligibility to active employees, the Plan does not do so either." Def. Us Filter's Rep. Mem. L. Supp. Mot. Dis. [Doc. # 41] at 7. Plaintiffs make no claim that there is no benefit program in which they are eligible to participate as retirees. Indeed, such an assertion would render plaintiffs' ERISA claims moot.

Plaintiffs' contention that only the collective bargaining agreement, not the Welfare Benefit Plan itself, obligated U.S. Filter to pay retirement health benefits also must fail. A civil enforcement action under ERISA, 29 U.S.C. § 1132(a)(1)(B), is brought to recover benefits due "under the terms of [the] plan." Thus, to the extent plaintiffs have claims under ERISA, not merely under the LMRA, the terms of the benefit plan itself are relevant. The Court agrees with U.S. Filter's argument that "while Plaintiffs might assert elsewhere in their Amended Complaint that [US Filter] is obligated under the CBA to pay their medical coverage premiums, Counts Eleven, Twelve and Fifteen [those brought under ERISA] allege Bish and Faustine are eligible for continued coverage under the Plan." Def. U.S. Filter's Rep. Supp. Mot. Dis. [Doc. # 41] at 8. The collective bargaining agreement cannot be read in isolation from the terms of the U.S. Filter Welfare Benefit Plan.

2003 WL 22351018, 2003 WL 22351018 (D.Conn.), 173 L.R.R.M. (BNA) 2725

END OF DOCUMENT

Not Reported in A.2d                                                                                              Page 15
15 Conn. L. Rptr. 562
(Cite as: 1995 WL 562203 (Conn.Super.))

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut, Judicial District of New Haven, at New Haven.

ABELY WASTE OIL SERVICES, INC.
v.
RAVENSWOOD DEVELOPMENT CORP.

No. CV95 036 94 87S.

Sept. 15, 1995.

*MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO STRIKE*

HART, Judge.

*FACTUAL BACKGROUND*

\*1 On March 6, 1995, the plaintiff, Abley Waste Oil Services, Inc., filed a six-count complaint against the defendant, Ravenswood Development Corp., arising out of a contract to remove used oil from the defendant's property. The plaintiff alleges that on September 21, 1994, the defendant, through its president Richard Fiske, signed an Agreement for the removal of used oil from the defendant's property whereby it warranted that the oil had "not been mixed, combined, or otherwise blended in any quantity with materials containing polychlorinated biphenyls (PCBs) or any other material defined as hazardous waste." See copy of Agreement attached to Plaintiff's Complaint and marked as Exhibit A. The plaintiff claims that on September 26, 1994, it notified the defendant that the oil removed from the defendant's property under the Agreement was contaminated with PCBs. According to the allegations of the complaint, the plaintiff arranged for secure and appropriate storage of the trucks, as requested by the defendant, until the defendant arranged for the removal and disposal of the PCB contaminated oil on November 7, 1994. Despite its demands, the plaintiff alleges that the defendant refused to decontaminate the plaintiff's trucks. The plaintiff now seeks damages as a result of the loss of the use of its trucks and the costs incurred in decontaminating those trucks.

The complaint consists of six counts. The plaintiff alleges that the defendant was negligent in failing to determine whether the used oil was contaminated with hazardous waste (first count), breached its contract in failing to notify the plaintiff that the oil was contaminated (second count), breached a warranty that the oil did not contain PCBs (fourth count), and negligently misrepresented that the oil was not contaminated with PCBs (fifth count). The third count alleges that the defendant engaged in an unfair and deceptive trade practice in violation of CUTPA, General Statutes § 42-110a et seq., causing the plaintiff to suffer damages and incur costs and attorneys' fees. The sixth and final count alleges that the defendant is liable in conversion as a result of the plaintiff's loss of the use of its trucks from approximately September 22, to November 7, 1994.

On April 28, 1995, the defendant filed a motion to strike the third and sixth counts of the complaint on the ground that they fail to state claims upon which relief can be granted. In support of this motion, the defendant has filed a memorandum of law. On May 17, 1995, the plaintiff filed an opposing memorandum of law.

*LEGAL DISCUSSION*
I. Third Count--CUTPA

The defendant moves to strike the third count of the plaintiff's complaint on the grounds that it fails to state a claim upon which relief can be granted in that: 1) it does not allege that the defendant engaged in the trade or commerce of selling and disposing of waste oil; 2) the complaint fails to allege that the defendant engaged in wrongful conduct with such frequency as to indicate a general business practice; and 3) CUTPA was not designed to protect persons in the position of the plaintiff in relation to the defendant.

\*2 The plaintiff argues in its opposing memorandum that the distribution of the used oil by the defendant "falls within the requirements of CUTPA in that the defendant in doing this was engaging in 'any trade or commerce.'" Plaintiff's Memorandum, p. 5. Because the development of land for residential purposes necessarily involves the removal of unwanted property from the site, the plaintiff argues, the removal of used oil from the site in the present case was a function of the defendant's trade or commerce and not purely incidental to that trade or commerce as was the leasing of the site by the defendant in *Arawana Mills Co. v. United Technologies Corp.*, 795 F.Supp. 1238 (D.Conn.1992).

Not Reported in A.2d  
(Cite as: 1995 WL 562203, *2 (Conn.Super.))

Page 16

Second, the plaintiff claims that an allegation that the defendant engaged in wrongful conduct with such frequency as to indicate a general business practice is not necessary. The plaintiff argues that it is well established that "[a] single act of conduct, ..., is all that is required to maintain a cause of action under CUTPA." Plaintiff's Memorandum, p. 5, citing *Cardello v. Reves*, 3 CSCR 466 (April 15, 1988, Walsh, J.). Finally, the plaintiff argues that a CUTPA claim is not limited to conduct involving consumer injury, but rather that a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury. Plaintiff's Memorandum, p. 6, citing *McLaughlin Ford Inc. v. Ford Motor Co.*, 192 Conn. 558, 566-67, 473 A.2d 1185 (1984); *Fiorillo v. Murray*, 3 CSCR 577 (June 10, 1988, Burns, J.) (CUTPA claim may be maintained between two commercial parties).

General Statutes § 42-110b(a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." A "trade or commerce" is defined in CUTPA as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property ... and any other article, commodity or thing of value in this state." General Statutes § 42-110a(4).

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [or competitors or other businessmen]...." (Internal quotation marks omitted.) *Associated Investment Co. Ltd. Partnership v. Williams Associates IV*, 230 Conn. 148, 155, 645 A.2d 505 (1994). "[A]ll three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.... Thus a violation of CUTPA may be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public policy.... Furthermore, a party need not prove an intent to deceive to prevail under CUTPA." (Internal quotation marks omitted.) Id., 156.

A. The Conduct of Trade or Commerce

*3 The defendant argues in its memorandum that in order to state a claim under CUTPA, the plaintiff must allege that the acts complained of were performed in a "trade or business." Because the plaintiff has not alleged, nor could the plaintiff allege, that the defendant was engaged in the business of disposal of waste oil, the defendant claims that the plaintiff has failed to state a claim under CUTPA. According to the defendant, the disposal of waste oil is incidental to the defendant's business of developing real estate. In support of this argument, the defendant relies in part on *Arawana Mills Co. v. United Technologies Corp.*, 795 F.Supp. 1238, 1252-53 (D.Conn.1992), in which the court held that the plaintiff failed to state a claim under CUTPA for the defendant's conduct in leasing the plaintiff's property, because leasing property was not this defendant's "trade or commerce" within the meaning of CUTPA. The defendant argues that because the disposal of waste oil is incidental to its primary trade or commerce of developing real estate, the alleged acts of the defendant were not committed in the conduct of its trade or commerce.

"In order to allege a CUTPA violation properly, the plaintiff must allege, inter alia, that the acts complained of were performed in a 'trade or business.' " (Internal quotation marks omitted.) *Pergament v. Green*, 32 Conn.App. 644, 655, 630 A.2d 615, cert. denied, 228 Conn. 903, 634 A.2d 296 (1993). Because the plaintiff's complaint was devoid of any allegation that the acts complained of were performed in a "trade or business," the court in *Pergament v. Green* held that the plaintiff failed to frame a cause of action under CUTPA. Id. Although the plaintiff in the present case does not expressly allege in the complaint that the defendant is in the business of developing real estate and that the alleged wrongful acts were committed in the conduct of that trade or business, these facts are "necessarily implied and fairly provable under the allegations." *Westport Bank & Trust Co. v. Corcoran, Mallin & Aresco*, 221 Conn. 490, 495, 605 A.2d 862 (1992). See Plaintiff's Complaint, ¶ 4 ("The property ... is being developed for residential use by the defendant.").

In *Arawana Mills Co. v. United Technologies Corp.*, supra, 795 F.Supp. 1238, the plaintiff lessor brought an action against the defendant lessee alleging that the

Not Reported in A.2d
(Cite as: 1995 WL 562203, *3 (Conn.Super.))

Page 17

defendant had deposited hazardous waste on the property. The issue in that case was "whether defendant's act of leasing the Property from plaintiff is in the conduct of defendant's 'trade or commerce' within the meaning of CUTPA." Id. 1252. In dismissing the plaintiff's CUTPA claim, the court concluded that "defendant's act of leasing property from plaintiff is incidental to the conduct of its true business on the Property, the repair and servicing of aircraft engines." Id. The court noted that "plaintiff has not alleged facts to establish that defendant is in the 'trade or commerce' of leasing property, but has alleged that defendant is in the 'trade or commerce' of repairing or servicing aircraft engines.... Accordingly, plaintiff lessor has no claim under CUTPA against defendant lessee for defendant's conduct in leasing the Property, because leasing property is not this defendant's 'trade or commerce' within the meaning of CUTPA." (Citations omitted.) Id.

*4 In a recent Superior Court opinion, the court granted a motion to strike the plaintiffs' CUTPA claim against the defendant manufacturing companies arising out of the disposal of hazardous waste at a landfill. *Barnes v. General Electric Co.*, 14 Conn.L.Rptr. 455 (August 28, 1995, Hennessey, J.). In *Barnes*, the plaintiffs argued that the disposal of the by-products of the manufacturing process by the defendants "was an integral and necessary part of the trade or commerce engaged in by these defendants." Id., 460. Relying in part on *Arawana Mills Co. v. United Technologies Corp.*, the court found that the defendants' activities in connection with the landfill "are not within the normal 'trade or commerce' of these parties within the meaning of CUTPA." Id., 461. Because the court found that "the defendant's disposal of hazardous and toxic waste chemicals ... are merely incidental to the primary trade or commerce of the defendants," the court concluded that "a CUTPA claim based on such conduct is not viable against the defendants." Id. See also *Mayer- Wittmann Joint Ventures, Inc. v. Gunther International, Ltd.*, 12 Conn.L.Rptr. 532, 533 (October 21, 1994, Lewis, J.) ("[T]he central issue in determining whether CUTPA should apply is whether 'the party against whom [the CUTPA claim] is made *is in the business of entering into transactions of the type that is at issue.*' ") (Emphasis in the original.).

The parties in the present case raise essentially the same issues that were decided by the court in *Barnes v. General Electric Co.* In the present case the issue is whether the alleged acts of misconduct were committed in the conduct of the defendant's trade or commerce within the meaning of General Statutes § 42-110a(4). [FN1] While the defendant in the present case argues that the disposal of waste oil is incidental to its primary business of real estate development, the plaintiff argues that the defendant's trade or commerce necessarily involves the disposal of waste. However, this court will adopt the court's reasoning in *Barnes v. General Electric Co.*, and hold that the disposal of waste oil by the defendant is "merely incidental to the primary trade of the defendant[ ]." *Barnes v. General Electric Co.*, supra, 14 Conn.L.Rptr. 461. "Therefore, a CUTPA claim based on such alleged conduct is not viable against the defendant[ ];" id.; and the defendant's motion to strike must be granted as to Count Three. The other grounds for the motion to strike count three will not be addressed.

> FN1. General Statutes § 42-110a(4) states that: " 'Trade' and 'commerce' means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.

II.سixth Count--Conversion

The defendant also moves to strike the sixth count (conversion) on the ground that the complaint does not allege that the defendant wrongfully withheld possession of the plaintiff's property or tampered with plaintiff's property while in the defendant's possession. The defendant argues that conversion involves the "unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights." Defendant's Memorandum, citing *Falker v. Samperi*, 190 Conn. 412, 419-20, 461 A.2d 681 (1983). The defendant contends that because plaintiff Abley does not allege that it was unable to obtain its trucks at any point in time, or that defendant Ravenswood exercised dominion or control over those trucks, the plaintiff has failed to state a claim for conversion.

*5 The plaintiff argues in its opposing memorandum that the defendant, who initially had authority to use the plaintiff's property, used the plaintiff's property to an unauthorized extent or in an unauthorized way, resulting in conversion. The plaintiff claims that the defendant is liable in conversion for the period that the plaintiff was unable to use its trucks due to the PCB contamination.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
(Cite as: 1995 WL 562203, *5 (Conn.Super.))

Page 18

Conversion is defined as an "unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights.... It is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm." (Internal quotation marks omitted.) *Aetna Life & Casualty Co. v. Union Trust Co.,* 230 Conn. 779, 790-91, 646 A.2d 799 (1994). "The seminal case in this state regarding conversion is *Coleman v. Francis,* 102 Conn. 612, 129 A. 718 (1925).... *Coleman* established that there are two general classes of conversion: (1) that in which possession of the allegedly converted goods is wrongful from the outset; and (2) that in which the conversion arises subsequent to an initial rightful possession." (Internal quotation marks omitted.) *Maroun v. Tarro,* 35 Conn.App. 391, 396, 646 A.2d 251 (1994).

The plaintiff claims in its memorandum that the present case falls into the second class of conversion because "[t]he use of the plaintiff's trucks to transport the used oil was authorized; however, the extended storage of contaminated oil in plaintiff's trucks was not authorized." Plaintiff's Memorandum, p. 7. Based on the above definition, however, the plaintiff has failed to allege facts sufficient to establish a cause of action for conversion. The plaintiff does not allege in the complaint that the defendant exercised "the right of ownership" or had "possession" of the trucks to the exclusion of the plaintiff's rights. Rather, the plaintiff alleges that the defendant's wrongful conduct resulted in the loss of use of these trucks until the contaminated oil was removed and the trucks decontaminated. While this may give rise to a cause of action against the defendant, it does not amount to a conversion. "[A]bsent an allegation and proof that the vehicle was initially put into the defendant's lawful *possession,* the plaintiff has not made out a case under the second class of conversion." (Emphasis added.) *Maroun v. Tarro,* supra, 35 Conn.App. 397. Furthermore, "the plaintiff has not alleged ... wrongful *possession* of the ... [trucks] from the outset as required by the first class of conversion." (Emphasis added.) Id.

"The authoritative general rule recognized in numerous decisions in this State is that the measure of damages in [conversion] is the value of the goods at the date of the conversion." *Waterbury Petroleum Products, Inc. v. Canaan Oil & Fuel Co.,* 193 Conn. 208, 222, 477 A.2d 988 (1984) (the court noted, however, that this formula is not exclusive of other methods, and that consequential damages are also recoverable in a conversion action). Here, the plaintiff is not entitled to, nor is it seeking, the value of the trucks as the measure of damages in this case, and therefore conversion is not the appropriate cause of action. Essentially the plaintiff is seeking lost profits for the period in which it was unable to use its trucks. Lost profits are a proper measure of damages in a claim for breach of contract. *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. 1, 32, 662 A.2d 89 (1995) ("it is our rule that [u]nless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach").

*6 Because the plaintiff does not allege that the defendant exercised the right of ownership over the plaintiff's trucks to the exclusion of the plaintiff's rights and is not seeking the value of the trucks as the measure of damages, the defendant's motion to strike the sixth count of the plaintiff's complaint must be granted.

*CONCLUSION*

Based on the foregoing, the defendant's Motion to Strike (# 104) the third and sixth count of the plaintiff's complaint is granted.

SO ORDERED.

1995 WL 562203 (Conn.Super.), 15 Conn. L. Rptr. 562

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works