Not Reported in F.Supp.                                                    Page 1
1995-2 Trade Cases P 71,218
(Cite as: 1995 WL 649934 (S.D.N.Y.))

United States District Court, S.D. New York.

ANTI-MONOPOLY, INC., Plaintiff,

v.

HASBRO, INC., et al., Defendants.

94 CIV. 2120 (LMM) (AJP).

Nov. 3, 1995.

Carl E. Person, New York City, for Anti-Monopoly,
Inc.

Dennis P. Orr, Shearman & Sterling, New York
City, Gary L. Reback, Susan Abouchar Creighton,
Wilson Sonsini Goodrich & Rosati, Palo Alto, CA,
Steven A. Maddox, Wilson Sonsini Goodrich &
Rosati, Palo Alto, CA, for Hasbro, Inc.

Brooks R. Burdette, Schulte, Roth & Zabel, New
York City, for Toys" R" Us, Inc.

Neal R. Stoll, Skadden Arps Slate Meagher & Flom,
New York City, Gary L. Reback, David J. Berger,
John Mathias Horan, Wilson, Sonsini, Goodrich &
Rosati, Palo Alto, CA, for Kmart Corp.

OPINION AND ORDER

PECK, United States Magistrate Judge:

*1 By letter motion dated October 13, 1995
(supplemented by letter dated October 31, 1995),
plaintiff Anti-Monopoly, Inc. moves to compel
production of certain data processing files (that is,
computerized data) from defendants. The relevance
of the material for discovery purposes is conceded.
Defendants object largely on two grounds: (1) that
they are producing the information in hard copy
format, and (2) that they would have to "create" the
information in electronic format.

The law is clear that data in computerized form is
discoverable even if paper "hard copies" of the
information have been produced, and that the
producing party can be required to design a computer
program to extract the data from its computerized
business records, subject to the Court's discretion as
to the allocation of the costs of designing such a
computer program. The application of these
principles to the facts of this case, however, require
further negotiation by the parties.

ANALYSIS

Rule 34(a) of the Federal Rules of Civil Procedure
clearly authorizes a party to request production of
computerized data:
  Any party may serve on any other party a request
  (1) to produce ... any designated documents
  (including writings, ... and other data compilations
  from which information can be obtained,
  translated, if necessary, by the respondent through
  detection devices into reasonably usable form) ....

The 1970 Advisory Committee Notes to Rule 34
emphasize that Rule 34 applies to computer
technology:
  The inclusive description of "documents" is revised
  to accord with changing technology. It makes clear
  that Rule 34 applies to electronic data compilations
  from which information can be obtained only with
  the use of detection devices, and that when the data
  can as a practical matter be made usable by the
  discovering party only through respondent's
  devices, respondent may be required to use his
  devices to translate the data into usable form. In
  many instances, this means that respondent will
  have to supply a printout of computer data. The
  burden thus placed on respondent will vary from
  case to case, and the courts have ample power
  under Rule 26(c) to protect respondent against
  undue burden or expense, either by restricting
  discovery or requiring that the discovering party
  pay costs. Similarly, if the discovering party needs
  to check the electronic source itself, the court may
  protect respondent with respect to preservation of
  his records, confidentiality of nondiscoverable
  matters, and costs.
See also Sanders v. Levy, 558 F.2d 636, 648-49 (2d
Cir. 1976) (en banc) ("The 1970 amendments to the
Federal Rules rendered Rule 34 specifically
applicable to the discovery of computerized
information."), rev'd on other grounds sub nom.
Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 98
S. Ct. 2380 (1978) (Rule 23 rather than Rule 34
governs identification of class members; production
of computer tape proper but district court erred in
imposing cost of doing so on defendants); Santiago v.
Mills, 121 F.R.D. 636, 640 (W.D.N.Y. 1988) ("A
request for raw information in computer banks is
proper and the information is obtainable under the
discovery rules."); Daewoo Electronics Co. v. United
States, 650 F. Supp. 1003 (C.I.T. 1986) (Rule 34 "is
intended to keep pace with changing technology");
8A C. Wright, A. Miller & R. Marcus, Federal
Practice and Procedure § 2218 at 450 (1994) (1970
amendment of Rule 34 "brought the federal rules ...

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
1995-2 Trade Cases P 71,218
(Cite as: 1995 WL 649934 (S.D.N.Y.))

Page 2

into the computer age").

*2 As Professors Wright and Miller have noted:

[I]t has become evident that computers are central to modern life and consequently also to much civil litigation. As one district court put it in 1985, "[c]omputers have become so commonplace that most court battles now involve discovery of some computer-stored information."

*Id.* § 2218 at 449 (*quoting Bills v. Kennecott Corp.*, 108 F.R.D. 459, 462 (D. Utah 1985)); *see generally* Manual for Complex Litigation (Third) § 21.446 (1995).

Thus, today it is black letter law that computerized data is discoverable if relevant.

Turning to defendants' objections, defendants first contend that "all of the information plaintiff requests is already being produced by [defendants] as part of [their] document response." (Defendants' 10/20/95 letter at p. 3.) That argument was rejected fifteen years ago by the court in *National Union Electric Corp. v. Matsushita Electric Industrial Co.*, 494 F. Supp. 1257, 1261 (E.D. Pa. 1980) (*citing, inter alia, United States v. Davey*, 543 F.2d 996, 1000 (2d Cir. 1976)). *See also* 8A C. Wright, A. Miller & R. Marcus, *Federal Practice and Procedure* § 2218 at 452 & n.13 (citing cases). As in the present case, *Matsushita* involved the need for computerized sales and price information to allow analysis in an antitrust case. Thus, the rule is clear: production of information in "hard copy" documentary form does not preclude a party from receiving that same information in computerized/electronic form.

Second, defendants contend that "[n]othing in the Federal rules requires Defendants to create new documents that they do not maintain in the ordinary course of business" and "Plaintiff's motion would require [defendants] to create a new electronic format, solely to ease plaintiff's review of documents." (Defendants' 10/20/95 letter at p. 1, 3.) The court rejected this same argument in *Matsushita*, at least where the requesting party offered to pay the cost of creating the computer program. 494 F. Supp. at 1258-62; *accord, In re Air Crash Disaster at Detroit Metropolitan Airport*, 130 F.R.D. 634, 635 (E.D. Mich. 1989). The *Matsushita* court further noted:

[W]e suspect that by the year 2000 virtually all data will be stored in some form of computer memory. To interpret the Federal Rules which, after all, are to be construed to "secure the just, speedy and *inexpensive* determination of every

action," F.R. Civ. P. 1 (emphasis added), in a manner which would preclude the production of material such as is requested here, would eventually defeat their purpose.

*Matsushita*, 494 F. Supp. at 1262-63.

In its letter dated October 30, 1995, defendants claim that:

The documents that Hasbro has agreed to produce present the requested sales and discount data in various aggregate forms -- broken down by item, customer, year or month. These are the reports that Hasbro generated for use by its management in the normal course of business during the period in question. Hasbro is not seeking to withhold electronic versions of these reports. The fact of the matter is that these reports no longer exist in electronic form. Accordingly, Hasbro can produce nothing more than the hard copy versions that it has agreed to produce.

*3 What is at issue here, then, is not sales and discount data, but electronic versions of each and every invoice and credit memo generated by Hasbro over a four year period. The burden to Hasbro of collecting all of these electronic invoices is substantial and certain: weeks of programming and computer time to collect the invoices followed by substantial attorney review time to ensure that they are responsive. It would be impossible to complete production by the Court's November 30 deadline. The benefit to plaintiff, however, is entirely speculative. Plaintiff has made no showing as to why it is necessary or even helpful to examine individual invoices to substantiate allegations of discriminatory pricing, especially when Hasbro has already agreed to produce documents sufficient to show the terms of sale with all its customers.

If the "aggregating" reports referred to in the first paragraph truly "no longer exist in electronic form," obviously that moots the issue. [FN1]

As to the second quoted paragraph, the Court does not have sufficient information as to plaintiff's need for "electronic" invoices in light of other available discovery data or of the real costs (in time and money) to defendants to create a program to "collect" that data. The Court leaves it to the parties to further discuss the issue in light of the Court's ruling.

The Court further notes that, as in *Matsushita*, further Court rulings may depend on plaintiff's willingness to pay defendants' costs in creating the required computer program. *See also, e.g., In re Air Crash Disaster at Detroit Metropolitan Airport*, 130

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
1995-2 Trade Cases P 71,218
(Cite as: 1995 WL 649934 (S.D.N.Y.))

Page 3

F.R.D. at 636 (ordering requesting party to pay costs
of manufacturing computerized information);
*Williams v. E.I. du Pont de Nemours & Co.,* 119
F.R.D. 648, 651 (W.D. Ky. 1987) (same); *Bills v.
Kennecott Corp.,* 108 F.R.D. at 462-64 (same).

If the parties are not able to resolve the issue,
plaintiff is to submit a follow-up letter motion by
November 17, 1995 (with defendants' response due
November 29, 1995 and plaintiff's reply due by
December 4, 1995). As appropriate, affidavits from
computer personnel or computer experts should be
submitted.

SO ORDERED.

> FN1 Defendants will need to represent not
> just that the reports are not available
> electronically but that it is not possible to
> electronically re-create the reports by
> running a specially-written computer
> program over existing computerized
> business data.

1995 WL 649934 (S.D.N.Y.), 1995-2 Trade Cases P
71,218

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 1
92 Fair Empl.Prac.Cas. (BNA) 1539
(Cite as: 2003 WL 22410619 (S.D.N.Y.))

United States District Court,
S.D. New York.

Laura ZUBULAKE, Plaintiff,

v.

UBS WARBURG LLC, UBS Warburg, and UBS
AG, Defendants.

No. 02 Civ. 1243(SAS).

Oct. 22, 2003.

In action by female employee under federal, state, and city law for gender discrimination, failure to promote, and retaliation, employee moved for sanctions against employer for its failure to preserve backup tapes containing potentially relevant e-mail correspondence of key employees. The District Court, Scheindlin, J., held that: (1) employer had duty to preserve backup tapes; and (2) employer would be ordered to pay costs of deposing certain witnesses; but (3) reconsideration of Court's prior cost-shifting order regarding backup tapes was not appropriate; and (4) adverse inference instruction was not warranted.

Motion granted in part.

West Headnotes

[1] Federal Civil Procedure ⊂⊃1551
170Ak1551 Most Cited Cases

In action by female employee for gender discrimination, failure to promote, and retaliation, employer had duty to preserve backup tapes containing potentially relevant e-mails which were not otherwise available and involved key employees; duty attached when relevant employees anticipated litigation, even though employer had not yet requested tapes or filed complaint.

[2] Federal Civil Procedure ⊂⊃1636.1
170Ak1636.1 Most Cited Cases

On motion by employee suing for gender discrimination, failure to promote, and retaliation, reconsideration of cost-shifting order, which directed parties to share cost of restoring certain backup tapes, was not appropriate remedy for employer's failure to preserve backup tapes containing potentially relevant

and otherwise unavailable e-mail correspondence of key employees, since evidence that certain e-mails had not been retained and that certain backup tapes were missing had informed District Court's resolution of original cost-shifting motion.

[3] Federal Civil Procedure ⊂⊃2173
170Ak2173 Most Cited Cases

Even though employer had duty to preserve backup tapes, containing e-mail correspondence of key employees which was potentially relevant to female employee's suit for gender discrimination, failure to promote, and retaliation, and even though employer's destruction of certain backup tapes, covering time period when relevant employees anticipated litigation, was negligent, and of others, covering time period after employee filed Equal Employment Opportunity Commission (EEOC) charge, was grossly negligent, if not reckless, employer's spoliation did not warrant adverse inference instruction, absent evidence that destroyed evidence would have been favorable to employee.

[4] Federal Civil Procedure ⊂⊃1637
170Ak1637 Most Cited Cases

In action by female employee for gender discrimination, failure to promote, and retaliation, employer who destroyed potentially relevant backup tapes which it had duty to preserve would be required to pay costs for re-deposing certain witnesses for limited purpose of inquiring into issues raised by destruction of evidence and any newly discovered e-mails.

James A. Batson, Liddle & Robinson, LLP, New York, New York, for Plaintiff.

Kevin B. Leblang, Norman C. Simon, Kramer Levin Naftalis & Frankel LLP, New York, New York, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, J.

*1 "Documents create a paper reality we call proof." [FN1] The absence of such documentary proof may stymie the search for the truth. If documents are lost or destroyed when they should have been preserved because a litigation was threatened or pending, a party may be prejudiced. The questions presented here are how to determine an appropriate penalty for

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy
92 Fair Empl. Prac.Cas. (BNA) 1539
(Cite as: 2003 WL 22410619 (S.D.N.Y.))

Page 2

the party that caused the loss and--the flip side--how to determine an appropriate remedy for the party injured by the loss.

FN1. Mason Cooley, *City Aphorisms, Sixth Selection* (1989).

Finding a suitable sanction for the destruction of evidence in civil cases has never been easy. Electronic evidence only complicates matters. As documents are increasingly maintained electronically, it has become easier to delete or tamper with evidence (both intentionally and inadvertently) and more difficult for litigants to craft policies that ensure all relevant documents are preserved. [FN2] This opinion addresses both the scope of a litigant's duty to preserve electronic documents and the consequences of a failure to preserve documents that fall within the scope of that duty.

FN2. *See* Adam I. Cohen & David J. Lender, *Electronic Discovery: Law and Practice* § 3.01 (Aspen Law & Business, publication forthcoming 2003) ("Unlike paper documents, electronic documents can be updated or changed without leaving an easily recognizable trace. Therefore, unique questions may arise as to the scope of a party's duty to preserve evidence in electronic form.").

I. BACKGROUND

This is the fourth opinion resolving discovery disputes in this case. Familiarity with the prior opinions is presumed, [FN3] and only background information relevant to the instant dispute is described here. In brief, Laura Zubulake, an equities

trader who earned approximately $650,000 a year with UBS, [FN4] is suing UBS for gender discrimination, failure to promote, and retaliation under federal, state, and city law. She has repeatedly maintained that the evidence she needs to prove her case exists in e-mail correspondence sent among various UBS employees and stored only on UBS's computer systems.

FN3. *See Zubulake v. UBS Warburg, LLC,*-- F.R.D.--, No. 02 Civ. 1243, 2003 WL 21087884 (S.D.N.Y. May 13, 2003) (*"Zubulake I"*) (addressing the legal standard for determining the cost allocation for producing e- mails contained on backup tapes); *Zubulake v. UBS Warburg, LLC,* No. 02 Civ. 1243, 2003 WL 21087136 (S.D.N.Y. May 13, 2003) (*"Zubulake II"*) (addressing Zubulake's reporting obligations); *Zubulake v. UBS Warburg LLC,* 216 F.R.D. 280 (S.D.N.Y.2003) (*"Zubulake III"*) (allocating backup tape restoration costs between Zubulake and UBS).

FN4. *See* 6/20/03 Letter from James A. Batson, Zubulake's counsel, to the Court.

On July 24, 2003, I ordered the parties to share the cost of restoring certain UBS backup tapes that contained e-mails relevant to Zubulake's claims. [FN5] In the restoration effort, the parties discovered that certain backup tapes are missing. In particular:

FN5. *Zubulake III,* 216 F.R.D. 280.

| Individual/Server | Missing Monthly Backup Tapes |
|---|---|
| Matthew Chapin (Zubulake's immediate supervisor) | April 2001 |
| Jeremy Hardisty (Chapin's supervisor) | June 2001 |
| Andrew Clarke and Vinay Datta (Zubulake's coworkers) | April 2001 |

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 3
92 Fair Empl.Prac.Cas. (BNA) 1539
(Cite as: 2003 WL 22410619 (S.D.N.Y.))

Rose Tong (human resources)    Part of June 2001, July 2001,
                               August 2001, and October 2001
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

(UBS has located certain *weekly* backup tapes to fill some of the gaps created by the lost monthly tapes).

In addition, certain isolated e-mails--created after UBS supposedly began retaining all relevant e-mails--were deleted from UBS's system, although they appear to have been saved on the backup tapes. As I explained in *Zubulake III*, "certain e-mails sent after the initial EEOC charge--and particularly relevant to Zubulake's retaliation claim--were apparently not saved at all. For example, [an] e-mail from Chapin to Joy Kim [another of Zubulake's coworkers] instructing her on how to file a complaint against Zubulake was not saved, and it bears the subject line 'UBS client attorney priviledge [sic] only,' although no attorney is copied on the e-mail. This potentially useful e-mail was deleted and resided only on UBS's backup tapes.' [FN6]

FN6. *Zubulake III*, 216 F.R.D. at 287.

**2** Zubulake filed her EEOC charge on August 16, 2001; the instant action was filed on February 14, 2002. In August 2001, in an oral directive, UBS ordered its employees to retain all relevant documents. [FN7] As Zubulake specifically requested e-mail stored on backup tapes, UBS's outside counsel orally instructed UBS's information technology personnel to stop recycling backup tapes. [FN8]

FN7. *See* 3/26/03 Oral Argument Transcript at 40 (Statement of Kevin Leblang, counsel to UBS) ("As of August when Ms. Zubulake filed a charge, everyone was told nothing gets deleted and we searched everyone's computer, everyone's hard files, the human resources files and the legal files.").

FN8. *See* 9/26/03 Oral Argument Transcript ("9/26/03 Tr.") at 18 (Statement of Norman C. Simon, counsel to UBS); *see also* 10/14/03 Letter from Norman Simon to the Court ("10/14/03 Ltr.") at 2.

Zubulake now seeks sanctions against UBS for its failure to preserve the missing backup tapes and deleted e-mails. In particular, Zubulake seeks the following relief: (a) an order requiring UBS to pay in full the costs of restoring the remainder of the monthly backup tapes; (b) an adverse inference instruction against UBS with respect to the backup tapes that are missing; and (c) an order directing UBS to bear the costs of re-deposing certain individuals, such as Chapin, concerning the issues raised in newly produced e-mails.

## II. LEGAL STANDARD

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." [FN9] The spoliation of evidence germane "to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." [FN10] However, "[t]he determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." [FN11] The authority to sanction litigants for spoliation arises jointly under the Federal Rules of Civil Procedure and the court's own inherent powers. [FN12]

FN9. *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999).

FN10. *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998).

FN11. *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 436 (2d Cir.2001).

FN12. *See Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72 (S.D.N.Y.1991) (Francis, M.J.) (citing Fed.R.Civ.P. 37). *See also Shepherd v. American Broadcasting Companies,* 62 F.3d 1469, 1474 (D.C.Cir.1995) ("When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy
92 Fair Empl.Prac.Cas. (BNA) 1539
(Cite as: 2003 WL 22410619 (S.D.N.Y.))

Page 4

the judicial process, the inherent power fills the gap."); *id.* at 1475 (holding that sanctions under the court's inherent power can "include ... drawing adverse evidentiary inferences"). *See generally* Cohen & Lender, *supra* note 2, § § 3.02[B][1]-[2].

## III. DISCUSSION

It goes without saying that a party can only be sanctioned for destroying evidence if it had a duty to preserve it. If UBS had no such duty, then UBS cannot be faulted. I begin, then, by discussing the extent of a party's duty to preserve evidence.

### A. Duty to Preserve

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." [FN13] Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?

> FN13. *Fujitsu,* 247 F.3d at 436 (citing *Kronisch,* 150 F.3d at 126). *See also Silvestri v. General Motors Corp.,* 271 F.3d 583, 591 (4th Cir.2001) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.") (citing *Kronisch,* 150 F.3d at 126).

### 1. The Trigger Date

In this case, the duty to preserve evidence arose, at the latest, on August 16, 2001, when Zubulake filed her EEOC charge. [FN14] At that time, UBS's in-house attorneys cautioned employees to retain all documents, including e-mails and backup tapes, that could potentially be relevant to the litigation. [FN15] In meetings with Chapin, Clarke, Kim, Hardisty, John Holland (Chapin's supervisor), and Dominic Vail (Zubulake's former supervisor) held on August 29-31, 2001, UBS's outside counsel reiterated the need to preserve documents. [FN16]

> FN14. *See* 9/26/03 Tr. at 16 (statement of Norman C. Simon agreeing that the duty to preserve attached no later than August 2001).

> FN15. *See* 10/14/03 Ltr. and attached exhibits (reflecting correspondence from UBS's in-house counsel reiterating, in writing, the August 2001 oral directive to UBS employees to preserve documents).

> FN16. *See id.* at 1 n. 1.

But the duty to preserve may have arisen even before the EEOC complaint was filed. Zubulake argues that UBS "should have known that the evidence [was] relevant to future litigation," [FN17] as early as April 2001, and thus had a duty to preserve it. She offers two pieces of evidence in support of this argument. *First,* certain UBS employees titled e-mails pertaining to Zubulake "UBS Attorney Client Privilege" starting in April 2001, notwithstanding the fact that no attorney was copied on the e-mail and the substance of the e-mail was not legal in nature. *Second,* Chapin admitted in his deposition that he feared litigation from as early as April 2001:

> FN17. *Fujitsu,* 247 F.3d at 436.

**\*3** Q: Did you think that Ms. Zubulake was going to sue UBS when you received these documents?
A: What dates are we talking about?
Q: Late April 2001.
A: Certainly it was something that was in the back of my head. [FN18]

> FN18. 2/12/03 Deposition of Matthew Chapin at 247:14-247:19, Ex. B. to the 9/15/03 Letter from James Batson to the Court ("Batson Ltr.").

[1] Merely because one or two employees contemplate the possibility that a fellow employee might sue does not generally impose a firm-wide duty to preserve. But in this case, it appears that almost everyone associated with Zubulake recognized the possibility that she might sue. For example, an e-mail authored by Zubulake's co-worker Vinnay Datta, concerning Zubulake and labeled

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy
92 Fair Empl.Prac.Cas. (BNA) 1539
(Cite as: 2003 WL 22410619 (S.D.N.Y.))

"UBS attorney client priviladge [sic]," was distributed to Chapin (Zubulake's supervisor), Holland and Leland Tomblick (Chapin's supervisor), Vail (Zubulake's former supervisor), and Andrew Clarke (Zubulake's co-worker) in late April 2001. [FN19] That e-mail, replying to one from Hardisty, essentially called for Zubulake's termination: "Our biggest strength as a firm and as a desk is our ability to share information and relationships. Any person who threatens this in any way should be firmly dealt with.... [B]elieve me that a lot of other [similar] instances have occurred earlier." [FN20]

FN19. *See* 4/27/01 e-mail, Ex. A to Batson Ltr.

FN20. *Id.*

Thus, the relevant people at UBS anticipated litigation in April 2001. The duty to preserve attached at the time that litigation was reasonably anticipated.

2. Scope

The next question is: What is the scope of the duty to preserve? Must a corporation, upon recognizing the threat of litigation, preserve every shred of paper, every e-mail or electronic document, and every backup tape? The answer is clearly, "no". Such a rule would cripple large corporations, like UBS, that are almost always involved in litigation. [FN21] As a general rule, then, a party need not preserve all backup tapes even when it reasonably anticipates litigation. [FN22]

FN21. *Cf. Concord Boat Corp. v. Brunswick Corp*, No. LR-C-95-781, 1997 WL 3335279, at \*4 (E.D.Ark. Aug. 29, 1997) ("to hold that a corporation is under a duty to preserve all e-mail potentially relevant to any future litigation would be tantamount to holding that the corporation must preserve all e-mail.... Such a proposition is not justified.").

FN22. *See, e.g., The Sedona Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Discovery* cmt 6.h (Sedona Conference Working Group Series 2003) ("Absent

specific circumstances, preservation obligations should not extend to disaster recovery backup tapes....").

At the same time, anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary. "While a litigant is under no duty to keep or retain every document in its possession ... it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." [FN23]

FN23. *Turner*, 142 F.R.D. at 72 (quoting *William T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443, 1455 (C.D.Cal.1984)).

i. Whose Documents Must Be Retained?

The broad contours of the duty to preserve are relatively clear. That duty should certainly extend to any documents or tangible things (as defined by Rule 34(a)) [FN24] made by individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses." [FN25] The duty also includes documents prepared *for* those individuals, to the extent those documents can be readily identified (*e.g.*, from the "to" field in e-mails). The duty also extends to information that is relevant to the claims or defenses of *any* party, or which is "relevant to the subject matter involved in the action." [FN26] Thus, the duty to preserve extends to those employees likely to have relevant information-- the "key players" in the case. In this case, all of the individuals whose backup tapes were lost (Chapin, Hardisty, Tong, Datta and Clarke) fall into this category. [FN27]

FN24. *See* Fed.R.Civ.P. 34(a) (defining the term "document" to "includ[e] writings, drawings, graphs, charts, photographs, phonorecords, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form"); *see also Zubulake I*, 217 F.R.D. 309, 2003 WL 21087884, at \*6

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy
92 Fair Empl.Prac.Cas. (BNA) 1539
(Cite as: 2003 WL 22410619 (S.D.N.Y.))

Page 6

(holding that the term "document," within the meaning of Rule 34(a), includes e-mails contained on backup tapes).

FN25. Fed.R.Civ.P. 26(a)(1)(A).

FN26. Fed.R.Civ.P. 26(b)(1).

FN27. See 9/26/03 Tr. at 17 (Statement of Norman C. Simon agreeing that the duty to preserve applied to the documents' of Chapin, Hardisty, Tong, Datta and Clarke).

### ii. What Must Be Retained?

*4 A party or anticipated party must retain all relevant documents (but not multiple identical copies) in existence at the time the duty to preserve attaches, and any relevant documents created thereafter. In recognition of the fact that there are many ways to manage electronic data, litigants are free to choose how this task is accomplished. For example, a litigant could choose to retain all then-existing backup tapes for the relevant personnel (if such tapes store data by individual or the contents can be identified in good faith and through reasonable effort), and to catalog any later-created documents in a separate electronic file. That, along with a mirror-image of the computer system taken at the time the duty to preserve attaches (to preserve documents in the state they existed at that time), creates a complete set of relevant documents. Presumably there are a multitude of other ways to achieve the same result.

### iii. Summary of Preservation Obligations

The scope of a party's preservation obligation can be described as follows: Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents. As a general rule, that litigation hold does not apply to inaccessible backup tapes (e.g., those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy. On the other hand, if backup tapes are accessible (i.e., actively used for information retrieval), then such tapes would likely be subject to the litigation hold.

However, it does make sense to create one exception to this general rule. If a company can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of "key players" to the existing or threatened litigation should be preserved if the information contained on those tapes is not otherwise available. This exception applies to all backup tapes.

### iv. What Happened at UBS After August 2001?

By its attorney's directive in August 2002, UBS endeavored to preserve all backup tapes that existed in August 2001 (when Zubulake filed her EEOC charge) that captured data for employees identified by Zubulake in her document request, and all such monthly backup tapes generated thereafter. These backup tapes existed in August 2002, because of UBS's document retention policy, which required retention for three years. [FN28] In August 2001, UBS employees were instructed to maintain active electronic documents pertaining to Zubulake in separate files. [FN29] Had these directives been followed, UBS would have met its preservation obligations by preserving one copy of all relevant documents that existed at, or were created after, the time when the duty to preserve attached.

FN28. See Zubulake I, 217 F.R.D. 309, 2003 WL 21087884, at *3 ("Nightly backup tapes were kept for twenty working days, weekly tapes for one year, and monthly tapes for three years.").

FN29. See Zubulake III, 216 F.R.D. at 287.

In fact, UBS employees did not comply with these directives. Three backup tapes containing the e-mail files of Chapin, Hardisty, Clarke and Datta created after April 2001 were lost, despite the August 2002 directive to maintain those tapes. According to the UBS document retention policy, these three monthly backup tapes from April and June 2001 should have been retained for three years. [FN30]

FN30. See supra note 28. According to a chart prepared by UBS's attorneys and presented during oral arguments, the three backup tapes of U.S. personnel were in fact deleted between October 2001 and February 2002--after UBS staff were warned to retain

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy
92 Fair Empl.Prac.Cas. (BNA) 1539
(Cite as: 2003 WL 22410619 (S.D.N.Y.))

documents, but before they were told specifically to preserve backup tapes.

**\*5** The two remaining lost backup tapes were for the time period *after* Zubulake filed her EEOC complaint (Rose Tong's tapes for August and October 2001). UBS has offered *no* explanation for why these tapes are missing. UBS initially argued that Tong is a Hong Kong based UBS employee and thus her backup tapes "are not subject to any internal retention policy." [FN31] However, UBS subsequently informed the Court that there *was* a document retention policy in place in Hong Kong starting in June 2001, although it only required that backup tapes be retained for one month. [FN32] It also instructed employees "not [to] delete any emails if they are aware that ... litigation is pending or likely, or during ... a discovery process." [FN33] In any event, it appears that UBS did not directly order the preservation of Tong's backup tapes until August 2002, when Zubulake made her discovery request. [FN34]

FN31. 9/17/03 Letter from Kevin Leblang to the Court ("Leblang Ltr.").

FN32. *See* 10/14/03 Ltr. at 2-3; *see also* UBS Asia policy for "Retention of Back-up Tapes of Email Servers," ("UBS Asia Policy") Ex. F to 10/14/03 Ltr.

FN33. UBS Asia Policy at 2.

FN34. *See* 9/26/03 Tr. at 31, 35-36.

In sum, UBS had a duty to preserve the six-plus backup tapes (that is, six complete backup tapes and part of a seventh) at issue here.

**B. Remedies**

As noted, Zubulake has requested three remedies for UBS's spoliation of evidence. I consider each remedy in turn.

**1. Reconsideration of the Cost-Shifting Order**

[2] Zubulake's request that this Court re-consider its July 24, 2003, Order in *Zubulake III* is inappropriate.

At the time that motion was made, the Court was well aware that certain e-mails had not been retained and that certain backup tapes were missing. [FN35] Indeed, Zubulake urged that these missing backup tapes "be considered as a factor in why the costs should be shifted to defendants," in part because she would have chosen one of the lost tapes as part of the court-ordered sample restoration. [FN36] And these lost tapes and deleted e-mails did, in fact, inform my resolution of the cost- shifting motion. In *Zubulake III*, in my analysis of the marginal utility factors, I specifically noted that "there is some evidence that Chapin was concealing and deleting especially relevant e-mails." [FN37] There is therefore no need to reconsider that ruling in light of the instant motion; this evidence already played a role in the cost-shifting decision.

FN35. *See* 9/26/03 Tr. at 27.

FN36. 6/17/03 Oral Argument Transcript (Statement of James Batson).

FN37. 216 F.R.D. at 287.

**2. Adverse Inference**

Zubulake next argues that UBS's spoliation warrants an adverse inference instruction. Zubulake asks that the jury in this case be instructed that it can infer from the fact that UBS destroyed certain evidence that the evidence, if available, would have been favorable to Zubulake and harmful to UBS. In practice, an adverse inference instruction often ends litigation--it is too difficult a hurdle for the spoliator to overcome. The *in terrorem* effect of an adverse inference is obvious. When a jury is instructed that it may "infer that the party who destroyed potentially relevant evidence did so 'out of a realization that the [evidence was] unfavorable,' " [FN38] the party suffering this instruction will be hard-pressed to prevail on the merits. Accordingly, the adverse inference instruction is an extreme sanction and should not be given lightly. [FN39]

FN38. *Linnen v. A.H. Robins Co.*, No. 97-2307, 1999 WL 462015, at \* 11 (Mass.Super. June 16, 1999) (alteration in original) (quoting *Blinzler v. Marriott International, Inc.*, 81 F.3d 1148, 1158 (1st

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Cir.1996)).

FN39. See Mary Kay Brown & Paul D. Weiner, *Digital Dangers: A Primer on Electronic Evidence in the Wake of Enron,* 74 Fla. B.A.Q. 1, 7 (2003) (listing "severe sanctions, such as adverse inference instructions" imposed by courts when "relevant electronic evidence was not preserved, or was intentionally destroyed"); *but see Mosel Vitelic Corp. v. Micron Technology, Inc.,* 162 F.Supp.2d 307, 315 (D.Del.2003) ("adverse inference instructions are one of the least severe sanctions which the court can impose").

*6 A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. [FN40] In this circuit, a "culpable state of mind" for purposes of a spoliation inference includes ordinary negligence. [FN41] When evidence is destroyed in bad faith (i.e., intentionally or willfully), that fact alone is sufficient to demonstrate relevance. [FN42] By contrast, when the destruction is negligent, relevance must be proven by the party seeking the sanctions. [FN43]

FN40. *Byrnie v. Town of Cromwell,* 243 F.3d 93, 107-12 (2d Cir.2001).

FN41. See *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 108 (2d Cir.2002).

FN42. See *id.* at 109.

FN43. See *id.*

a. Duty to Preserve

[3] For the reasons already discussed, UBS had--and

breached--a duty to preserve the backup tapes at issue. Zubulake has thus established the first element.

b. Culpable State of Mind

Zubulake argues that UBS's spoliation was "intentional--or, at a minimum, grossly negligent." [FN44] Yet, of dozens of relevant backup tapes, only six and part of a seventh are missing. Indeed, UBS argues that the tapes were "inadvertently recycled well before plaintiff requested them and even before she filed her complaint [in February 2002]." [FN45]

FN44. See Batson Ltr. at 2.

FN45. Leblang Ltr. at 2.

But to accept UBS's argument would ignore the fact that, even though Zubulake had not yet requested the tapes or filed her complaint, UBS had a duty to preserve those tapes. Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent. [FN46] (Of course, this would not apply to destruction caused by events outside of the party's control, e.g., a fire in UBS's offices).

FN46. See Black's Law Dictionary (6th ed.1991) (defining "negligence" as "that legal delinquency which results whenever a man fails to exhibit the care which he ought to exhibit, whether it be slight, ordinary, or great. It is characterized chiefly by inadvertence, thoughtlessness, inattention, and the like...."). *Cf. Kier v. UnumProvident Corp.,* No. 02 Civ. 8781, 2003 WL 21997747, at *13 (S.D.N.Y. Aug.22, 2003) (criticizing defendant for loss of e-mails even though loss occurred "through the fault of no one," because "[i]f UnumProvident had been as diligent as it should have been ... many fewer [backup] tapes would have been inadvertently overwritten.").

Whether a company's duty to preserve extends to backup tapes has been a grey area. As a result, it is not terribly surprising that a company would think that it did *not* have a duty to preserve all of its backup tapes, even when it reasonably anticipated the onset of litigation. Thus, UBS's failure to preserve all potentially relevant backup tapes was merely

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy
92 Fair Empl.Prac.Cas. (BNA) 1539
(Cite as: 2003 WL 22410619 (S.D.N.Y.))

negligent, as opposed to grossly negligent or reckless. [FN47]

> FN47. Litigants are now on notice, at least in this Court, that backup tapes that can be identified as storing information created by or for "key players" must be preserved.

UBS's destruction or loss of Tong's backup tapes, however, exceeds mere negligence. UBS failed to include these backup tapes in its preservation directive in this case, notwithstanding the fact that Tong was the human resources employee directly responsible for Zubulake and who engaged in continuous correspondence regarding the case. Moreover, the lost tapes covered the time period *after* Zubulake filed her EEOC charge, when UBS was *unquestionably* on notice of its duty to preserve. Indeed, Tong herself took part in much of the correspondence over Zubulake's charge of discrimination. Thus, UBS was grossly negligent, if not reckless, in not preserving those backup tapes.

*7 Because UBS was negligent--and possibly reckless--Zubulake has satisfied her burden with respect to the second prong of the spoliation test.

c. Relevance

Finally, because UBS's spoliation was negligent and possibly reckless, but not willful, Zubulake must demonstrate that a reasonable trier of fact could find that the missing e-mails would support her claims. [FN48] In order to receive an adverse inference instruction, Zubulake must demonstrate not only that UBS destroyed relevant evidence as that term is ordinarily understood, [FN49] but also that the destroyed evidence would have been favorable to her. [FN50] "This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." [FN51] This is equally true in cases of gross negligence or recklessness; only in the case of *willful* spoliation is the spoliator's mental culpability itself evidence of the relevance of the documents destroyed. [FN52]

> FN48. *See Byrnie*, 243 F.3d at 107-12.

> FN49. *See* Fed.R.Evid. 401; Fed.R.Civ.P.

26(b)(1)

> FN50. See *Residential Funding*, 306 F.3d at 108-09 ("Although we have stated that, to obtain an adverse inference instruction, a party must establish that the unavailable evidence is 'relevant' to its claims or defenses, our cases make clear that 'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.' ") (citations, footnote, and alterations omitted).

> FN51. *Turner*, 142 F.R.D. at 77 (citing *Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 924 n. 7 (2d Cir.1981)).

> FN52. See *Residential Funding*, 306 F.3d at 109.

On the one hand, I found in *Zubulake I* and *Zubulake III* that the e-mails contained on UBS's backup tapes were, by-and-large, relevant in the sense that they bore on the issues in the litigation . [FN53] On the other hand, *Zubulake III* specifically held that "nowhere (in the sixty-eight e-mails produced to the Court) is there evidence that Chapin's dislike of Zubulake related to her gender." [FN54] And those sixty-eight e-mails, it should be emphasized, were the ones selected by Zubulake as being the *most* relevant among all those produced in UBS's sample restoration. There is no reason to believe that the lost e-mails would be any more likely to support her claims.

> FN53. See *Zubulake I*, 217 F.R.D. 309, 2003 WL 21087884, at *6; *Zubulake III*, 216 F.R.D. at 284-87.

> FN54. 216 F.R.D. at 286.

Furthermore, the likelihood of obtaining relevant

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy

Page 10

92 Fair Empl.Prac.Cas. (BNA) 1539

(Cite as: 2003 WL 22410619 (S.D.N.Y.))

information from the six- plus lost backup tapes at issue here is even lower than for the remainder of the tapes, because the majority of the six-plus tapes cover the time prior to the filing of Zubulake's EEOC charge. The tape that is most likely to contain relevant e-mails is Tong's August 2001 tape--the tape for the very month that Zubulake filed her EEOC charges. But the majority of the e-mails on that tape are preserved on the September 2001 tape. Thus, there is no reason to believe that peculiarly unfavorable evidence resides solely on that missing tape. Accordingly, Zubulake has not sufficiently demonstrated that the lost tapes contained relevant information. [FN55]

> FN55. *See generally* <u>*Turner,* 142 F.R.D. at 77</u> ("Where, as here, there is no extrinsic evidence whatever tending to show that the destroyed evidence would have been unfavorable to the spoliator, no adverse inference is appropriate."); <u>*Concord Boat Corp.,* 1997 WL 33352759, at *7</u> ("It would simply be inappropriate to give an adverse inference instruction based upon speculation that deleted e-mails would be unfavorable to Defendant's case.").

d. Summary

In sum, although UBS had a duty to preserve all of the backup tapes at issue, and destroyed them with the requisite culpability, Zubulake cannot demonstrate that the lost evidence would have supported her claims. Under the circumstances, it would be inappropriate to give an adverse inference instruction to the jury.

3. UBS Must Pay the Costs of Additional Depositions

[4] Even though an adverse inference instruction is not warranted, there is no question that e-mails that UBS should have produced to Zubulake were destroyed by UBS. That being so, UBS must bear Zubulake's costs for re-deposing certain witnesses for the limited purpose of inquiring into issues raised by the destruction of evidence and any newly discovered e-mails. In particular, UBS is ordered to pay the costs of re-deposing Chapin, Hardisty, Tong, and Josh Varsano (a human resources employee in charge of the Asian Equities Sales Desk and known to have been in contact with Tong during August 2001). [FN56]

> FN56. *See* 9/26/03 Tr. at 26 (statement of James Batson, seeking to re-depose only these four employees).

IV. CONCLUSION

*8 For the reasons set forth above, Zubulake's motions for an adverse inference instruction and for reconsideration of the Court's July 24, 2003, Order are denied. Her motion seeking costs for additional depositions is granted.

2003 WL 22410619 (S.D.N.Y.), 92 Fair Empl.Prac.Cas. (BNA) 1539

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

NEW YORK STATE NATIONAL
ORGANIZATION FOR WOMEN, et al., on behalf
of
themselves, their members, and all others similarly
situated, and Clarice
Seegars, et al., on behalf of herself, and all others
similarly situated,
Bernadette Thomas, on behalf of herself and all
others similarly situated, Jane
Doe as the Administratrix of the Estate of John Doe
on behalf of himself and
all others similarly situated, Dellie Britt, on behalf of
himself and all
others similarly situated, Plaintiffs-Intervenors,
v.
Mario CUOMO, individually and as Governor of the
State of New York, and
Margarita Rosa, individually and as Commissioner of
the Division of Human
Rights of the Executive Department of New York
State, George Pataki,
individually and as Governor of the State of New
York, and Edward Mercado,
individually and as Commissioner of the Division of
Human Rights of the
Executive Department of New York State,
Defendants.

No. 93 Civ. 7146(RLC)JCF.

July 14, 1998.

MEMORANDUM AND ORDER

FRANCIS, Magistrate J.

*1 The plaintiffs [FN1] in this class action contend that the New York State Division of Human Rights (the "SDHR") violated their rights by failing to adjudicate their claims of discrimination in a timely manner. New York State Governor George Pataki and former Governor Mario Cuomo, among others, are named as defendants.

> FN1. As used here, the term "plaintiffs" refers to the individual plaintiffs and plaintiff-intervenors and to the New York State National Organization for Women, which represents its members in this action.

The plaintiffs now seek sanctions against defendant Cuomo for failure to preserve evidence consisting of: (1) the Executive Chamber computer database created during his term in office, and (2) monthly summary reports prepared for his review for the years 1986 through 1994. As a remedy for the destruction of this evidence the plaintiffs seek an order precluding the defendants from presenting evidence that Governor Cuomo took steps to reduce the time for processing complaints at the SDHR, that he made efforts to reduce the case backlog there, that there were budgetary or personnel constraints that prevented his taking action to ameliorate the problems at the SDHR, or that he did not know that delays at the SDHR jeopardized the property rights of the claimants. The plaintiffs further request monetary sanctions against Governor Pataki and his counsel for failing to promptly search for the records at issue and disclose that they had been destroyed. Finally, the plaintiffs seek an award of attorneys' fees and costs in connection with this motion.

*Background*

The original complaint in this action was filed on October 15, 1993. The New York State National Organization for Women ("NOW") filed a motion to intervene and submitted a proposed intervenor complaint on August 17, 1994, and NOW's motion was subsequently granted. Governor Cuomo left office on January 1, 1995. On January 30, 1995, the plaintiffs served their first request for production of documents. Affidavit of David Raff dated March 20, 1998 ("Raff Aff."), Exh. 4. Among other things, this request sought:

> 1. All reports, studies, analyses, and other documents prepared by defendants, or for defendants, or in any way related to defendants, which purport to study, analyze, or make recommendations as to any aspect of the Division [of Human Rights] and is [sic] operations and budget.

> * * *

> 6. All documents which discuss or refer to funding or staffing at the Division. This request expressly includes all documents in the possession of any executive department, division, agency, bureau, or other government entity within the statutory control of Cuomo, including, but not limited to, the Division of the Budget.
> 7. All documents which refer to the Division not having adequate staffing or sufficient funding.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

A series of discovery disputes, rulings, and conferences ensued. On November 12, 1997, defendants' counsel produced the Executive Chamber Manual which purportedly revealed that the Cuomo administration had maintained a computer database that included letters and reports sent to the Governor, out-going letters, internal memoranda, monthly summary reports, and electronic mail. Raff Aff., ¶ ¶ 26-28. According to a computer advisor in the Executive Chamber, the central database was in fact much more limited. Affidavit of Thomas W. Irvin dated April 24, 1998 ("Irvin Aff."), ¶ 9. In any event, at the end of the Cuomo administration, the Executive Chamber databases, along with information saved by individual employees on personal computers, were deleted. Irvin Aff., ¶ ¶ 15-16.

*2 Among the paper documents generated by the Cuomo administration were monthly summary reports. These reports included information generated by various agencies including the SDHR and were submitted to the Governor for his review. Copies were also sent to seven other state officials. Raff Aff., ¶ ¶ 31- 32 & Exh. 10. After reviewing the reports, the Governor would send them to an assistant with comments and questions. Raff Aff., ¶ 33. No copies of the summary reports for the period 1986-1994 have been located, and it is believed that they no longer exist. Raff Aff., ¶ ¶ 32-33; Affidavit of June Duffy dated April 29, 1998 ("Duffy Aff."), ¶ 7 & Exh. A.

*Discussion*

The threshold question here is whether the defendants had an obligation to preserve evidence and, if so, when that obligation arose. Service of a complaint puts the receiving party on notice that it is required to preserve evidence that may be relevant to the claims asserted. See *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 73 (S.D.N.Y.1991); *Computer Associates International, Inc. v. American Fundware, Inc.,* 133 F.R.D. 166, 169 (D.Colo.1990). In this case, then, the defendants were notified of the plaintiffs' specific claims no later than August 1994 when NOW submitted its proposed intervenor complaint. It is therefore immaterial that the first document requests were not served until after the records were apparently destroyed at the end of the Cuomo administration. The preservation obligation had arisen earlier. [FN2]

FN2. The plaintiffs also argue that the

defendants had certain obligations under state law to retain records. However, any state requirements are irrelevant to the current dispute. The laws and regulations of other entities neither expand nor contract the discovery obligations that attach to a federal court proceeding. See *Turner,* 142 F.R.D. at 73 (federal agency regulations permitting destruction of records do not excuse spoliation in violation of discovery obligations).

Defendants' counsel treated that obligation cavalierly. Counsel have a duty to advise their client of pending litigation and of the requirement to preserve potentially relevant evidence. *Turner,* 142 F.R.D. at 73. However, prior to receipt of the plaintiffs' document requests, counsel never instructed Governor Cuomo to retain any documents or electronic data. Duffy Aff., ¶ 5. Indeed, it was not until 1996 that counsel in this action contacted defendant Cuomo directly. Duffy Aff., ¶ 6. Nevertheless, the defendants suggest that because of the volume of litigation involving a sitting governor, Mr. Cuomo cannot be charged with knowledge of each pending case and the corresponding obligations. Affidavit of Mario M. Cuomo dated April 24, 1998 ("Cuomo Aff."), ¶ ¶ 3-4; Affidavit of Elizabeth Moore dated April 27, 1998 ("Moore Aff."), ¶ ¶ 2-3. This argument is unpersuasive. If responsibility for handling such matters is delegated to the Governor's legal staff and to the Office of the State Attorney General, the Governor is ultimately accountable for the conduct of those entities.

Whether sanctions are warranted, however, depends on two factors: whether the destruction of the evidence was accomplished in bad faith and whether the party seeking the evidence was substantially prejudiced by its loss. There has been no showing here that the defendants deleted computer databases or destroyed monthly summary reports in order to impede this litigation. To the contrary, neither the Executive Chamber database nor the reports were specific to the issues raised in this case. Their destruction evidently occurred as part of a general purging of records at the conclusion of Governor Cuomo's term and the beginning of Governor Pataki's. While this constituted a negligent breach of the duty to preserve evidence, it was hardly intentional.

*3 The plaintiffs have also failed to demonstrate that they were prejudiced by the loss of the records. See *Turner,* 142 F.R.D. at 77 (moving party must show

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 395320
(Cite as: 1998 WL 395320 (S.D.N.Y.))

content of destroyed evidence before adverse inference can be drawn). With respect to the computer database, the plaintiffs argue only that they could have used computerized search devices to locate relevant documents. Raff Aff., ¶ 30. But they fail to identify with any specificity what information they would have been reasonably likely to find. In essence, they argue that the defendants' conduct deprived them of a pond in which they would like to have gone on a fishing expedition. That is not a showing of prejudice.

The issue is somewhat closer with respect to the monthly summary reports. These reports routinely included a section concerning the SDHR and were directed to Governor Cuomo for his review. However, the plaintiffs have obtained voluminous other documents and have had a full opportunity to take the deposition both of Governor Cuomo and of the Commissioner of the SDHR who provided the information that was summarized for him. By these means, the plaintiffs have obtained substantial evidence about Governor Cuomo's awareness of the problems plaguing the SDHR. Raff Aff., ¶ 34. Thus, the monthly summary reports would have been largely cumulative. Moreover, the plaintiffs could have deposed other former state officials who received the reports in order to try to track down remaining copies, but they apparently chose not to do so. Since the plaintiffs have failed to demonstrate prejudice to their case or bad faith by the defendants, then, they are not entitled to any sanction for the loss of the records, much less the sweeping preclusion order they have requested.

The plaintiffs have also failed to show that they were prejudiced by any delay by Governor Pataki or his counsel in advising them that this evidence could not be located. They speculate that had they known earlier of the loss of the computer database they might have been able to enlist computer experts to recover the information by undeleting it. Raff Aff., ¶ 43. But the plaintiffs provide no expert testimony describing in detail what would have been required. Likewise, the plaintiffs argue that had they known of the loss of the monthly summary reports they could have tried to locate these documents through former employees whose memories were still fresh. Raff Aff., ¶ 44. But the plaintiffs have never sought out such employees to test their current memories. Accordingly, they are not entitled to sanctions for the delay in disclosing the destruction of the records.

*Conclusion*

For the reasons set forth above, the plaintiffs'

application for sanctions for the destruction of evidence is denied.

1998 WL 395320, 1998 WL 395320 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works