9 Fed.Appx. 822  
2001 DJCAR 2510  
(Cite as: 9 Fed.Appx. 822, 2001 WL 536974 (10th Cir.(Okla.)))

Page 5

C

This case was not selected for publication in the Federal Reporter.

Please use FIND to look at the applicable circuit court rule before citing this opinion. Tenth Circuit Rule 36.3. (FIND CTA10 Rule 36.3.)

United States Court of Appeals,  
Tenth Circuit.

McCURDY GROUP, LLC, a Virginia limited liability company, Plaintiff-Appellee,  
v.  
AMERICAN BIOMEDICAL GROUP, INC., an Oklahoma corporation, Defendant-Appellant,  
and  
James K. Burgess, III, an individual, Defendant.

Nos. 00-6183, 00-6332.

May 21, 2001.

Business consulting company brought action against biomedical group, claiming breach of contract and quantum meruit. The United States District Court for the Western District of Oklahoma entered judgment upon jury verdict for company, and awarded attorney fees to company. Group appealed. The Court of Appeals, Briscoe, Circuit Judge, held that: (1) under Oklahoma law, as predicted by Court of Appeals, presence of express contract did not preclude quantum meruit claim; (2) written agreement between parties was a final, enforceable contract; (3) group's discovery concerns did not entitle group to return of computer and disc drives that group supplied to company at start of parties' relationship; and (4) company was statutorily entitled to attorney fees as a prevailing party.

Affirmed.

Lucero, Circuit Judge, dissented and filed opinion.

West Headnotes

[1] Federal Courts ⚖776  
170Bk776

Court of Appeals reviews de novo the question of whether district court's jury instructions, considered as a whole, correctly stated governing law and provided jury with an ample understanding of issues and applicable standards.

[2] Federal Courts ⚖433  
170Bk433

Question of propriety of district court's jury instructions in diversity action was whether instructions correctly stated governing standards under Oklahoma law.

[3] Implied and Constructive Contracts ⚖30  
205Hk30

Oklahoma law recognizes a legal action for quantum meruit.

[4] Implied and Constructive Contracts ⚖30  
205Hk30

Under Oklahoma law, where a person performs services without a written contract, the law implies an agreement to pay what is reasonable, meaning thereby what he reasonably deserves.

[5] Implied and Constructive Contracts ⚖60.1  
205Hk60.1

Under Oklahoma law, as predicted by Court of Appeals, plaintiff may recover under a quantum meruit claim, even though plaintiff had an express contract with defendant, as long as quantum meruit claim involved obligations outside scope of express contract.

[6] Implied and Constructive Contracts ⚖122  
205Hk122

Under Oklahoma law, as predicted by Court of Appeals, district court's jury instructions concerning recovery by business consulting company under a quantum meruit theory were consistent with general principles that a plaintiff may recover under a quantum meruit claim, even though plaintiff had an express contract with defendant, as long as quantum meruit claim involved obligations outside scope of express contract; instructions limited consulting company's recovery on its quantum meruit claim to the reasonable value of services it rendered to biomedical group outside scope of parties' written agreement.

[7] Federal Courts ⚖795

9 Fed.Appx. 822                                                                                                    Page 6
(Cite as: 9 Fed.Appx. 822, 2001 WL 536974 (10th Cir.(Okla.)))

170Bk795

[7] Federal Courts ⚖ 871
170Bk871

Court of Appeals reviews a damage award challenged on basis of insufficient evidence under a clearly erroneous standard, viewing evidence in light most favorable to prevailing party.

[8] Federal Courts ⚖ 846
170Bk846

Court of Appeals will affirm a jury's damage award if there is substantial evidence tending to support it.

[9] Federal Courts ⚖ 629
170Bk629

Biomedical group waived claim that evidence was insufficient to support jury's damage award to business consulting company under a quantum meruit theory, where although it appeared that group moved for judgment as a matter of law at conclusion of consulting company's evidence and again at conclusion of all evidence, group did not file any type of posttrial motion challenging jury's damage award on quantum meruit claim.

[10] Federal Courts ⚖ 698.1
170Bk698.1

Even if biomedical group's motion for judgment as a matter of law was sufficient to preserve issue of whether evidence was sufficient to support jury's damage award to business consulting company under a quantum meruit theory, group failed to provide Court of Appeals with a sufficient record to decide issue, where group included only selected excerpts from trial transcript.

[11] Federal Courts ⚖ 776
170Bk776

Court of Appeals reviews de novo a district court's disposition of a motion for judgment as a matter of law, applying the same standard as district court.

[12] Federal Civil Procedure ⚖ 2152
170Ak2152

Judgment as a matter of law is warranted only if evidence points but one way and is susceptible to no reasonable inferences supporting party opposing motion.

[13] Federal Courts ⚖ 698.1
170Bk698.1

Biomedical group failed to provide Court of Appeals with sufficient record to decide issue of whether group's agreement with business consulting company was an illegal contract under statute generally prohibiting contingent fee arrangements in connection with procurement of government contracts, where group failed to provide a complete copy of trial transcript. Federal Property and Administrative Services Act of 1949, § 304(a), 41 U.S.C.A. § 254(a).

[14] Federal Courts ⚖ 373
170Bk373

[14] Federal Courts ⚖ 416
170Bk416

In a diversity case, the so-called "substantive" state rules of evidence, including the forum state's parol evidence rule, apply.

[15] Federal Courts ⚖ 776
170Bk776

Court of Appeals would apply a de novo review to question of whether Oklahoma's parol evidence rule would prohibit introduction of oral statements made by parties prior to signing agreement.

[16] Contracts ⚖ 9(1)
95k9(1)

Written agreement between business consulting company and biomedical group was a final, enforceable contract, where agreement set forth in detail what it described as essential terms to which parties agreed, including nature of relationship between parties, term of agreement, services to be performed by company on behalf of group, compensation to be paid by group to company and company's founder, company's option to purchase stock of group, conditions under which a party could terminate agreement, and confidentiality and non-compete provisions, and agreement expressly stated that it superseded all previous discussions and agreements and was entire agreement between parties.

[17] Federal Courts ⚖ 820
170Bk820

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Court of Appeals applies an abuse of discretion standard in reviewing a district court's denial of a motion to compel discovery.

[18] Federal Civil Procedure ☞1581
170Ak1581

Biomedical group's discovery concerns did not entitle group to return of computer and disc drives that group supplied to business consulting company at start of parties' relationship, where group never explained why it should have been allowed to conduct a physical inspection of company's computer hard drives, and although group was apparently skeptical that company produced copies of all relevant and nonprivileged documents from hard drives, that reason alone was not sufficient to warrant such a drastic discovery measure, and group did not explain why inspection of zip drive and/or inspection of hard drive by third party would not have been sufficient to satisfy its concerns.

[19] Federal Courts ☞830
170Bk830

Court of Appeals generally reviews an award of attorney fees for abuse of discretion.

[20] Federal Courts ☞776
170Bk776

Court of Appeals reviews de novo any statutory interpretation or other legal analysis underlying district court's decision concerning attorney fees.

[21] Costs ☞194.32
102k194.32

Oklahoma statute providing that prevailing party may recover reasonable attorney fees as costs in actions on certain accounts, bills, and contracts allowed for recovery of attorney fees by business consulting company in its action against biomedical group, where essence of company's suit, including both its breach of contract and quantum meruit claims, was that it performed services for group, but that group failed to pay for those services. 12 Okl.St.Ann. § 936.

*824 Before BRISCOE, BALDOCK, and LUCERO, Circuit Judges.

ORDER AND JUDGMENT [FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir.R. 36.3.

BRISCOE, Circuit Judge.

**1 Defendant American Biomedical Group, Inc., (ABGI) appeals from a final judgment, entered after a jury verdict, awarding plaintiff McCurdy Group, LLC, (MG) $228,406.82 on its claim for breach of contract, and $148,800.00 on its claim for quantum meruit. ABGI has also filed a separate appeal challenging the district court's award of attorney fees in favor of MG. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

Dave McCurdy is a former Oklahoma Congressman, having served in the United States House of Representatives from 1980 until January 1995. In March 1995, McCurdy formed MG, a Virginia limited liability company, with its principal office *825 and place of business in Virginia. McCurdy's intent was for MG "to be a business consulting and investment group," and "not a lobbying group" or "a political group." Aplt.App. (00-6183) at 218.

On April 7, 1995, McCurdy, on behalf of MG, signed a written agreement with ABGI, an Oklahoma corporation with its principal office and place of business in Oklahoma. ABGI provided hospitals and other healthcare providers with systems to reduce equipment maintenance expenses. Prior to entering into the agreement with MG, ABGI had unsuccessfully attempted to obtain contracts with federally-run hospitals. ABGI's purpose in entering into the agreement with MG was to have MG assist in marketing ABGI's products and services to federal government officials.

The April 7 agreement between MG and ABGI stated that McCurdy would become a director of and consultant to ABGI. In return for his role as director, McCurdy was to receive an annual fee of $24,000. MG was to perform the following services for ABGI:
(1) establish an office for ABGI in the Washington, D.C. area;
(2) provide and direct a marketing strategy and effort to secure additional business for ABGI with the Veterans Administration (VA), other hospitals

under the Department of Defense (DOD), Indian Health Services, and other public, government, and private sector hospitals identified in advance and agreed to by ABGI and MG;

(3) consult with Jim Burgess and ABGI regarding long-range planning, capital information, potential mergers and acquisitions, and future public offering or sale of ABGI;

(4) perform such other duties and services as may be requested by ABGI and agreed to be performed by MG; and

(5) report no less than monthly on its efforts in fulfilling the above-outlined contractual obligations.

Aplee.App. (00-6183) at 299-300. MG was to receive the following compensation:

(1) a marketing/consulting fee equal to 2.0% of the VA/DOD and other identified contract business obtained and completed by ABGI and entered into by ABGI during the term of the contract or any extension thereof and renewals of these contracts;

(2) a monthly office and staff overhead fee of $16,600; and

(3) reimbursement of out-of-pocket travel and business expenses.

Id. at 301-02. In addition, MG was granted an option to acquire up to 5% of the outstanding common stock of ABGI, either by purchase of such stock or by waiver of MG's consulting/marketing fee on an equal dollar-waived to dollar-acquired basis. Lastly, the contract provided that either party could terminate the contract upon 120 days' written notice.

**2 Upon signing the agreement, both parties began performing their respective obligations. In particular, McCurdy and MG began efforts to market ABGI's products and services to various government officials and organizations (e.g., VA hospitals located on the east coast). In return, ABGI helped establish an office for MG in Washington, D.C., and began paying MG the amounts of compensation set forth in the agreement (except for the director's fee to be paid to McCurdy). ABGI continued to make payments to MG through June 1996, when the payments from ABGI to MG ceased. According to McCurdy, the only reason given by Burgess for ABGI's failure to pay was cash flow problems, and that at no time did Burgess or anyone else at ABGI indicate the parties' written agreement had been terminated.

*826 Notwithstanding ABGI's failure to pay, MG continued to perform its obligations under the written agreement. Indeed, MG continued to market ABGI's products and services to potential customers through approximately August 1997. Beginning in the fall of 1996 and continuing into August 1997, MG repeatedly asked ABGI why payments had not been made under the agreement and, according to McCurdy, Burgess repeatedly attributed the failure to ABGI's alleged cash flow problems.

MG filed this diversity action on July 1, 1997, and the case proceeded to trial in April 2000. At the conclusion of all the evidence, the jury returned a verdict in favor of MG on its claim for breach of contract and awarded MG damages in the amount of $228,406.82. The jury also returned a verdict in favor of MG on its claim for quantum meruit and awarded MG damages on that claim in the amount of $148,800. The district court granted MG's request for attorney fees in the amount of $221,921.51, but denied its request for prejudgment interest.

II.
*No. 00-6183*
*Quantum meruit--jury instructions*

According to the record, MG's primary theory at trial was that the April 7 agreement was not terminated until after this lawsuit was filed and that ABGI was therefore liable for damages under the agreement through that time period. The district court, however, chose to instruct the jury that a breach of contract on the part of ABGI (e.g., failure to pay MG) would result in triggering the 120-day notice provision and the ultimate termination of the contract. [FN1] Apparently concerned whether this instruction was correct, and also concerned that this would limit the amount of damages recoverable by MG, the district court allowed MG to pursue, in addition to its breach of contract claim, a quantum meruit theory under which the jury could award MG damages for any services that MG rendered to ABGI after termination of the contract.

> FN1. According to MG, "[s]ince ABGI's payments ceased after the June, 1996 payment ..., the 120-day period under the court's ruling ended with October, 1996." Aplee.Br. at 13. Because the record on appeal does not include the complete trial transcript, the complete jury instructions, or the verdict form, it is impossible to verify this.

ABGI contends it was improper for the district court to permit MG to recover on its quantum meruit claim. According to ABGI, quantum meruit is only appropriate where there is no contract in place covering the transactions at issue. Here, ABGI argues, MG should have been limited to damages that

accrued during the 120-day notice period set forth in the parties' written agreement [FN2] and should not have been permitted to recover any damages that accrued after that period.

> FN2. The agreement specifically provided that either party could terminate the agreement "on 120 days written notice," and that, "[u]pon termination, both parties w[ould] account for and settle all charges and accounts due under the marketing/consulting fee agreement including future business booked as a direct result of McCurdy efforts, including rent, overhead, expenses and fees due under the consulting/marketing [agreement] and any outstanding claims due ABGI." Aplt.App. at 29.

**3 [1][2] We review de novo the question of whether the district court's jury instructions, considered as a whole, correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards. *Brown v. Gray*, 227 F.3d 1278, 1291 (10th Cir.2000). Since this is a diversity action, the question is whether the district court's jury *827 instructions correctly stated the governing standards under Oklahoma law. *See generally Wood v. Eli Lilly & Co.*, 38 F.3d 510, 512 (10th Cir.1994) ("A federal court sitting in diversity must apply the law of the forum state, in this case Oklahoma, and thus must ascertain and apply Oklahoma law with the objective that the result obtained in the federal court should be the result that would be reached in an Oklahoma court.").

[3][4] Oklahoma law recognizes a legal action for quantum meruit. "[T]he common law doctrine of 'quantum meruit' ... is founded on a Latin phrase meaning, 'as much as he deserves,' and in law has been defined as 'a legal action grounded on a promise that the defendant would pay to the plaintiff [for his services] as much as he should deserve.' " *Martin v. Buckman*, 883 P.2d 185, 193-94 (Okla.Ct.App.1994). "Where a person performs services without a written contract, the law implies an agreement to pay what is reasonable, meaning thereby what he reasonably deserves." *Brown v. Wrightsman*, 175 Okla. 189, 51 P.2d 761, 763 (1935).

[5] It is true, as noted by ABGI, that the Oklahoma Supreme Court has held "the rule of 'quantum meruit' applies only where there is no express contract." *Brown*, 51 P.2d at 763. ABGI, however, reads too much into this holding. Contrary to ABGI's arguments, Oklahoma law does not appear to preclude a plaintiff from recovering under a quantum meruit claim, even though the plaintiff had an express contract with the defendant, as long as the quantum meruit claim involved obligations outside the scope of the express contract. Although there are no Oklahoma cases directly on point, the Oklahoma Supreme Court has indicated, in dicta, that a quantum meruit action can be brought "despite the existence of an express contract," and that evidence of the express contract can be admitted "as a circumstance indicating" the "value of the services" rendered by the plaintiff to the defendant. *Reynolds v. Conner*, 190 Okla. 323, 123 P.2d 664, 668 (1941); *see also Shumaker v. Hazen*, 372 P.2d 873, 875 (Okla.1962) (" 'There cannot be an express and an implied contract for the same thing existing at the same time.' "). Cases from other jurisdictions, although not controlling here, support this conclusion. *E.g., Turner Assoc., Inc. v. Small Parts, Inc.*, 59 F.Supp.2d 674, 683 (E.D.Mich.1999) (concluding plaintiff, who sought to recover post-termination commissions, would be foreclosed from doing so under a quantum meruit theory "only if it is first established that a valid and enforceable contract governed defendant's payment of post-termination commissions"); *Mary Matthews Interiors, Inc. v. Levis*, 208 A.D.2d 504, 617 N.Y.S.2d 39, 41 (N.Y.App.Div.1994) ("Recovery in quantum meruit is not warranted when the services rendered by the plaintiff were required by the terms of an express contract between the parties."); *Gen. Homes, Inc. v. Denison*, 625 S.W.2d 794, 797 (Tex.App.1981) (indicating that a person can recover, under a quantum meruit theory, the reasonable value of services rendered outside the scope of an express contract).

**4 [6] The district court's jury instructions were consistent with these general principles. The district court's initial instruction on the theory of quantum meruit informed the jury that, "[i]n appropriate circumstances, a party may have an obligation to pay another party for services rendered, even where there is no actual contract requiring payment." Aplt.App. at 179 (Instruction 34). This same instruction further informed the jury that MG was seeking to recover under a theory of quantum meruit "for services rendered after the date of termination of the contract." *Id.* In its second quantum meruit instruction, the district court informed the jury that, "[i]f you find that plaintiff continued *828 to render services to defendant after the date of termination of the contract, plaintiff may recover under the doctrine of quantum meruit for the reasonable value of those services." *Id.* at 181 (Instruction 35). More specifically, the instruction stated:

Plaintiff is here claiming that it should be

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

compensated for services reasonably provided after the date of termination. As I will explain later, you must determine when the contract was breached and consider the date of termination of the contract to be 120 days past that date. With respect to this theory of quantum meruit recovery, you must limit your consideration to services rendered after the date you decide was the date of termination of the contract.

*Id.* at 182. In short, the district court's jury instructions limited MG's recovery on its quantum meruit theory to the reasonable value of services it rendered to ABGI outside the scope of the parties' written agreement (i.e., those services rendered to and accepted by ABGI after expiration of the 120-day notice period).

*Quantum meruit--sufficiency of evidence*

ABGI contends that, even if it was proper for the district court to allow MG to proceed on its quantum meruit claim, the evidence presented at trial was insufficient to support the jury's damage award in favor of MG. More specifically, ABGI contends "[t]here was insufficient evidence presented at trial to establish that [MG] conferred benefits on ABGI after October 1996 [the expiration of the 120-day notice period] to justify" the jury's award "of $18,600 per month ($16,600 for overhead expenses and $2,000 for director's fees) ... from October 1996 to July 1997." Aplt.Br. at 16. According to ABGI, McCurdy was never a director of ABGI and thus was never entitled to a director's fee. Further, ABGI argues that "overhead expenses" are not recoverable under a theory of quantum meruit.

[7][8] We "review a damage award challenged on the basis of insufficient evidence under a clearly erroneous standard, 'viewing the evidence in the light most favorable to the prevailing party.' " *Vining v. Enter. Fin. Group, Inc.,* 148 F.3d 1206, 1216 (10th Cir.1998) (quoting *Rainbow Travel Serv., Inc. v. Hilton Hotels Corp.,* 896 F.2d 1233, 1239 (10th Cir.1990)). We will "affirm the judgment below if there is substantial evidence tending to support the jury's damage award." *Id.*

**5 [9][10] There are two procedural problems that prove fatal to ABGI's argument. First, although it appears that ABGI moved for judgment as a matter of law at the conclusion of MG's evidence and again at the conclusion of all the evidence, it did not file any type of post-trial motion challenging the jury's damage award on the quantum meruit claim (e.g., motion for remittitur or new trial on the issue of damages). Thus, the specific issue ABGI now seeks to assert was not raised in the district court and it has been waived for purposes of appeal. *See Walker v. Mather,* 959 F.2d 894, 896 (10th Cir.1992). Second, even if ABGI's motion for judgment as a matter of law was somehow sufficient to preserve the issue for purposes of appeal, ABGI has failed to provide the court with a sufficient record to decide the issue. Tenth Circuit Rule 10.1(A)(1)(a) provides that "[w]hen sufficiency of the evidence is raised, the entire relevant trial transcript must be provided." Here, however, ABGI has included only selected excerpts from the trial transcript. [FN3]

> FN3. We have reviewed the trial transcript excerpts submitted by ABGI and MG and, based upon the evidence contained therein, it appears the jury's damage award on the quantum meruit claim was supported by sufficient evidence. Although it is true that McCurdy was never formally made a director of ABGI, the evidence indicates that ABGI repeatedly informed potential clients that McCurdy was a director of ABGI. Further, evidence of the payments made by ABGI to MG for overhead expenses was relevant for purposes of determining the reasonable value of the services provided by MG to ABGI after the termination of the parties' agreement.

*829 *Legality of the parties' agreement*

ABGI contends the district court erred in denying its motion for judgment as a matter of law on the issue of whether the parties' written agreement was illegal. In ruling on cross motions for summary judgment in which each party sought summary judgment on the question of whether the contract at issue was an illegal contract under 41 U.S.C. § 254(a), the district court concluded the challenged contingent fee provision was illegal "unless it is found that MG is excepted from Section 254(a) and a bona fide established commercial or selling agency maintained by ABGI for the purpose of securing business." Order filed Aug. 11, 1999, at 3. According to ABGI, the agreement violated § 254(a) and was therefore invalid because (1) it provided for the payment of a commission to MG for the procurement of government contracts, and (2) MG did not qualify as a bona fide established commercial or selling agency.

[11][12] "We review de novo a district court's disposition of a motion for judgment as a matter of law, applying the same standard as the district court." *Ballard v. Muskogee Reg'l Med. Ctr.,* 238 F.3d 1250, 1252 (10th Cir.2001). Judgment as a matter of law

"is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Id.*

[13] Again, ABGI's failure to provide a complete copy of the trial transcript prevents our review. As previously noted, ABGI has included in its appendix only selected excerpts from the trial transcript. Although MG has filed its own appendix which includes additional excerpts, we do not have a complete record of the trial and it is impossible to determine from the record on appeal all of the evidence that was presented at trial. [FN4]

> FN4. Even if we were to overlook the record deficiencies, we are not persuaded by the dissent's position. Based on what it describes as "the historical backdrop against which 41 U.S.C. § 254(a) and the relevant [implementing] regulations were promulgated," the dissent suggests a bona fide established commercial or selling agency cannot exist if there exists a "special risk that improper influence will be exerted." Dissenting op. at 8. Aside from our skepticism about this theory, we note it has never been propounded by defendant, either in the district court or on appeal, and the jury was never instructed on it. Thus, even assuming its legitimacy, it cannot provide a basis for reversal in this case.

*District court's ruling that April 7 agreement constituted a final, enforceable contract*

On the first day of trial, prior to commencement of ABGI's case, the district court conducted an evidentiary hearing on MG's motion in limine to exclude evidence of oral statements regarding terms extrinsic to the April 7 agreement. At the conclusion of the hearing, the district court concluded, as a matter of law, that the April 7 agreement was a valid enforceable contract. Accordingly, the district court granted MG's motion in limine and subsequently instructed the jury that the agreement was a valid enforceable contract. On appeal, ABGI contends the district court erred in finding as a matter of law that the parties' April 7 agreement constituted a final, enforceable contract. According to ABGI, the issue should have been submitted to the jury for consideration (ABGI contends the April 7 writing was merely a preliminary letter of intent that required further finalization to be effective).

*830 **6 [14][15] In concluding that the agreement was an enforceable contract, the district court was acting upon MG's motion in limine and deciding whether Oklahoma's parol evidence rule would prohibit ABGI's introduction of oral statements made by the parties prior to signing the agreement. In a diversity case such as this, the so-called "substantive" state rules of evidence, including the forum state's parol evidence rule, apply. *Blanke v. Alexander,* 152 F.3d 1224, 1231 (10th Cir.1998). We apply a de novo review. *See Betaco, Inc. v. Cessna Aircraft Co.,* 32 F.3d 1126, 1131 (7th Cir.1994); *Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc.,* 971 F.2d 272, 277 (9th Cir.1992); *United States Fire Ins. Co. v. Gen. Reinsurance Corp.,* 949 F.2d 569, 571 (2d Cir.1991).

Oklahoma's parol evidence rule provides that "[t]he execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter, which preceded or accompanied the execution of the instrument." Okla.Stat.tit. 15, § 137. Applying the rule, the Oklahoma Supreme Court has indicated that "[w]here ... a contract is complete in itself and, when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended. That intention cannot be determined from the surrounding circumstances, but must be gathered from a four-corners' examination of the instrument." *Lewis v. Sac & Fox Tribe of Okla. Hous. Auth.,* 896 P.2d 503, 514 (1994).

[16] After reviewing the April 7 written agreement, we agree that it constitutes a final, enforceable contract. The agreement sets forth in detail what it describes as the "essential terms" to which the parties agreed, including the nature of the relationship between the parties (i.e., that McCurdy "will become a Director and Consultant to ABGI" and that MG "will be granted an option to purchase" the stock of ABGI, Aplt.App. at 26), the term of the agreement (five years, subject to the right of either party to terminate), the services to be performed by MG on behalf of ABGI (e.g., establishing an office in the Washington, D.C. area, performing marketing activities), the compensation to be paid by ABGI to MG and McCurdy, [FN5] MG's option to purchase stock of ABGI, the conditions under which a party could terminate the agreement, and confidentiality and non-compete provisions. Perhaps most importantly, the agreement expressly states that it "supersedes all previous discussions and agreements and is the entire Agreement between the parties." Aplt.App. at 29. Lastly, the agreement contains the signatures of Burgess (on behalf of ABGI) and McCurdy (on behalf of MG).

FN5. The compensation provisions twice refer to a "Schedule 'A,' " which was apparently intended to outline in greater detail (a) what the agreed-upon "monthly office and staff overhead fee" would cover, and (b) what "out-of-pocket travel and business expenses" would be reimbursable. Aplt.App. at 27-28. Although Schedule A was not included with the agreement when signed, we are not persuaded that is sufficient to create an ambiguity in the agreement or to otherwise nullify the effect of the agreement.

*Discovery dispute--computer and disc drives*

[17] ABGI contends the district court abused its discretion in refusing to order MG to return to ABGI computer and disc drives that ABGI supplied to MG at the start of the parties' relationship. We apply an abuse of discretion standard in reviewing a district court's denial of a motion to compel discovery. *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1169 (10th Cir.2000).

*831 **7 During discovery, ABGI requested that MG "[p]roduce all computer disc drives, including back-up computer disc drives for plaintiff from 1995 to the present." Aplt.App. at 95. MG objected on the grounds that the request was "overly broad and unduly burdensome" and would require the disclosure of confidential communications (e.g., letters from MG to its counsel) and other communications unrelated to ABGI or the lawsuit. *Id.* at 99-100. Subject to these objections, MG agreed to produce a copy of the printouts from McCurdy's hard drive for nonprivileged documents related to ABGI, plus a zip drive of those same documents.

Dissatisfied with MG's response, ABGI moved to compel production of the computer disc drives. In support of its motion, ABGI asserted that it should be permitted to examine the disc drives to determine whether they contained any memoranda referring to Burgess' March 6, 1996, letter, which MG denied receiving. ABGI also asserted that it should be permitted to examine the disc drives to determine whether they contained any "memoranda or correspondence" to ABGI's competitors. *Id.* at 100-01. Finally, ABGI asserted that it was the owner of the computer equipment and that MG had agreed to return the equipment after the conclusion of the lawsuit. In its response, MG asserted that it had "produced a printout of all of the documents on Dave McCurdy's hard-drive which related to his work for ABGI," and had also granted ABGI permission to inspect a "zip-drive ... taken directly from Dave McCurdy's computer." Aplee.App. at 18. MG further asserted that it had agreed to produce the requested disc drives to a third party (Tri Logic Systems, Inc., of Grand Prairie, Texas) for inspection. *Id.* at 19-20. Finally, MG asserted that the disc drives contained "substantial information protected by the attorney- client and trade secret privileges." *Id.* at 20-21.

The magistrate judge denied ABGI's motion after a hearing. ABGI filed written objections to the magistrate judge's order. The district court denied ABGI's objections, concluding that ABGI had "failed to show that the [magistrate judge's] order was either clearly erroneous or contrary to law." Aplee.App. at 82. The district court noted that "the deadline for designation of trial exhibits ha[d] passed and [ABGI] failed to list the ... computer equipment as exhibits." *Id.*

[18] We are not persuaded the district court abused its discretion in denying ABGI's objections to the magistrate judge's order. ABGI has never explained, either in the district court or on appeal, why it should be allowed to conduct a physical inspection of MG's computer hard drive(s). Although ABGI was apparently skeptical that MG produced copies of all relevant and nonprivileged documents from the hard drive(s), that reason alone is not sufficient to warrant such a drastic discovery measure. Further, ABGI has not explained why inspection of the zip drive and/or inspection of the hard drive by Tri Logic would not have been sufficient to satisfy its concerns.

*No. 00-6332*

**8 [19][20] ABGI challenges the district court's post-trial award of attorney fees to MG. We generally review an award of attorney fees for abuse of discretion. *Chesapeake Operating, Inc. v. Valence Operating Co.*, 193 F.3d 1153, 1157 (10th Cir.1999). In doing so, we review de novo any statutory interpretation or other legal analysis underlying the district court's decision concerning attorney fees. *Id.*

The district court awarded fees to MG pursuant to Okla.Stat.tit. 12, § 936, which provides:
   *832 In any civil action to recover on an open account, a statement of account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, unless otherwise provided by law or the contract which is the subject to the action, the prevailing party shall

be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.

ABGI's primary contention on appeal is that MG's action (in particular its breach of contract claim) was not for "labor or services" as contemplated by § 936. In support of its contention, ABGI cites *Russell v. Flanagan*, 544 P.2d 510 (Okla.1975). In *Russell*, the plaintiff hired the defendant to service his sewer line for a fee of $24.50. Less than thirty days after the service, plaintiff experienced sewer line problems and requested that defendant return and perform additional work without charge, but defendant refused. Plaintiff filed a small claims action against defendant for "breach of warranty on labor contract." *Id.* The case proceeded to trial and a jury found in favor of defendant. Defendant subsequently moved for an award of attorney fees pursuant to § 936, but the request was denied. The Oklahoma Supreme Court agreed that fees were not available to the defendant under § 936. In doing so, the court interpreted § 936 narrowly, finding that the phrase "labor or services" fell "within the initial category of 'a civil action' " but not "the antecedent classification of a 'contract relating to.' " *Id.* at 512. According to the Oklahoma Supreme Court, "the addition of the phrase 'or for labor or services' by amendment to the statute in 1970 was intended by the legislature to be limited to those situations where suit is brought for labor and services rendered," and "an improper and unintended meaning would result if ... th[e] clause were construed to allow attorney fees in the all encompassing field of 'contracts related to ..., labor or services.' " *Id.*

Although *Russell* would appear at first glance to support ABGI's argument, the Oklahoma Supreme Court has since clarified its holding in *Russell*. In *Burrows Construction Company v. Independent School District*, 704 P.2d 1136 (Okla.1985), the court explained what was intended by the holding in *Russell*:

> It is the underlying nature of the suit itself which determines the applicability of the labor and services provisions of section 936. If the action is brought for labor and services rendered, the provisions of section 936 apply. If the nature of the suit is for damages arising from the breach of an agreement relating to labor and services the provisions of this section *do not necessarily apply*. The question is whether the damages arose directly from the rendition of labor or services, such as a failure to pay for those services, or from an aspect collaterally relating to labor and services, such as loss of profits on a contract involving the rendition of labor and services.

**9 *Id.* at 1138 (emphasis added and footnotes omitted). In accordance with this clarification, the Oklahoma Supreme Court has since held, for example, that attorney fees are recoverable under § 936 in a suit to recover the unpaid balance on a yellow pages advertising contract (the court having held that advertising is a "service"). *Southwestern Bell Tel. Co. v. Parker Pest Control, Inc.*, 737 P.2d 1186, 1187-88 (Okla.1987). Likewise, in *Strickland Tower Maintenance, Inc. v. AT & T Communications, Inc.*, 128 F.3d 1422, 1429 (10th Cir.1997), this court concluded attorney fees are recoverable under § 936 in a breach of contract action alleging that defendant failed to properly calculate the *833 amount of compensation owed to plaintiff for services it performed under the parties' written agreement.

[21] Based upon these authorities, it is clear that § 936 allowed for recovery of attorney fees in this action. The essence of MG's suit (including both its breach of contract and quantum meruit claims) was that it performed services for ABGI (i.e., marketing and business consulting services), but that ABGI failed to pay for those services. In other words, the damages alleged by MG arose directly from its rendition of services to ABGI, and not "from an aspect collaterally relating to labor and services." *Burrows*, 704 P.2d at 1138.

ABGI attempts to nitpick MG's breach of contract claim by arguing that the various components of damages recovered thereunder by ABGI were not for labor or services rendered. For example, ABGI attacks the components of the damage award which effectively constituted reimbursement for commissions due under the agreement and the retainer for overhead expenses due under the agreement. As the district court aptly noted, however, both of these items "were to be paid in exchange for acts collectively described in the contract as 'consulting and marketing services.' " Aplt.App. at 243. Thus, contrary to ABGI's assertions, these two items were integral components of the overall compensation package that MG was to be paid in return for services rendered to ABGI.

ABGI asserts several other arguments, none of which have merit. ABGI contends that MG "took the position that it was entitled to payment by ABGI for overhead fees, director's fees, travel expenses and commissions during the term of the alleged agreement, regardless of whether any services were rendered to ABGI and regardless of whether contracts

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

9 Fed.Appx. 822                                                                                              Page 14
(Cite as: 9 Fed.Appx. 822, *833, 2001 WL 536974, **9 (10th Cir.(Okla.)))

were obtained through [MG's] efforts." Aplt.Br. at 14. This contention is apparently based upon the fact that MG's complaint requested damages for the four-month period following the date the lawsuit was filed, even though MG performed no services for MG during at least three of those months. The contention is ultimately meritless, however, because, under the district court's instructions, MG was only allowed to recover damages for the time period that it actually performed services for ABGI. ABGI also complains that MG's complaint did not include a claim for quantum meruit, and that this claim was only added near the end of the litigation, based upon the district court's ruling that it would limit contractual damages to the 120-day period following ABGI's breach of the agreement. Regardless of when the claim was first raised, however, it is clear that the district court allowed it to go forward and the jury found in favor of MG on that claim. Thus, it can clearly be considered as one of the bases for an award of fees under § 936. ABGI contends that the damages awarded on the quantum meruit claim were not for labor or services rendered. This contention is patently incorrect. A review of the available portions of the trial transcript indicates that MG continued to perform marketing and consulting services for ABGI through the summer of 1997, and the jury obviously based its quantum meruit damage award on what it determined to be the reasonable value of those services.

**10 The judgment of the district court is AFFIRMED.

LUCERO, Circuit Judge, dissenting.

Because the majority's decision can not be squared with a clear reading of 41 U.S.C. § 254(a), and because I am concerned with the majority's summary dismissal of ABGI's challenge to the arrangement's legality, I respectfully dissent. Contrary to the majority, I conclude that *834 the record before us adequately demonstrates the illegality of the parties' agreement and thus would reach and consider the question of the legality of contingent fee arrangements with selling agents to obtain government contracts. On my review of the record, I conclude there was no legally sufficient evidentiary basis for the jury to find that McCurdy Group fell under § 254(a)'s exception for bona fide established selling agencies as the exception traditionally has been understood.

I

A. Judicial Beginnings

The broad and long-standing policy against contingent fees was articulated by the Supreme Court in *Providence Tool Co. v. Norris,* 69 U.S. (2 Wall.) 45, 54-56, 17 L.Ed. 868 (1864). The prohibition promoted efficiency by preventing the use of personal influence in obtaining public contracts; in the Court's view, the rule was fundamental to good government. [FN1] According to the Court's precedent, it was irrelevant that improper influence was not exerted in a given case, for " '[t]he objection to [contingent fee arrangements] rests in their tendency, not in what was done in the particular case.... The court will not inquire what was done. If that should be improper it probably would be hidden, and would not appear.' " *United States v. Miss. Valley Generating Co.,* 364 U.S. 520, 550 n. 14, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961) (quoting *Hazelton v. Sheckels,* 202 U.S. 71, 79, 26 S.Ct. 567, 50 L.Ed. 939 (1906)).

> FN1. In *Providence Tool*, the Court observed that contingent fee arrangements "tend to introduce personal solicitation and personal influence, as elements in the procurement of contracts; and thus directly lead to inefficiency in the public service, and to unnecessary expenditures of the public funds." 69 U.S. (2 Wall.) at 54. The matter was put more bluntly in *Meguire v. Corwine,* 101 U.S. 108, 111-12, 25 L.Ed. 899 (1879) (internal citations omitted):
> The law touching contracts like the one here in question has been often considered by this court, and is well settled by our adjudications.... Frauds of this class to which the one here disclosed belongs are an unmixed evil. Whether forbidden by a statute or condemned by public policy, the result is the same. No legal right can spring from such a source. They are sappers and miners of the public welfare, and of free government as well. The latter depends for its vitality upon the virtue and good faith of those for whom it exists, and of those by whom it is administered. Corruption is always the forerunner of despotism.

The exception for established commercial or selling agencies maintained by the contractor for the purpose of securing business was first recognized in *Oscanyan v. Arms Co.,* which distinguished "contingent compensation in the obnoxious sense of that term" from "rates established by merchants for legitimate services in the regular course of business"--in other words, "the ordinary brokerage commission." 103 U.S. 261, 276, 26 L.Ed. 539 (1880). The exception was a narrow one and applied only to contingent fees "allowed by established custom of commission

merchants and brokers." [FN2] *Id.*

> FN2. Subsequently, the Supreme Court, through Justice Holmes, reaffirmed its approval of the public policy against contingent fee arrangements:
> The general principle was laid down broadly in *Providence Tool Co. v. Norris* that an agreement for compensation to procure a contract from the government to furnish its supplies could not be enforced, irrespective of the question whether improper means were contemplated or used for procuring it. And it was said that there is no real difference in principle between agreement to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of departments. [We have] said that all contracts for a contingent compensation for obtaining legislation [a]re void.... *Hazelton*, 202 U.S. at 79, 26 S.Ct. 567 (internal citations omitted); *see also Miss. Valley Generating*, 364 U.S. at 550 n. 14 (citing *Hazelton* with approval); *ACME Process Equip. Co. v. United States*, 171 Ct.Cl. 251, 347 F.2d 538, 548 (Ct.Cl.1965) ("Though the uncompromising rule stated in the *Norris* case has been tempered in the intervening years ..., its basic rationale was accepted and elaborated by Mr. Justice Holmes, speaking for a unanimous court...."); *Bradley v. Am. Radiator & Standard Sanitary Corp.*, 6 F.R.D. 37, 40 (S.D.N.Y.1946) ("The language of the Supreme Court in the *Providence Tool Co.* and *Hazelton* cases is explicit and rather sweeping.").

*835 B. Executive Actions

Covenants against contingent fees were included in government procurement contracts as a matter of course beginning in World War I . [FN3] At the start of World War II, Executive Order 9001 required that all military procurement contracts include a warranty that the contractor "has not employed any person to solicit or secure this contract upon any agreement for a commission, percentage, brokerage, or contingent fee." Exec. Order No. 9001, 1941 U.S.Code Cong.Serv. 992, 994 (Dec. 27, 1941). Excepted from the Order's warranty requirement were "commissions payable by contractors upon contracts or sales secured or made through bona fide established commercial or selling agencies maintained by the contractor for the purpose of securing business." *Id.*

> FN3. *ACMA Process Equip.*, 347 F.2d at 549 n. 10 (citing Barron & Munves, *The Government Versus the Five-Percenters: Analysis of Regulations Governing Contingent Fees in Government Contracts*, 25 Geo.Wash.L.Rev. 127 (1957)).

**11 The Executive Order's prohibition and its exception broke no new ground. Its purpose was plain: "it reflect[ed] the public policy long enunciated by the courts, and add[ed] to it a thrust comparable to that of statutory law." *Le John Mfg. Co. v. Webb*, 222 F.2d 48, 50 (D.C.Cir.1955); *United States v. Paddock*, 178 F.2d 394, 396 (5th Cir.1949) ("Executive Order No. 9001 was a declaration of public policy, and its purpose was to preserve the contractual integrity of the United States.").

In interpreting the exception to the warranty requirement, courts properly focused on its purpose and plain language. *See Reynolds v. Goodwin-Hill Corp.*, 154 F.2d 553, 555 (2d Cir.1946) (L.Hand, J.); *see also Paddock*, 178 F.2d at 395-96. As the Second Circuit put it, the exception for "bona fide commercial or selling agencies maintained by the contractor for the purpose of securing business" created a "privileged class who may receive contingent fees for securing government contracts, while others may not." *Bradley v. Am. Radiator & Standard Sanitary Corp.*, 159 F.2d 39, 40, 41 (2d Cir.1947) (per curiam). "Not only should grants of special privileges be jealously restricted, but such a restriction is also in the interest of maintaining the integrity of governmental contracting procedure." *Id.* at 41.

C. Congressional Enactment

Congress made the prohibition on contingent fees a matter of statutory law with the passage of the Armed Services Procurement Act of 1947, ch. 65, § 4, 1947 U.S.Code Cong.Serv. 20, 22, and the Federal Property and Administrative Services Act of 1949, ch. 288, § 304(a), 1949 U.S.Code Cong.Serv. 372, 388- 89. Pursuant to the latter enactment, 41 U.S.C. § 254(a) states:

> Every contract awarded after using procedures other than sealed-bid procedures shall contain a suitable warranty, as determined by the agency head, by the contractor that no person or selling agency has been employed or retained to solicit or secure such contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the *836 contractor for the purpose of securing business.... The Congressional Reports on the Federal Property and Administrative Services Act are mostly silent regarding the propriety of contingent fees. However, it is noteworthy that § 254(a) was enacted against the

backdrop of a late 1940s Congressional investigation of the unlawful activities of "five-percenters" and "influence peddlers." [FN4] A resulting Senate Report concluded that the "modus operandi of these individuals differed, but basically they had one thing in common--the commodity they had for sale was collusion with Government officials. The mere existence of such a condition tends to destroy good government." S.Rep. No. 81-1232, at 1 (1950). Based on the Congressional investigation, the report listed a number of tests that were considered relevant in distinguishing "bona fide representatives" from "influence peddlers." [FN5]

> FN4. For a discussion of the quoted terms, see Subcomm. on Investigations, Comm. on Expenditures in the Executive Dep'ts, *The 5-Percenter Investigation*, S.Rep. No. 81-1232, at 3-5 (1950).

> FN5. S.Rep. No. 81-1232, at 3-5, listed a number of factors, including the following:
> (1) "The 5-percenter emphasizes whom he knows and attempts to create the impression that to be successful in dealing with the government you must know the right people." *Id.* at 5.
> (2) "Generally, the 5-percenter will discuss in some detail how he succeeded in other cases in defeating his client's competitors by knowing just where to exert the proper pressure." *Id.*
> (3) "Usually he will apply the social technique to the problem to impress the client." *Id.*

D. Regulatory Gloss

**12 Federal regulations issued pursuant to the Federal Property and Administrative Services Act give meaning to the exception for bona fide established commercial or selling agencies. According to 48 C.F.R § 3.401, "bona fide agency"
> means an established commercial or selling agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence.

"Improper influence" is defined as "any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter." *Id.*

A regulation provides a number of tools to be used in "determining whether an agency is a 'bona fide established commercial or selling agency maintained by the contractor for the purpose of securing business.' " 41 C.F.R. § 101- 45.313-4(e)(2). It acknowledges that the factors
> are necessarily incapable of exact measurement or precise definition and it is neither possible nor desirable to prescribe the relative weight to be given any single factor as against any other factor or as against all other factors. The conclusions to be reached in a given case will necessarily depend upon a careful evaluation of the agreement and other attendant facts and circumstances.

*Id.*

II

The party wishing to invoke the § 254(a) exception for established commercial or selling agencies bears the burden of showing that it applies. *See Bradley*, 159 F.2d at 40. The exception requires more than the existence of an agency relationship that sells. *Puma Indus. Consulting Inc. v. Daal Assocs., Inc.*, 808 F.2d 982, 985 (2d Cir.1987); *cf. Reynolds*, 154 F.2d at 555. *837 A contrary reading would render meaningless the general prohibition that "no person or selling agency [be] employed or retained ... upon [a] ... contingent fee." 41 U.S.C. § 254(a).

McCurdy Group correctly suggests that 41 C.F.R. § 101-45.3134(e)(2) provides useful tools for making this determination, but our evaluation must take into account the historical backdrop against which 41 U.S.C. § 254(a) and the relevant regulations were promulgated. *Cf. Puma Indus.*, 808 F.2d at 985. In light of that history, I conclude that the exception for established commercial or selling agencies carries a specific meaning. It contemplates a relationship that by its very nature does not pose a special risk that improper influence will be exerted. [FN6] Counted in the class of established commercial or selling agents are the man who sells cars for an auto dealership, the woman who sells hardware at a major department store, and the college student who sells mobile telephones at an electronics shop. When the exception applies, there is by no means a complete absence of temptation to cheat, defraud, or connive, but that risk is tolerably low.

> FN6. The majority notes that this legal conclusion "cannot provide a basis for reversal in this case" because the "theory ... has never been propounded by defendant, either in the district court or on appeal, and the jury was never instructed on it." Slip op. at ---- n. 4. I disagree and make some general

observations.

As a preliminary matter, failure to object to a jury instruction in the district court does not necessarily foreclose its review on appeal. *See Zimmerman v. First Fed. Sav. & Loan Ass'n*, 848 F.2d 1047, 1054 (10th Cir.1988) ("Therefore, '[t]his court will not review instructions given to which no objections were lodged before the jury retired for deliberation unless they are patently plainly erroneous and prejudicial.' ") (quoting *Moe v. Avions Marcel Dassault-Breguet Aviation*, 727 F.2d 917, 924 (10th Cir.1984)).

As we have said in another context, "[p]arties to a dispute cannot stipulate to the law and assume that the court will follow blindly an incorrect interpretation of the law." *Carlile v. S. Routt Sch. Dist. Re-3J IN*, 739 F.2d 1496, 1500 (10th Cir.1984). This is particularly true when a case primarily involves a matter of high public importance. *Cf. Sussman v. Patterson*, 108 F.3d 1206, 1210 (10th Cir.1997) (considering the importance of public policy in reaching the merits of issue not raised in the district court). Unlike run-of-the-mill contract cases, which predominantly implicate the rights and obligations of private parties, we are dealing with a broad and long-standing policy intended to protect the integrity of public institutions.

**13 The jury, in considering the evidence before it, could have found that the parties' arrangement fit 41 C.F.R. § 101-45.313 4(e)(2)'s description of a bona fide established commercial or selling agency maintained by the contractor for the purpose of securing business. That circumstance can not be dispositive, for, as we have seen, the record evidence must be considered in light of the public policy served by § 254(a)--the prohibition on the use of improper influence . [FN7]

> FN7. *Cf. Puma Indus.*, 808 F.2d at 985 ("The consideration and application of these enumerated factors can be meaningful only in light of the policies underlying § 254(a)."); 48 C.F.R. § 3.408- 2(c) (1995) ("However, the guidelines are not individually or collectively inviolable rules. The contracting officer must evaluate each arrangement in its totality, including attendant facts and circumstances.").

The record on appeal is sufficient for us to conclude that the evidence points in only one direction--the parties' relationship by its very nature posed a special risk that improper influence would be exerted. During trial, McCurdy testified:

> Q. And, in fact, even before you and Jim signed what I call the letter of intent, you arranged meetings between Mr. Burgess and government officials in Washington; correct?
> A. Yes, sir.
> *838 ....
> Q. And you told Jim, among other things, did you not, that you felt you could gain access to critical decision makers at a higher level than ABGI had been dealing with up to that time.
> A. Well, I believe I proved that in our first meetings.
> (Appellant's App. at 234-35.)

In a memorandum prepared by McCurdy entitled "Ten Reasons why the Burgess/McCurdy Team is a Winner," Reason No. 2 stated: "Two great minds are better than one! Combine vision, skills and contacts to make a successful partnership." (*Id.* at 329.) Reason No. 8 stated: "McCurdy's access to the Administration, Congress and other key officials is invaluable." (*Id.* at 330.) Asked about that document during trial, McCurdy stated that he

> had contacts and knew people across the nation in both--in all the areas that we were looking at, whether it was the Department of Defense, Veterans Affairs, or the private sector, including the investment community.... Q. Well, that's right. McCurdy's access to the administration, Congress and other key officials is invaluable, you said; right?
> A. That's in addition to. Yes.
> ....
> Q. Which administration are we talking about here when it says you had access to the administration? Which one?
> A. The term, "administration" refers to the current administration.
> Q. Which was what?
> A. The Clinton Administration.
> ....
> Q. Did you tell Jim Burgess that some of these officials owed you favors?
> A. Nope. Absolutely not. None of them owe me favors. There are no favors.
> (*Id.* at 238, 240.) In a memorandum dated January 2, 1996, McCurdy wrote:
> I also spoke to Senator Al Simpson from Wyoming who is the chair of the Veteran's Committee. He is a friend and I want to get the cost comparisons to him at some point to put the political pressure on the department. Once we get real numbers from both DOD and VA, we can mount a serious effort to get Congress engaged in "saving money".
> (*Id.* at 355A.)

Based on McCurdy's testimony, I conclude that McCurdy Group did not fit the statutory exception to

the contingent fee prohibition. The parties' contract contemplated exploitation of McCurdy's influence, including his valuable contacts, gained during his years in public service. We must keep in mind that "[i]t is the threat of persons selling government influence or access to government officials" that 41 U.S.C. § 254(a) protects against. *Puma Indus.*, 808 F.2d at 985. "[A] restrictive approach ... is necessary in order to prevent the excepting clause from utterly defeating the purpose and effect of the warranty itself." *Le John Mfg.*, 222 F.2d at 51. It is of no consequence that, in addition to using his contacts, McCurdy also pitched ABGI's services on the merits. Selling on the merits when the agency contract contemplated exertion of improper influence does not cure the contract's infirmity. *See Miss. Valley Generating*, 364 U.S. at 550 & n. 14, 81 S.Ct. 294; *Hazelton*, 202 U.S. at 79, 26 S.Ct. 567. Thus, I would hold that the contingent fee arrangement violated public policy and was unenforceable.

III

**14 Under Tenth Circuit Rule 10.1(A)(1)(a), appellant must provide the Court "the entire relevant trial transcript" when the sufficiency *839 of the evidence is challenged. Pursuant to that provision, the majority holds that "ABGI's failure to provide a complete copy of the trial transcript prevents our review" and summarily dismisses ABGI's challenge to the arrangement's legality. Slip op. 13. For the reasons previously expressed, I believe the record before us amply demonstrates the illegality of the parties' agreement, and it is without reservation that I respectfully dissent.

9 Fed.Appx. 822, 2001 WL 536974 (10th Cir.(Okla.)), 2001 DJCAR 2510

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
52 Fed.R.Serv.3d 1406
(Cite as: 2002 WL 385566 (N.D.Ill.))

Page 19

United States District Court, N.D. Illinois, Eastern Division.

Shirley STALLINGS-DANIEL Plaintiff,
v.
THE NORTHERN TRUST COMPANY, Defendant.

No. 01 C 2290.

March 12, 2002.

MEMORANDUM OPINION AND ORDER

MASON, Magistrate J.

*1 Employment discrimination plaintiff Shirley Stallings-Daniel has filed a motion asking that we reconsider our order denying her use of an expert to conduct so-called "electronic discovery" of defendant The Northern Trust Company's e-mail system. Stallings-Daniel originally argued that some of the e-mails defendant produced to her in hard copy in response to her document requests appeared incomplete, either because they did not show the entire chain of recipients or because they referred to other e-mails she did not think she had. We denied her request because it was supported by nothing more than speculation that defendant had somehow altered its e-mails before producing them. Additionally, defendant agreed to search its archives to try to determine if any of the supposedly missing e-mails existed.

In support of her motion for reconsideration, plaintiff argues that she has recently become aware of "new" information that adds weight to her speculation that the defendant has altered some of its e-mail documentation before producing it. This "new" information is her discovery that in a previous employment discrimination case (the Madura case) involving another employee and different counsel for both plaintiff and defendant, Northern Trust redacted several documents it produced to the EEOC and did not identify them as redacted. During that lawsuit, Northern Trust produced the unredacted documents to the plaintiff some time after it produced the redacted ones. Plaintiff here argues that since the individual who redacted the documents in the previous case--Richard Bordelon--also produced documents to the EEOC in this case, then certain "suspicious" e-mails produced to the plaintiff very possibly were altered before production. [FN1]

FN1. Plaintiff wishes to conduct electronic discovery on four specific documents: promotion lists, an e-mail concerning a performance review update discussion between the plaintiff and her supervisor, a memo discussing plaintiff's reaction to the update discussion, and the "predicate" for that memo, by which we assume the plaintiff means the request from another of plaintiff's supervisor's for information about plaintiff's review.

None of plaintiff's evidence supports her speculations about the documents she wishes to have examined by electronic discovery. Plaintiff wishes to have us review the discovery history of a settled case that was before a different judge and hold that because defendant may have committed some sort of discovery abuse there [FN2], it must also be guilty of similar conduct here, justifying electronic discovery for documents she is not sure even exist. Even if we did find that defendant had acted questionably in the Madura case, none of the documents plaintiff wishes to have examined here were produced by Bordelon, the individual responsible for the Madura redaction. Further, defendant both explains the events that led to the redactions in the Madura case, and also reconstructs the chain of e-mails already produced to the plaintiff to demonstrate to her that none are missing.

FN2. Absent any court decision detailing and discussing defendant's actions in the previous case, we decline to form any opinion on its alleged activity. Stallings-Daniel's attorney submitted an affidavit setting forth her discussion with the Madura plaintiff's attorney, which stated that upon learning of the redaction, Magistrate Judge Ashman appeared "angry and upset". This third party recitation of another's judge's perceived attitude on the bench is hardly evidence to support a finding that defendant committed discovery abuse.

Finally, plaintiff deconstructs some of the documents Bordelon produced to the EEOC in this case to try to prove that he was again "guilty" of misleading the EEOC by producing incorrect documents (and thus, she deserves electronic discovery of unrelated documents). After examining the documents in question, the EEOC's requests, Bordelon's responses and his affidavit, we are not convinced that Bordelon provided misleading information to the EEOC. Any questions plaintiff has about the documents and the format in which they were created and produced should have been addressed during her deposition of

Not Reported in F.Supp.2d
(Cite as: 2002 WL 385566, *1 (N.D.Ill.))

Page 20

Bordelon. Nothing in the documents produced justifies an intrusive and wholly speculative *electronic investigation into defendant's e-mail files.* Thus, plaintiff's motion for reconsideration is denied. It is so ordered.

2002 WL 385566 (N.D.Ill.), 52 Fed.R.Serv.3d 1406

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2000 WL 1620915
(Cite as: 2000 WL 1620915 (S.D.Ohio))

Page 1

Only the Westlaw citation is currently available.

United States District Court, S.D. Ohio, Eastern Division.

Jamshid SABOURI, Plaintiff,
v.
OHIO BUREAU OF EMPLOYMENT SERVICES, et al., Defendants.

No. 2:97-CV-715.

Oct. 24, 2000.

OPINION AND ORDER

KING, Magistrate J.

*1 Plaintiff, an employee of the Ohio Department of Job and Family Services ["ODJFS"], [FN1] brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*, the Equal Pay Act, 29 U.S.C. § 206, and 42 U.S.C. § 1983, alleging that defendants discriminated against him because of his race, ethnicity and age and retaliated against him because he had previously filed a complaint with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission. Plaintiff names as defendants ODJFS, agency managers Michael Valentine, Carol Brigham, and Marijo Green; supervisors Jim Adams and Pablo Nunez; and Joan Palmer, Personnel Officer. This matter is before the Court on plaintiff's motions for leave to amend the complaint and to compel discovery.

> FN1. When plaintiff initially filed the complaint, his employer was denominated as the Ohio Bureau of Employment Services ["OBES"]. The agency's designation has since changed to Ohio Department of Job and Family Services.

I. Amendment of the Complaint

A. Standard

In a motion filed June 23, 2000, plaintiff asks for leave to amend the complaint. Fed.R.Civ.P. 15(a) governs amended pleadings and provides, in relevant part:
> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend the party's pleading only by leave of court ... and leave shall be freely given when justice so requires.

Rule 15 reinforces the principle that cases "should be tried on their merits rather than the technicalities of pleadings." *Tefft v. Seward*, 689 F.2d 637, 639 (6 th Cir.1982). "The decision as to whether justice requires the amendment is committed to the district court's sound discretion." *Moore v. City of Paducah*, 790 F.2d 557, 559 (6 th Cir.1986). Among the factors which the court should consider in determining whether a party should be permitted to amend a complaint are undue delay in filing, lack of notice to the opposing party, bad faith by the movant, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 591 (6th Cir.1990). In the absence of any of the above-mentioned factors, and if the underlying facts or circumstances upon which the plaintiff relies may be a proper subject for relief, the plaintiff should be afforded the opportunity to amend his complaint. *Foman v. Davis*, 371 U.S. at 182.

B. Application

Although plaintiff has designated his motion as one for leave to amend the complaint, his request is actually one to supplement the complaint. In his proposed pleading, plaintiff names two additional defendants, James Matthews, former Employment Services Acting Director, and Dwight Garner, former Assistant to the Employment Services Director. Plaintiff seeks to assert against these two new defendants claims of retaliation, obstruction of justice, and failure to hear a grievance. Plaintiff further alleges that Matthews and Garner are involved in the conspiracy to which plaintiff refers in the original and first amended complaints. Plaintiff also seeks to add a claim of defamation against defendants Adams, Matthews and Garner. Plaintiff argues that he should be permitted to amend the complaint a second time because the events alleged in the proposed amended complaint, which related to issues in the original and amended complaints, either arose after the filing of the first amended complaint or were discovered by plaintiff in March 2000.

*2 Defendants contend that plaintiff's motion to amend the complaint a second time should not be granted for several reasons. First, defendants argue that plaintiff should have alleged these facts in the

2000 WL 1620915
(Cite as: 2000 WL 1620915, *2 (S.D.Ohio))

Page 2

first amended complaint. Second, defendants object on the grounds that this litigation is three years old and that their motion for summary judgment on all claims presented in the original complaint has been pending since October 20, 1999. Third, defendants argue that the grant of plaintiff's motion would subject them to additional frequent, burdensome and overly broad discovery requests and would further delay the resolution of the merits of the case. Finally, defendants argue that it is within the Court's discretion to refuse to allow plaintiff to amend his complaint because he has previously amended the original complaint, and because the proposed second amended complaint is verbose, repetitive, confusing, asserted for coercive and improper purposes, and fails to meet the requirements of Fed.R.Civ.P. 8.

The Court will first address plaintiff's claim that Adams defamed him via the Internet and that Matthews and Garner conspired with Adams by allowing him to use state resources in order to disseminate his allegedly defamatory e-mail messages. Plaintiff contends that he did not discover that Adams had made these allegedly defamatory statements until March 2000, during discovery relating to claims asserted in the first amended complaint. *Proposed Amended Complaint.*, at 5-6. Defamation is a state law claim and does not give rise to a constitutional claim actionable under 42 U.S.C. § 1983. *Paul v. Davis*, 424 U.S. 693, 711-12 (1976). Because a "federal court cannot entertain a lawsuit against state officials for violations of state law unless the state has waived its immunity under the Eleventh Amendment," and because it does not appear that Ohio has waived that immunity in this action, the Court lacks jurisdiction to hear plaintiff's proposed defamation claim. *See Turker v. Ohio Dep't of Rehabilitation and Correction*, 157 F.3d 453, 457 (6 th Cir.1998).

The Court will now address the remainder of plaintiff's proposed new claims of retaliation, obstruction of justice, and refusal to hear a grievance. Plaintiff alleges that he was subjected to a pre-disciplinary investigation on December 3, 1999, *i.e.*, after he filed the first amended complaint. *Proposed Amended Complaint,* at 3. It has further been alleged that Matthews prevented Dale Lehmann, ODJFS legal counsel, from writing the pre-disciplinary investigation report until some time following that hearing, *Id.*, and Garner did not issue the written reprimand regarding the matter until January 18, 2000. *Id.*, at 4. Plaintiff filed a grievance about these events on January 27, 2000. *Id.*, at 5. Although the proposed new claims based on these alleged events arose in early December 1999 through January 2000, plaintiff waited until April 13, 2000, to file the motion seeking leave to amend the complaint. The Court concludes that plaintiff unreasonably delayed the filing of the motion to further amend the complaint.

*3 Delay alone is not a sufficient basis upon which to deny a motion to amend, however. *Janikowski v. Bendix Corp.*, 823 F.2d 945 (6 th Cir.1987); *Brennan v. Arkay Industr., Inc.*, 164 F.R.D. 464, 466 (S.D.Ohio 1996). "There must be at least some significant showing of prejudice to the opponent if the motion is to be denied." *Brennan*, 164 F.R.D. at 466. *See also Janikowski*, 823 F.2d 945. Defendants argue that the grant of the motion to further amend would prejudice them because this litigation is three years old, because their motion for summary judgment on all claims presented in the original complaint has been pending since October 20, 1999, because plaintiff would propound further burdensome and overly broad discovery requests upon them, and because resolution of the merits of the case would be further delayed. The Court notes that, during the pendency of plaintiff's motion to amend, the discovery completion date has lapsed. Grant of plaintiff's motion to amend would necessitate a reopening of the discovery process and would further delay the resolution of this litigation. This, in turn, would undermine the viability of defendants' pending motion for summary judgment. Under the particular facts presented, the Court concludes that plaintiff has unreasonably delayed seeking leave to further amend the complaint, and that defendants would be unreasonably prejudiced should the motion be granted. The Court therefore concludes that its discretion is better exercised by denying the motion for leave to further amend the complaint.

II. Motion to Compel Discovery

On November 24, 1999, plaintiff was granted leave to file a supplemental complaint to assert claims of retaliation and hostile work environment that allegedly arose after the filing of the original complaint. *Order* (November 24, 1999). The supplemental complaint was filed on December 3, 1999. The Court granted plaintiff leave to conduct discovery relating to the claims asserted in the supplemental complaint. *Order* (February 16, 2000). All discovery was to be completed by April 15, 2000. *Id.*

On March 29, 2000, plaintiff requested that defendants produce a printout of the file directories for the computers used by ten employees or former employees of ODJFS. [FN2] *Exhibit A attached to Defendants' Memorandum contra Plaintiff's Motion to Compel.* This request included those files generated on the GroupWise, Word and Corel WordPerfect programs. In a letter dated March 29, 2000, defense counsel responded that plaintiff's request was unreasonable, overbroad, and burdensome, *Exhibit 4 attached to Plaintiff's Motion to Compel Discovery,* and defense counsel suggested that plaintiff narrow his discovery requests. *Id.* On April 3, 2000, in a letter to defense counsel, plaintiff limited his discovery requests to all computer communications in the specified programs that concerned allegations by Brigham, Adams and Jennie Arnold against plaintiff, all disciplinary or investigatory reports concerning plaintiff, and all communications in regard to plaintiff's assignments, evaluations and complaints. *Exhibit 5 attached to Plaintiff's Motion to Compel Discovery.* In response, defense counsel requested that plaintiff indicate which particular documents he desired. *Exhibit 6 attached to Plaintiff's Motion to Compel Discovery.* Plaintiff suggested that, if defendants provided him with a copy of the file directories for each of the named individuals, plaintiff would mark which documents he sought. *Exhibit 7 attached to Plaintiff's Motion to Compel Discovery.* Plaintiff indicated, further, that the directories should include the period of time covered by the amended complaint and should reflect the file name, and the date and time each document was created or modified. *Id.* On April 12, 2000, defense counsel sent plaintiff a letter which included printouts of computer file directories; counsel also advised plaintiff that he should specify which documents he would like copied from the individuals' computers. *Exhibit E attached to Defendants' Memorandum contra Plaintiff's Motion to Compel.* After receiving plaintiff's request for specific files, defense counsel sent those documents to plaintiff on April 24, 2000. *Exhibit F attached to Defendants' Memorandum contra Plaintiff's Motion to Compel.* However, plaintiff did not receive some of the requested documents because, according to defense counsel, they had been deleted from the computers. *Id.*

> FN2. Plaintiff sought the computer file directories relating to the computers used by James Adams, Carol Brigham, Gail Gilbert, Dwight Garner, James Matthews, Melissa Delisio, Ted Durkee, Dale Lehmann, Janice Viau, and Jerry Lehman.

*4 Plaintiff also requested that defendants produce a complaint about plaintiff filed by James Adams with the city prosecutor's office. *Exhibit 9 attached to Plaintiff's Motion to Compel Discovery.* Defense counsel refused and suggested that plaintiff obtain a copy of the complaint from the city prosecutor's office. *Exhibit 10 attached to Plaintiff's Motion to Compel Discovery.* In a letter dated April 10, 2000, plaintiff replied that the city prosecutor's office had referred him to Adams or his attorney. *Exhibit 11 attached to Plaintiff's Motion to Compel Discovery.* Defense counsel then sent a letter, dated April 12, 2000, informing plaintiff that he needed to send a letter to Steven McIntosh at the city prosecutor's office, requesting a copy of the complaint. *Exhibit E attached to Defendants' Memorandum contra Plaintiff's Motion to Compel.*

On April 14, 2000, one day prior to the discovery deadline, plaintiff filed the motion to compel discovery. Plaintiff seeks to compel defendants to produce the complaint filed by James Adams with the city prosecutor's office. [FN3] Plaintiff also seeks to compel the production of printouts of specific file directories. Specifically, plaintiff seeks the production of a printout of the GroupWise e-mail directories for Durkee, Dale Lehmann, James Adams and Jerry Lehman, [FN4] the WordPerfect or Corel WordPerfect file directories for each of the ten mentioned individuals, and the WordPerfect, Word, Corel WordPerfect, and GroupWise e-mail directories for Lin Williams from the date that he replaced Janice Viau. Plaintiff argues that defendants are capable of retrieving from the system server or backup files any deleted files; if they are not, plaintiff seeks sanctions against defendants for destruction of the requested documents. Finally, plaintiff requests an extension of time in which to complete this discovery.

> FN3. Although plaintiff complains in his memorandum in support of the motion to compel that he received such "ambiguous and fruitless" responses from the three individuals deposed that he cancelled the remaining scheduled depositions, and that the documents examined on April 6, 2000 were so disorganized that he only examined them for one hour and twenty minutes instead of the three hours allotted to him, plaintiff does not seek to compel discovery in regard to these requests.

> FN4. Plaintiff seeks a printout of Durkee's e-mail directory because defendants have not produced it. *Response to Defendants' Memorandum contra Plaintiff's Motion to Compel Discovery,* at 6.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

2000 WL 1620915
(Cite as: 2000 WL 1620915, *4 (S.D.Ohio))

Page 4

> Furthermore, according to plaintiff, he seeks complete printouts of the e-mail directories of Dale Lehmann, James Adams, and Jerry Lehman because the lists provided were incomplete. *Id.*

Defendants oppose the motion to compel on several grounds. First, defendants complain that plaintiff filed the motion to compel before their time to respond to the discovery requests had lapsed. [FN5] They also argue that plaintiff ignored defense counsel's caution that it would take time to respond to such a voluminous and burdensome request. Defendants further contend that they have provided plaintiff with all the information they possess regarding the claims in his amended complaint, and that the information which plaintiff seeks to compel would be cumulative and duplicative. In regard to the requested complaint allegedly filed with the city by James Adams, defendants contend that plaintiff was informed repeatedly that the complaint was a public record in the possession of the Columbus City Prosecutor's office and would be available to him upon written request. Defendants maintain that it is not their responsibility to provide plaintiff a public record. Finally, defendants request guidance from the Court in limiting the type, manner and number of plaintiff's discovery requests.

> FN5. The request was delivered on March 29, 2000, and plaintiff filed the motion to compel on April 14, 2000.

*5 The Court will first address plaintiff's motion to compel in regard to the complaint filed by defendant Adams with the Columbus City Prosecutor's office. Fed.R.Civ.P. 34 requires production of a document that is in the "possession, custody or control" of a party; the fact that the document may also be available from another source is irrelevant. If defendants are in possession of the requested document, they must produce it to plaintiff within ten (10) days.

Plaintiff also requests production of complete printouts of file directories from the computers used by several individuals for the period October 1998 through January 31, 1999. Although plaintiff is entitled to view files that relate to him or to the claims or defenses asserted in this action, he has no right to rummage through the computer files of the defendants. Plaintiff's discovery request is not so limited, and his motion to compel is therefore denied in this respect.

Plaintiff also specifically requested several computer files from printouts provided by defendants, which they contend are no longer available because the files have either been deleted or destroyed. The affidavit of the network service technician who searched for the directories specifically advises that Adams' personal computer was searched for the documents requested by plaintiff and that those documents were not found. *Affidavit of Donna Tingle* ¶ 10. Tingle further states, "If the memos had been deleted, then I would not have been able to access said memos." *Id.* However, defendants have not explained to the Court that these documents are, in fact, not available. Defendants must provide to the Court, within ten (10) days, an affidavit from Donna Tingle, or another qualified person, explaining whether defendants are unable to access copies of these files from the system server or from backup files.

III. Conclusion

Plaintiff's motion for leave to amend the complaint is DENIED. Defendants may have ten (10) days in which to explain by appropriate affidavit whether certain computer files are in fact inaccessible.

2000 WL 1620915, 2000 WL 1620915 (S.D.Ohio)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works